IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| Timothy Armstrong, Wanda Armstrong, ) | CIV.  C07-4107 |
| Todd Atenhan, Todd Atenhad IRA, ) | |
| Todd Atenhand SEP, Aaron Baart, Nicole Baart, ) | |
| Todd Bartman, Juliann Bartman, ) | |
| Jeffrey J. Benedict, Dennis Bertilson, ) | |
| Thomas Blauwet, Kim Blauwet, Clarence Boer, ) | |
| Karyn Boer, Jason A. Boer, Alvin Bylsma, ) | |
| Gene Collins, William Corcoran, Jack Corcoran, ) | |
| Michael P. Corcoran, Randy Cramer, ) | |
| Lenora Davelaar, Earl DeBey, Paul DeBey, ) | COMPLAINT AND |
| Karmin DeBey, Dan DeRoon, Arline DeRoon, ) | JURY DEMAND |
| Derrick DeRoon, Larry Dirksen, Gloria Dirksen, ) | |
| James R. Ellis, Ruth Ann Ellis, ) | |
| Ken Emmelkamp, Ardene Emmelkamp, ) | |
| Audrey Eppinga, Sydney Eppinga, Ben Eppinga, ) | |
| Robbin D. Eppinga, Sara K. Eppinga, ) | |
| Scott Eppinga, Nathan Fichter, Robert Fleming, ) | |
| Gary Harmelink, John Harmelink, Brent Hella, ) | |
| Bruce Hella, Kevin Hoogendoorn, ) | |
| Janelle Hoogendoorn, Peter Hoogendoorn, ) | |
| Connie Hoogendoorn, Hoogendoorn Construction, ) | |
| Robert Van't Hul, Leroy Intveld, Wanda Intveld, ) | |
| Keith Johs, John Jones, Linda Jones, Paul Kats, ) | |
| Blake Kerbaugh, Mary Kerbaugh, Kyle Koedam, ) | |
| Roger Koedam, Muriel Koedam, Bruce Kooima, ) | |
| Linda Kooima, Clarence Kooima, Winifred Kooima, ) | |
| Tim R. Kooima, Clarine Kooima, Kenneth Krieg, ) | |
| Sandy Krieg, Glenn Lange, Cheryl Lange, ) | |
| Jason D. Liles, Scott J. Lyftogt, Kim M. Lyftogt, ) | |
| Damon Maassen, Dave Maassen, Lisa Maassen, ) | |
| Mike Maassen, Juanita Maassen, Paul Maassen, ) | |
| Shelly Maassen, Tom Maassen, Paula Maassen, ) | |
| Craig Miller, Kerry McAbee, Barbara McAbee, ) | |
| Craig Miller, Allen B. Nelson, Tim Niemeyer, ) | |
| Mary Niemeyer, Lori Ohlemann, Scott Ohlemann, ) | |
| Mark Ohling, Ronald Owens, Karen Owens, ) | |
| Donald Peterson, Stacey Peterson, ) | |
| Bradley Pollema, Kerri Pollema, ) | |
| David M. Ransome, Stephen Richter, ) | |

Joyce Richter, Ronan Roghair, Christopher Rosen,    )
Bart Roskoski, Darwin Rus, Helen Rus,    )
Duane Rus, DLD Cattle, Lorn Rus, Marilyn Rus,    )
Marion Rus, Mike Rus, Jean Schlossman,    )
Brad Elliot Schlossman, Sam Vander Schaaf,    )
Daniel Schreurs, Rachel Schreurs, Seppinga, Inc.,    )
Jesse Van De Stroet, Tanya Van De Stroet,    )
Vincent Thompson, Vincent Thompson IRA    )
Bovine Technology, Inc., Arnold Kelderman,    )
Carol Kelderman, The Kelderman Living Trust,    )
Allan Van Beek, Colleen Van Beek,    )
Garlen Van Beek, Tammie Van Beek,    )
Joyce Van Beek, Marvin Van Beek,    )
Jeanette Van Beek, The Estate of Wilmer Van Beek,)
Della Van Beek, Gary Van Den Berg,    )
Norma Van Den Berg, Edward Van Der Brink,    )
Dan Van Ginkel, Michele Van Ginkel,    )
Ross Van Kekerix, Evert D. Van Maanen,    )
Kathy Van Maanen, Oakwood Rentals,    )
Jason Van Surksum, Becky Van Surksum,    )
Ronald Van Veldhuizen, Gertrude Van Veldhuizen, )
Sturgis Van Vugt, John H. Van Zanten,    )
Mary Van Zanten, Terry Van Zanten,    )
Darrel Vande Vegte, Andrew Vander Vliet,    )
Amber Vander Vliet, Charles Witte, Linda Witte,    )
Fred Ymker, Michelle Ymker, Mark Zomer,    )
Karla Zomer, Joel Van Den Top, James Hawkins,    )
Hoper Family Trust, Robert Matthiessen,    )
Craig Richie for Fishes & Loaves from    )
Jesus Christ Foundation, Chuck Nejdl,    )
Deann Nejdl, Robert Reese, Dale Wacker,    )
Connie Wacker, Donald Wacker, and Lori Wacker,    )
                                                                          )
                   Plaintiffs,                                    )
                                                                          )
vs.                                                                   )
                                                                          )
American Pallet Leasing, Inc., a Delaware    )
Corporation, formerly Literary Playpen, Inc., and    )
formerly American Pallet Leasing, an Iowa    )
Corporation; Langley, Williams & Company, LLC    )
and Daniel L. Williams, Michael F. Calloura,    )
Phillip D. Abshire Jr., Daphne B. Clark and Jay    )
Aaron Cooper, and Danilo Cacciamatta;    )

2

)
Kirkpatrick & Lockhart, Preston, Gates, Ellis, LLP,)
f/k/a Preston, Gates & Ellis, LLP and also known   )
as K L Gates, and Daniel K. Donahue;               )
                                                    )
Nevada Agency & Trust Company and                  )
Michael J. Morrison;                               )
                                                    )
Marshall W. Dooley, Tempus Financial, Inc.,        )
Glast, Phillips & Murray and Gersten Savage, LLP;)
                                                    )
Timothy Bumgarner, Margaret Bumgarner,             )
Byron Hudson, Kevin Bumgarner,                     )
James F. Crigler, Douglas H. Peterson,             )
Keith Kerbaugh, Robert Vinson, James A. Jeffery,  )
Elgin McDaniel, Mark Hicks, and                    )
TAMKO Roofing Products, Inc.;                      )
                                                    )
Curt Kramer, Steve Burman, Bradley Doss,           )
Chris Curnutt, Jason Nichols, Jennifer Nichols,    )
Jesse Navarro, Gregory D. Frost, John Breda,       )
Danny Garber, Marianna Porcella and                )
Craig Medoff;                                       )
                                                    )
AG Edwards & Sons, Inc., Oppenheimer & Co, Inc., )
Citigroup Smith Barney, Merrill Lynch,             )
Ameritrade, 1st Discount Brokerage, Inc.,          )
Fidelity Investments, Aluma Holdings, LLC,         )
Aluma Investment Company,ACAP Financial, Inc., )
Pennaluna & Company, Templemore Partners,          )
a General Partnership,Hope Capital, Inc., XXC       )
Consulting, Inc.,Mercedis Canada, Ltd, Mercedis    )
USA Limited, Insarch USA, LLC, CALA Group,          )
Inc., First Dallas Securities, Penson Financial     )
Services,Inc., "First Southwest Company" a/k/a      )
Southwest Securities, a Subsidiary of SWS Group,   )
Inc., Scott Trade, Selective Consulting, Inc.,      )
Vincent Cerrone, South Coast Fund, LLC, Fiserv      )
Security, LLC and Fiserv Securities, Inc., Bank of  )
America Securities, LLC, Frank Colmes, Hughes-     )
Roth Capital Markets, Inc., US Bancorp, Inc. and    )
US Bancorp Investment Services, Inc., J.H. Darbie  )
& Co., Richard Frost, Becky Chalfant, V. Dallas    )
Echelman, Jack Sivakumar, Suzanne Wonderly         )

and other unknown Clearing Agents or Brokers,　　)
Broker-Dealers and Securities Representatives;　　)

COME NOW the Plaintiffs, by their undersigned counsel, and for their cause of action against the Defendants state:

## JURISDICTION AND VENUE

1.　　Jurisdiction herein is based upon federal question jurisdiction as the Plaintiffs' Complaint is premised upon myriad federal statues, including, but not limited to the Securities Exchange Acts of 1933 and 1934 and the Racketeer Influenced and Corrupt Organizations Act.

2.　　Jurisdiction over any state law claims is proper pursuant to this court's supplemental jurisdiction as any state law claims are so related to the federal claims that they form part of the same controversy.

3.　　Venue is proper pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or admissions giving rise to the claim occurred in the Northern District of Iowa.

## ALLEGATIONS COMMON TO ALL COUNTS

4.　The Plaintiffs are comprised of individuals and entities that invested money into American Pallet Leasing, Inc. ("APL") from approximately 2003 through 2006.

5. Defendant, APL, was originally incorporated under the laws of the State of Iowa on June 13, 2003, and maintained its principal place of business in Cedar Rapids, Iowa.

4

6.    APL purported to be in the business of manufacturing both wooden and metal pallets in Rock Valley, Iowa, as well as in South Carolina.

7.    In September of 2004, APL was reverse merged into the publicly traded corporation of Literary Playpen, Inc., a Delaware Corporation.

8.    Following the reverse merger transaction, the name of Literary Playpen, Inc. was changed to American Pallet Leasing, Inc., a Delaware Corporation.    (Hereinafter, "APL" will necessarily include all iterations of the company both before and after the reverse merger transaction).

9.    The corporate offices of American Pallet Leasing, Inc., a Delaware Corporation, f/k/a Literary Playpen, Inc., and their predecessor, American Pallet Leasing, Inc., were located in Cedar Rapids, Iowa, from June 2003 through 2006.

10.    Beginning in June 2003 and continuing through 2006, APL solicited investment funds from the Plaintiffs.

11.    APL reported wildly successful growth in its sales and assets, thereby luring and enticing investors to the purchase of its stock.

12.    In truth, APL fabricated millions of dollars in assets and sales and engaged in fraudulent schemes that ultimately lead to the company's dissolution.

13.    There were approximately four investment offerings in which the various named Plaintiffs purchased stock in APL's enterprise.

14.    Defendants, Kirkpatrick & Lockhart, Preston, Gates, Ellis, LLP, f/k/a Preston, Gates & Ellis, LLP and also known as K L Gates, is a limited liability

partnership law firm comprised of about 1,400 attorneys (hereinafter "Preston Gates").

15.     At all relevant times during the incidents alleged in this complaint, Daniel Donohue was a licensed attorney, practicing at Preston Gates.

16.     Preston Gates and, specifically, Attorney Donahue acted as APL's attorneys from April 2004 through May 11, 2005.

17.     Defendant Gersten, Savage, LLP is a limited liability partnership law firm.

18.     Gersten, Savage, LLP acted as APL's attorney from April 2005 through 2006.

19.     Gersten, Savage, LLP also acted as James Jeffrey's attorney while he was APL's investment banker.

20.     James Jeffrey is the owner of Mercedis USA Limited, Mercedis Canada Limited and Insarch Group.

21.     Defendant Langley, Williams & Company, LLC is a limited liability company and provider of accounting, auditing and bookkeeping services, with its principal place of business in Lake Charles, Louisiana.

22.     At all relevant times asserted in this Complaint, Daniel L. Williams, Michael F. Calloura, Phillip D. Abshire Jr., Daphne B. Clark and Jay Aaron Cooper were licensed CPAs employed at Langley, Williams & Company, LLC.

23.     Defendants Langley, Williams & Company, LLC and Daniel L. Williams, Michael F. Calloura, Phillip D. Abshire Jr., Daphne B. Clark and Jay

Aaron Cooper, CPA, acted as APL's auditors from August 30, 2004 through the middle of 2006

24.   Danilo Cacciamatta is a licensed accountant and CPA located and doing business in Irvine, California.

25.   Defendant Nevada Agency & Trust Company (hereinafter "NATCO") is a transfer agent organized under the laws of Nevada with its principal place of business in Reno, Nevada.

26.   Defendant NATCO acted as the transfer agent for Literary Playpen, Inc., and subsequently APL, from 1997 through the present.

27.   Defendant Michael J. Morrison is a licensed attorney domiciled in Reno, Nevada.

28.   At all relevant times alleged in this Complaint, Defendant Michael J. Morrison was a licensed attorney.

29.   Defendant Michael J. Morrison acted as one of the escrow agents for the reverse merger transaction between Literary Playpen and APL.

30.   Defendant Marshall W. Dooley is a licensed attorney and served as financial advisor to APL at all relevant times, through Tempus Financial, Inc., a provider of financial services.

31.   Dooley was simultaneously serving as a lawyer and owner of Glast, Phillips & Murray, P.C., a full-service law firm and professional corporation located in Dallas, Texas.

32.     Defendant Craig Medoff was hired by Tempus Financial during 2003 to act as a consultant in the investment banking arena and was made an officer of Tempus Financial, Inc.

33.     Medoff had previously been permanently enjoined by the SEC from dealing with publicly traded companies.

34.     Dooley, Medoff and Tempus Finanicial, Inc., utilized Glast, Phillips & Murray, P.C.'s address, phone and web site as their own.

35.     Defendants Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Byron Hudson, Elgin McDaniel and James Jaffery, were all at some period of time from June 2003 through 2006, Officers, Directors, relatives of APL's CEO or Senior Employees of APL or all four.

36.     Defendants Curt Kramer[1], Steve Burman, Bradley Doss, Chris Curnutt, Jason Nichols, Jennifer Nichols, Jesse Navarro, Gregory D. Frost, John Breda, Marianna Porcella, Craig Medoff, Danny Garber, Aluma Investment Company, Aluma Holdings, LLC and other unknown "Aluma" entities in which Danny Garber acted as the principal, were individuals and entities who were issued approximately 80% of all the free trading stock of APL between September 20, 2004 and October 31, 2004 for little or no consideration whatsoever.

37.     Defendants AG Edwards & Sons, Inc., J.H. Darbie & Co., Fidelity Investments, ACAP Financial, Inc., Pennaluna & Company, First Dallas Securities;

---

[1] Curt Cramer uses several aliases consisting of various forms of spelling alterations, to wit: Kurt Cramer, Curt Cramer, Curt Kramer and possibly other unknown iterations.

Penson Financial Services, Inc., "First Southwest Company" a/k/a Southwest Securities, a Subsidiary of SWS Group, Inc., Scott Trade, , Fiserv Security, LLC and Fiserv Securities, Inc., Bank of American Securities, LLC, Fidelity Investments, Hughes-Roth Capital Markets, Inc., US Bancorp, Inc. and US Bancorp Investment Services, Inc. and other unknown Broker-Dealers and security representatives and other unknown entities and individuals were at all relevant times Broker-Dealers and security representatives who at some point or another during the times alleged in this complaint provided business services to APL and/or Literary Playpen or to the Defendants named in paragraph 36.

38.    Richard Frost, Becky Chalfant, V. Dallas Echelman, and Jock Sivakumar are  principals of Hughes-Roth Capital Markets, Inc.

39.    Defendants Oppenheimer & Co, Inc., Citigroup Smith Barney, Merrill Lynch, Ameritrade, and 1st Discount Brokerage, Inc. are also broker-dealers and security representatives.  These five Defendants are only alleged to have failed to give the requisite penny stock disclosures to the plaintiffs and are not included in the additional allegations pertaining to the remaining broker-dealers.

40.  South Coast Funds, LLC, Mercedis Canada, Ltd, Mercedis USA Limited, Insarch USA, LLC, CALA Group, Inc., Vincent Cerrone, Frank Colmes, Selective Consulting, Inc., and Templemore Partners were all paid consultants employed by APL and/or received inappropriate funds from the plaintiff-investors of the reverse merger.

41. Defendant Suzanne Wonderly is a securities broker who was found guilty of securities wire fraud and conspiracy for selling non-existent prime bank notes by the Eighth Circuit Court of Appeals on December 5, 1995, and was enjoined from any dealings with publicly traded companies.

42. Defendant Wonderly contacted and introduced Defendants A.G. Edwards & Sons, Inc. and James Jeffery and his companies to APL.

43. Defendant US Bancorp, Inc. is a nationally chartered bank and regulated by Federal laws.

44. At all relevant times alleged in this complaint, US Bancorp, Inc. was responsible for both APL's banking transactions and Timothy Bumgarner's personal banking transactions.

## THE FIRST INVESTMENT OFFERING

45. The first stock offering was solicited by APL pursuant to an Executive Summary of APL, a Hughes-Roth funding request, or both, from June 2003 through April 2004.

### A. *The Executive Summary*

46. The Incorporators and original Officers and Directors of APL drafted a document entitled "American Pallet Leasing, Inc. Executive Summary", (hereinafter referred to as "Executive Summary") sometime before APL's incorporation.

47. The Executive Summary represented that APL owned certain patents related to the production of wood pallets.

10

48. These statements were false as the patents were never transferred, assigned or leased from Timothy Bumgarner's personal name to APL, in any of its iterations as a corporate entity.

49. The Executive Summary further represented that a purchase agreement for RY-JO-BE had been negotiated and that RY-JO-BE's customers had agreed to make a contractual change to APL, including but not limited to the customer named TAMKO Roofing.

50. These statements were false as APL had not negotiated a purchase agreement with RY-JO-BE and the company did not have cash flows and few, if any, of the RY-JO-BE customers had agreed to make any contractual agreements to the APL steel pallet.

51. TAMKO had entered into an agreement to purchase pallets from APL, which was signed by TAMKO's Director of Purchasing Mark Hicks.

52. TAMKO believed the contract was invalid due to the fact it believed Hicks had exceeded his authority in entering into the contract.

53. TAMKO did not inform APL until January 2005 that Hicks had exceeded his authority and that the agreement was invalid.

54. These facts were never disclosed to the investors at any time.

55. The Executive Summary further named and identified APL's customer base.

56. These statements were false as none of the quality customers identified were ever customers of APL.

57.    The Executive Summary further indicated that manufacturing and fabrication of the initial pallets would be performed by Iron Company Enterprises, located in Phoenix, Arizona.

58.    These statements were false as Iron Company Enterprises never agreed to these terms.

59.    The Executive Summary further indicated the projected earnings of APL.

60.    These projections were false as they were grossly and intentionally inflated and not based on sound principles of financial forecasting or truthful assumptions.

61.    The Executive Summary further listed the specific purposes for which the Plaintiffs' investment would be utilized.

62.    These representations were false as little, if any, of the invested money was utilized for the stated purposes in the Executive Summary.

63.    The investors were charged differing prices for the stock that they purchased from as low as $0.25 to as high as $1.00 per share in less than a 6-month period.

64.    This fact was never disclosed to the plaintiff-investors.

65.    In addition, APL never filed any Regulation D exemption from securities registration as required by Federal and State Law for any of the sales of stock in the Iowa APL Corporation.

66.    This fact was never disclosed to the investors.

67.     The following Plaintiffs made investments in an approximate amount of $300,000:

> Earl DeBey, Sydney Eppinga, Audrey Eppinga, Bruce Kooima, Linda Kooima, Stephen Richter, Joyce Richter, Wilmer Van Beek, Della Van Beek, Ronald Van Veldhuizen, Gertrude Van Veldhuizen, Glenn Lange, Cheryl Lange, Roger Koedam, Muriel Koedam, Paul Kats, John Van Zanten, Mary Van Zanten, Tim Kooima, Clarine Kooima, Alvin Bylsma, Duane Rus, Clarence Kooima, Winifred Kooima, Larry Dirksen, Gloria Dirksen, Ronald Owens, Karen Owens, Lori Ohlemann, Scott Ohlemann, Chuck Witte, Linda Witte, Robert Van't Hul, Michael Corcoran, Brent Hella, Blake Kerbaugh, Randy Cramer, Keith Johs, and Scott Eppinga (all shall be described as "Plaintiffs Group 1").

68.     All of the individuals comprising Plaintiffs Group 1 were given a copy of the Iowa APL's Executive Summary from June 2003 through April 2004 and relied on the misrepresentations contained therein.

**B. The Hughes-Roth Funding Request**

69.     Plaintiffs Group 1 was also provided a "Funding Request Confidential Information Memorandum" that had been prepared by Defendant Hughes-Roth, one of APL's broker-dealers, in September 2003 with "information solely for use by potential investors." (hereinafter "CIM").

70.     In violation of the "use of proceeds" statement contained in the Executive Summary, APL paid proceeds to Hughes-Roth for the preparation of the CIM.

71.     The CIM represented that APL had made considerable headway in its developmental plan and represented certain phases had been completed.

72.     These statements were false as no contracts with high volume pallet users had been secured as of October 2003.

73.    The CIM further represented that APL was managing and operating a facility in Oklahoma which had increased revenue by 400%.

74.    These statements were false as APL was not operating the Oklahoma manufacturing plant and it had not increased the monthly revenues as stated.

75.    The CIM also represented APL entered into an agreement with TAMKO.

76.    In reality, the supply agreement with TAMKO was allegedly void because the purchasing agent exceeded his contract authority in signing the contract.

77.    These facts were never revealed to the investors.

78.    The CIM projected net earnings for the Iowa APL to be $1,458,930 by September of 2004 and $9,252,134 by September of 2005 and $23,223,583 by September of 2006.

79.    These projections were false as they were intentionally and grossly inflated and not based upon sound actuarial principles or truthful assumptions.

80.    The CIM also indicated that APL intended to enter into a reverse merger transaction with Literary Playpen.

81.    This statement was intended to entice investors by causing them to believe their shares would become tradable and thus liquid in the near future.

82.    In reality, APL and Literary Playpen never intended to allow the plaintiff-investors to receive or realize any type of benefit under the reverse merger transaction.

14

83.   All of the individuals comprising Plaintiffs Group 1 were given a copy of the CIM on or around October 2003 and relied on the misrepresentations contained therein.

## THE SECOND INVESTMENT OFFERING

84.   The second investment offering of APL's stock began pursuant to a Confidential Private Placement Memorandum (referred to hereinafter as the "PPM") issued on June 2004 and finalized in August 2004.

85.   The PPM investment offering sought to raise $2,500,000 at $2.50 per share.

86.   The PPM contained numerous misrepresentations regarding the estimated value of APL's stock and the estimated book value.

87.   These statements were false as APL had close to a zero net book value as of June 30, 2004.

88.   The PPM indicated that all investors who purchased would receive "piggy-back registration rights."

89.   These statements were false as the investors never received the benefit of these rights, nor were they included in any of the subsequent SB-2 filings or S-8 filings.

90.   The PPM further represented that shares would only be sold to 35 Non-Accredited Investors.

91.   These statements were false as well over 35 Non-Accredited Investors invested pursuant to the PPM.

92.   The PPM falsely represented that a down payment had been made on the purchase of the G & G / Cherokee Wood, Inc.  facility located in Blacksburg, South Carolina (hereinafter "G & G").

93.   The PPM represented Timothy Bumgarner personally invested substantial sums of money in APL.

94.   These statements were false as Bumgarner did not invest the amount represented.

95.   The PPM also indicated that Ryan Financial Group issued a Financing Commitment Letter, which reasonably created the appearance that the G & G facility was completely funded.

96.   This statement was false as Ryan Financial Group never issued a Financing Commitment Letter.

97.   In reality, the contract for the purchase of the G & G facility was designed to be paid in $30,000 installments over five months, and after the five months, a balloon payment of $2,700,000 would become due.

98.   APL had not secured appropriate financing as represented as APL missed four of the five monthly payments, as well as the balloon payment.  APL ultimately defaulted on the purchase.

99.   These facts were never revealed to the investors at any time.

100.   The PPM also indicated a copy of the purchase agreement between APL and the G & G facility had been attached.

101.   The Purchase Agreement was never attached to the PPM that was distributed or shown to prospective investors because the Purchase Agreement would have revealed that the financing had not been secured as represented.

102.   Even if a few of the Plaintiffs' saw a copy of the Purchase Agreement these investors were told by Defendant Jesse Navarro there was no problem with the financing and that the investors could rely on the PPM which said that a financing commitment for the purchase of the G & G facility was in place.

103.   The PPM further represented that the State and local governments of South Carolina agreed to give APL certain tax benefits.

104.   These statements were false as the State of South Carolina and the local governments had made no such promises of incentive tax benefits to either APL or G & G.

105.   The PPM also indicated that G & G agreed to purchase timber from APL for the upcoming three years.

106.   These statements were false as the sellers of G & G never agreed to purchase the timber from APL as stated.

107.   The PPM represented that certain patents were owned by APL and that Nucor had offered a large sum of money to purchase the patents.

108.   These statements were false as the patents were never transferred to APL by Timothy Bumgarner.

109.   In addition, Nucor never offered APL or Tim Bumgarner the money represented for the steel pallet patents.

110.   The PPM further listed a number of corporate customers of APL.

111.   These statements were false as APL had never sold a single galvanized or steel pallet to any of the alleged corporate customers listed in the above mentioned quotation.

112.   The PPM listed the 2005 projected revenues.

113.   These statements were false as they were intentionally and grossly overstated and not based on sound actuarial principles or truthful assumptions.

114.   The PPM indicated Defendant Mercedis USA Limited agreed to purchase APL stock at $7.85 per share.

115.   These statements were false as Mercedis USA never intended or agreed to purchase APL stock.

116.   Instead, Mercedis USA was paid $50,000 in May or June 2004 to make said representations contained in the PPM.

117.   The PPM indicated Mercedis would function as APL's investment bank and that a banking agreement had been signed.

118.   These statements were false as Mr. James Jeffrey and his Mercedis corporations never performed any useful service for APL or any of its investors or paid any of the money alleged in the PPM.

119.   The PPM represented that, under the banking agreement, Mercedis USA Limited was to pay $0.50 each for 6 million warrants to purchase APL common shares.

120. These statements were false as Mercedis USA Limited and James Jeffrey never paid the $0.50 for 6 million warrants.

121. The PPM made higher financial projections than the ones contained in the Executive Summary.

122. These statements were false as even the lower projections contained in the Executive Summary were never achieved and were not based on truthful assumptions or sound financial and actuarial principles.

123. The PPM indicated a facility was to be built in Burnsville, North Carolina and would be fully operational by September 1, 2004.

124. In reality, the Burnsville project was neither commenced, nor materialized.

125. The PPM represented that a wood and steel pallet manufacturing facility was to be constructed in Rock Valley, Iowa.

126. These statements were false as APL breached its contract with the City of Rock Valley and never intended to commence construction on a facility in Rock Valley.

127. In addition, the facility itself was foreclosed upon by creditors and governmental agencies and is no longer owned by APL.

128. The PPM listed, specifically, the permissible uses of APL's net proceeds.

129. These statements were false as little, if any, of the funds obtained from Plaintiffs Group 2 were used for any of the stated purposes in the PPM.

130.   The PPM represented an equity valuation analysis was done stating that the "Estimated Value of APL Common Stock" as of December 31, 2005, should have an "effective price per share of $9.58."

131.   These estimates were false as the assumptions that the equity valuation analysis were based on were false and not based on sound actuarial or financial principles.

132.   The PPM indicated that a business entity known as "US Consults" had awarded APL a total of $15 million of USTC's and that APL would receive a total of $1,233,600 in cash.

133.   These statements were false as US Consults was never aware of these representations and never authorized them.

134.   The PPM contained ten Pro Forma income statements and balance sheets and another twenty Pro Forma financial statements and projections.

135.   These statements were false as none of the represented revenues were ever realized.

136.   The PPM materially omitted the fact that Daniel Donahue was the General Partner of Templemore Partners, an original investor in a publicly traded company known as Literary Playpen, Inc., which would be reverse merged into APL in September of 2004.

137.   Donahue was motivated to falsify statements as a result of the substantial profit he stood to gain from the impending reverse merger transaction.

138.   The PPM listed both Tempus Financial, Inc. and Marshall W. Dooley as APL's financial advisors.

139.   During the same period of time, Defendant Craig Medoff worked for Tempus Financial, Inc. as its corporate secretary.

140.   The investors were never notified that the Securities and Exchange Commission (SEC) had enjoined Medoff from any dealings with publicly traded companies in a court proceeding.

141.   The following Plaintiffs invested money to purchase APL's stock during this second campaign:

Aaron Baart, Nicole Baart, Todd Bartman, Juliann Bartman, Alvin Bylsma, Earl DeBey, Paul DeBey, Karmin DeBey, Dan DeRoon, Arline DeRoon, Derrick DeRoon, Ken Emmelkamp, Ardene Emmelkamp, Audrey Eppinga, Sydney Eppinga, Scott Eppinga, Brent Hella, Pete Hoogendoorn, Connie Hoogendoorn, Paul Kats, Roger Koedam, Muriel Koedam, Bruce Kooima, Linda Kooima, Clarence Kooima, Winifred Kooima, Kenneth Krieg, Sandy Krieg, Glenn Lange, Cheryl Lange, Paul Maassen, Shelly Maassen, Oakwood Rentals, Jason Van Surksum, Ronan Roghair, Darwin Rus, Helen Rus, DLD Cattle, Duane Rus, Bovine Technologies, Jesse Van De Stroet, Tanya Van De Stroet, Kelderman Living Trust, Arnold Kelderman, Carol Kelderman, Allan Van Beek, Colleen Van Beek, Garlen Van Beek, Tammie Van Beek, Edward Van Der Brink, Evert D. Van Maanen, Kathy Van Maanen, Jason Van Surksum, Becky Van Surksum, Sturgis Van Vugt, John H. Van Zanten, Mary Van Zanten, Andrew Vander Vliet, Amber Vander Vliet, Fred Ymker, and Michelle Ymker (collectively referred to as "Plaintiffs Group 2").

142.   Each of the individuals in Plaintiffs Group 2 received and read the PPM and relied on the misrepresentations contained therein.

143.   US Bank loaned a number of these Plaintiffs up to 100% of the funds needed to purchase stock in American Pallet Leasing, Inc. an Iowa Corporation in violation of Securities Margin Regulations.

144. Between August 2, 2004 and August 6, 2004, thirty-four (34) individual checks from thirty-four (34) different individuals were deposited into APL's corporate checking account at US Bancorp, in amounts totally $1,600,000.

145. Over 75% of those deposits were withdrawn on or about August 6, 2004 by Timothy Bumgarner and deposited into a new personal account with Timothy Bumgarner's social security number on the account with US Bancorp.

146. Timothy Bumgarner then withdrew some of the money from his personal account and loaned it back to American Pallet Leasing, Inc. an Iowa Corporation's US Bancorp checking account.

147. Bumgarner also withdrew some of the money from his $1,300,000 personal account and deposited it into a US Bancorp Investment Services, Inc. securities account for personal investment purposes.

148. These transactions occurred without shareholder notice and/or approval.

149. Neither US Bancorp nor US Bancorp Investment Services, Inc. gave notice of large and unusual deposits to the federal agencies required to receive notice under the Patriot Act and in doing so violated Regulation "Z" of the Banking Acts.

## THE THIRD INVESTMENT OFFERING

150. The third investment campaign coincided with the reverse merger transaction between APL and Literary Playpen that occurred in September of 2004.

22

151.   Daniel Donahue and Preston, Gates & Ellis represented both the purchasers and sellers of the reverse merger transaction without disclosure of the conflict to the potential and actual investors.

152.   In order to complete the reverse merger, the sellers and purchasers were divided into two different groups.

153.   Each of the two groups of investors and sellers had a different escrow account manager.

154.   One escrow account was managed by Michael J. Morrison and was comprised of eight investors.

155.   However, only seven individuals actually contributed money for the Morrison escrow account in an amount of $295,000.

156.   The other $55,000 was wired to Marshall Dooley and Tempus Financial by Timothy Bumgarner and his son, Kevin Bumgarner from certain proceeds that had been invested by Plaintiffs Group 2.

157.   Dooley and Tempus Financial, Inc. were instructed to then wire the $55,000 to Michael Morrison the escrow agent and attorney to finalize that portion of the reverse merger.

158.   The other six individuals listed as being contributors to the Morrison escrow and who were ultimately issued free trading stock were Jesse Navarro, Jason Nichols, Jennifer Nichols Gregory Frost, Christopher Curnutt and John Breda.

159.  These six individuals did not contribute any cash or money in exchange for the issuance of stock.

160.  This transaction was never disclosed to any of the individuals in Plaintiffs Group 2, despite the fact that such a use of the Plaintiffs Group 2's funds violated the "use of proceeds" representations contained in the PPM.

161.  The other escrow account was managed by Preston Gates and was also contributed to by eight investors.

162.  However, of the eight investors who were listed as contributors to the Preston Gates escrow account, only one of them, Scott Eppinga, actually paid money for the stock.

163.  Although Eppinga had collected money from other individuals for the stock, none of those individuals were included or listed as being contributors.

164.  The other seven (7) individuals listed as being contributors and who were ultimately issued stock were Mariana Porcella, the wife of Craig Medoff; Steve Burman; Bradley J. Doss; Curt Cramer; Aluma Investment Company, Harold Jensen, James Jeffery's corporations, and John Breda.

165.  These seven individuals did not contribute any cash or money in exchange for the issuance of stock.

166.  This set-up enabled Donahue and the sellers to charge two different prices for the shares, despite the fact the closings occurred on the same day and that the same purchase agreement was utilized.

167. The sellers in the Preston Gates escrow account charged a substantially higher price for their shares of stock, thereby deriving massive profit from the sale of their shares.

168. The sellers involved in the Preston Gates escrow transaction who received the benefit of the higher priced shares were all friends and relatives of Attorney Donahue.

169. The $350,000 cash that was paid to the Preston Gates escrow account was transferred in its entirety to Danilo Cacciamatta, CPA.

170. Pursuant to the Shareholders Purchase Agreement, the plaintiff-investors were to receive approximately 97.5% of the restricted and free trading stock of Literary Playpen, Inc. in exchange for their cash contribution.

171. This representation was false as the plaintiff-investors did not receive the percentage of stock as represented and in fact, received only a tiny percentage of the shares they were allegedly entitled to receive under the purchase agreement.

172. Instead, the majority of the shares went to other individuals, including Timothy Bumgarner, Tempus Financial, Jesse Navarro, Jason Nichols, Jennifer Nichols, Attorney Gregory Frost, Christopher Curnutt, and John Breda, Mariana Porcella (the wife of Craig Medoff); Steve Burman; Bradley J. Doss; Curt Cramer; Aluma Investment Company, Harold Jensen, and Mercedis Canada Ltd and James Jeffery.

173. These individuals either sold long or short on the market and made a substantial profit.

174.  Further, other individuals were issued stock by NATCO despite the fact they had not paid a single penny for their stock.

175.  The Defendant broker dealers who were issued these apparently stolen securities, and which were held in their own corporate names, were First Southwest Company, Fiserv Securities, Inc., AG Edwards & Sons, Inc., and Penson Financial Services, Inc.

176.  The individuals who actually contributed money lost 100% of their investment.

177.  None of the Defendants, attorneys, auditors, accountants or transfer agents ever matched the actual cash payments against the representations in the purchase agreement.

178.  Instead, they relied upon instructions from APL's investment advisor, Tempus Financial, Inc. and its agents Dooley and Medoff.

179.  Again, none of the individual investors were ever told that the SEC had enjoined Medoff, an agent of Tempus Financial, from any dealings with publicly traded companies in a court proceeding.

180.  Michael Morrison and Dan Donahue, as escrow agents and as an attorneys at law, gave a written opinion saying that all the legal requirements and regulations, including SEC and State securities regulations, had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock.

181.   These statements were false as not all of the purchasers had paid consideration and the necessary Regulation D forms were not filed.

182.   The following named Plaintiffs invested money to purchase stock in APL pursuant to the Reverse Merger dated September of 2004 in the approximate amount of $595,000:

> Alvin Bylsma, William Corcoran, Jack Corcoran, Michael P. Corcoran, Earl DeBey, Audrey Eppinga, Sydney Eppinga, Scott Eppinga, Brent Hella, Paul Kats, Roger Koedam, Muriel Koedam, Bruce Kooima, Linda Kooima, Clarence Kooima, Winifred Kooima, Glenn Lange, Cheryl Lange, Kerry McAbee, Barbara McAbee, Bart Roskoski, DLD Cattle, Duane Rus, John H. Van Zanten, Mary Van Zanten, James Hawkins, Hoper Family Trust, Robert Matthiessen, Craig Richie for Fishes & Loaves from Jesus Christ Foundation, Chuck Nejdl, Deann Nejdl, Robert Reese, Dale Wacker, Connie Wacker, Donald Wacker, and Lori Wacker (collectively referred to as "Plaintiffs Group 3").

183.   Plaintiffs Group 3 relied on the misrepresentations contained in the purchase agreement and the other representations made by Morrison and Donahue concerning the structure of the reverse merger transaction.

## THE FOURTH INVESTMENT OFFERING

184.   The fourth stock offering occurred on the open market from September 2004 through 2006 and allowed for the direct purchase of APL stock.

### A. *Press Releases and Newspaper Articles*

185.   On June 27, 2004, and June 30, 2004, several representations appeared in local Rock Valley newspapers about APL's secured contracts and plans to build a manufacturing plant based on information obtained from interviews with APL.

186.   These statements were false as no contracts had been secured and APL

never intended to complete the Rock Valley, Iowa plant.

187.  The newspaper articles were based on factual statements made by the officers and directors of APL, specifically, APL's CEO Keith Kerbaugh and CFO Doug Peterson.

188.  Most of the Plaintiff investors in this lawsuit are from Northwestern Iowa in the Rock Valley Iowa area and relied upon what these newspapers stated.

189.  On September 22, 2004, October 21, 2004, and December 14, 2004, APL issued a number of press releases indicating contracts that had been secured by APL and its financial condition.

190   These statements were false as all of the revenues, net incomes and assets represented were ultimately listed as "zero" in a subsequent audit and contradicted statements made in the PPM.

191. In addition, the September 2004 press release announced APL had completed the initial closing of its reverse acquisition of Literary Playpen, Inc.

192.  This statement was false because at that time, the shareholders had not reviewed or approved the purchase agreement.

193.  A letter was also mailed to APL's shareholders containing similar omissions and misrepresentations about the financial condition, business revenues and current projects and contracts at this same time.

194.  On January 4, 2005, APL issued a press release stating that it had increased production over the previous quarter by 30% in its G & G facility and that $150,000 had been invested in improvements.

195.   There was no mention that the contract payments for the G & G facility had not been made for October, November and December and that the contract could be foreclosed upon.

196.   The statements made in the January 4, 2005 press release were false as there had not been $150,000 in improvements to the G & G facility.

197.   In addition, not a single pallet had been produced at the G & G facility until January 2005, and after that time only a few truckloads of pallets were ever made and those were manufactured by hand.

198.   On January 11, 2005, APL issued another press release that equipment had been installed at its G & G facility and that contracts had been awarded which would add about $200,000 per month in a new revenue stream.

199.   These statements were false as such assets never existed.

200.   On March 10, 2005, APL issued a press release indicating it had obtained a 3-year contract with G & G for production of pallets and that it had purchased the G & G facility.

201.   In reality, on March 10, 2005, APL was in full and complete default on the purchase of G & G facility and the contract for production never existed.

202.   Further, APL had run out of its entire timber inventory and was not even operating the G & G facility on March 10, 2005.

203.   The March 10, 2005 press release further represented that additional contracts for manufacturing facilities were being negotiated.

204.   No contracts for the purchase of other facilities were being negotiated at this time.

205.   The March 2005 press release further represented that the G &G facility revenues would reach $9 million based on the G & G contract and current sales of pallets.

206.   As the G & G production contract did not exist, and the G &G facility was in total default and no pallets had been produced, these statements and corresponding projections were false.

207.   On March 16, 2005, APL issued another press release indicating that automated equipment was being installed in the G &G facility and that APL was expanding its capabilities.

208.   These statements were false as there was no production going on in the G & G facility on March 16, 2005 and APL was in total and complete default with the seller of the same facility.

209.   On May 10, 2005, APL issued another press release indicating APL had received the exclusive right to market a new wood pallet cleansing product and that the product had been approved by the USDA and that it complied with federal regulations.

210.   The wood pallet cleansing product came from a corporation known as Cala Group, Inc.,

211.   Cala Group is owned by the then Directors of APL, James Crigler and Robert Vinson.

212. There is no evidence that the USDA had approved the so called "pallet cleansing product" or that it complied with federal regulations for treating wood pallets.

213. As of May 10, 2005, APL was totally out of business and almost totally out of cash.

## *SEC Filings*

### *A. September/October 2004 8-K*

214. In September or October 2004, APL filed a Form 8-K with the SEC.

215. The 8-K increased the amount of shares and authorized a split of the common stock.

216. The 8-K represented that a shareholders meeting was not required to approve this change because the Chairman and CEO had majority control of the stock.

217. The officers and directors of APL refused to call a shareholders meeting from the time APL was formed in 2003 to the present date even after a number of the plaintiffs had demanded one in violation of state corporate laws.

218. This statement was false as the cash investors were to receive 97.5% of the stock and were never notified of or approved these transactions.

219. The 8-K filing materially omitted the fact that the Regulation D offering was invalid.

**B. *November 22, 2004 10-KSB***

220. On November 22, 2004, APL filed its Form 10-QSB for what was then still known as Literary Playpen, Inc. for the three months ending September 30, 2004.

221. Like the 8-K filing, the 10-KSB omitted the fact that the Regulation D offering was invalid.

222. The 10-QSB omitted that APL had missed 2 payments on the G & G facility.

**C. *February 7, 2005 Form S-8 Registration***

223. On February 7, 2005, APL filed a form S-8 Registration Statement under the Securities Act of 1933 with the SEC.

224. The S-8 Registration failed to mention that the previously required Regulation D forms had never been filed and that the reverse merger had been transacted improperly.

225. The investors who were guaranteed "piggy-back registration" rights were not mentioned in the S-8.

226. A substantial number of the registered S-8 stocks were issued directly to Kevin Bumgarner and to other market manipulators or affiliates such as Tim Bumgarner, Margaret Bumgarner, Jim Crigler through his corporation, CALA Group, and Kevin Bumgarner, without consideration or shareholder approval.

**D.    *February 23, 2005 10-QSB***

227.   On February 23, 2005, APL filed its 10-QSB for the 3 month period ending December 31, 2004.

228.   The February 23, 2005, 10-QSB materially omitted that APL had missed its 5th contract payment on the G &G facility and that the entire 2.7 million dollars due on the contract had become payable in full.

229.   The February 2005 10-QSB showed that cash had been depleted to $74,990 as of December 31, 2004, but that gross revenues for the three months ending December 31, 2004 had increased to $1,226,318.

230.   These revenues were grossly and intentionally inflated and were based upon untruthful assumptions and unsound actuarial or financial principles.

231.   The 10-KSB further showed that consultants fees for the period of July 1, 2004 through December 31, 2004 had increased to $666,301 and the office expense had increased to $499,767 without any narrative explanation.

232.   In reality, most of the alleged "consultant fees" were paid to the officers and directors of APL and their respective friends and family or other business entities that performed no discernable service to APL.

**E.  *May 12, 2005 10-QSB***

233.   On or about May 12, 2005, APL filed its form 10-QSB with the SEC for the quarterly period ending March 31, 2005.

234. On the front page of the 10-QSB it showed that APL's issued shares of common stock had increased from 11,946,090 shares as of the February 23, 2005 10-QSB, to 19,825,742 shares as of May 12, 2005.

235. The 10-QSB failed to mention that the increase in shares occurred pursuant to Timothy Bumgarner's instructions to Defendant NATCO and that shareholder approval had not been obtained.

236. The 10-QSB further failed to mention that NATCO complied with all of the instructions from Timothy Bumgarner without legal opinion or auditor's opinion, and in some cases, without Medallion guarantees.

237. The 10-QSB further failed to indicate that the transfer agent issued stock without the co-owners' signatures or the required 144 documentation.

238. This transaction resulted in nearly doubling the number of free trading shares of APL without shareholder notice or approval.

239. Most of these shares were issued to Bumgarner and his family members.

240. The May 12, 2005, 10-QSB showed that APL's cash or cash equivalent was down to $16,539 and that inventories existed of $116,641.

241. None of the claimed assets actually existed.

242. The 10-QSB went on to state that sales from July 1, 2004 through March 31, 2005 were $2,418,256 and the company had assets valued at $3,402,697.

243. In reality, sales did not rise to that level and APL was almost completely out of assets, cash and business.

244. Further, the May 12, 2005, 10-QSB went on to state that consultants had been paid $1,079,516 and that office expenses were $707,630 from July 1, 2004 through March 31, 2005, with no narrative explanation.

245. In reality, most of the alleged "consultant fees" were paid to the officers and directors of APL and their respective friends and family or other business entities that performed no discernable service to APL.

246. The May 12, 2005, 10-QSB failed to mention that all of the monthly payments on the G & G contract were missed except the payment in September 2004.

247. The May 12, 2005, 10-QSB further indicated the purchase of the G & G facility was executed through an unsecured promissory note.

248. In reality, the purchase was not on an unsecured promissory note but on a Contract for Deed that could be foreclosed upon within 30 days notice.

249. The May 12, 2005, 10-QSB further indicated the time to pay the balance due on the G & G facility had been extended.

250. In reality, the seller of the G & G facility had not granted any extension as the 10-QSB alleges.

F. *June 2005 SB-2 Filing*

251. In June 2005, APL filed an SB-2.

252. On August 5, 2005, an amendment was filed to the June 2005 SB-2.

253. The SB-2 amendment filed on August 5, 2005 showed that the amount of shares of stock issued and outstanding were 26,881,720 shares.

254. This amounted to a more than 7 million share increase from the May 12, 2005 10-QSB filing.

255. This increase had not been approved by the shareholders.

256. The SB-2 filing stated that all of the assets were intact as of July 15, 2005.

257. In reality, as of July 15, 2005, APL was insolvent and had no revenues.

**G.**   ***October 17, 2005 10-KSB***

258. On October 17, 2005, APL filed its 10-KSB with the SEC for the period ending June 30, 2005.

259. The 10-KSB stated that as of October 14, 2005, the company had 24,534,651 shares issued and outstanding, many of which had not been approved by the shareholders and were therefore illegally issued.

260. The 10-KSB stated the reverse merger had been done legally when in fact it had not.

261. The 10-KSB failed to mention that the monthly payments on the G & G facility, with the exception of the September 2004 payment, had never been made.

262. Further, there was no mention that the entire $2.7 million dollars had become due on the contract and had not been paid.

263. The 10-KSB stated that the sellers of the G & G facility had filed a lawsuit against APL as of August 4, 2005.

264. The 10-KSB said the lawsuit was for Breach of Contract but materially omitted the fact that the sellers were also suing for fraud and unfair trade practices.

265.   The 10-KSB stated that it had received land in Rock Valley from the City of Rock Valley and that APL was going to be receiving numerous grants from Iowa.

266.   These statements were not truthful.

267.   The 10-KSB further listed the compensation of Timothy Bumgarner as $22,500 from July 1, 2004 through June 30, 2005.

268.   In reality, Timothy Bumgarner received hundreds of thousands of dollars of compensation.

269.   Suddenly and in direct contradiction to the previously filed 10-KSB's and the 2-SB, this 10-KSB eliminated 95% of all the assets from the balance sheets in comparison to the March 31, 2005 10-QSB.

270.   In addition, the $2,418,256 in gross sales that was represented as being generated from July 1, 2004 through March 31, 2005 in the May 12, 2005 10-QSB was eliminated in its entirety in the October 17, 2005 10-KSB for the period ending June 30, 2005.

271.   The 10-KSB misrepresented the price per share of APL's stock.

272.   On November 14, 2005, an amendment to the 10-KSB was filed on behalf of APL with the SEC.

273.   Most of the amended 10-KSB repeated the October 17, 2005 filing.

274.   The following Plaintiffs purchased stock in APL on the open market in the approximate amount of $1,800,000:

Todd Atenhan, Todd Atenhad IRA, Todd Atenhand SEP, Jeffrey J. Benedict, Thomas Blauwet, Kim Blauwet, Clarence Boer, Karyn Boer, Jason A. Boer,

Corilee J. Boer, Gene Collins, Hoogendoorn Construction, Jack Corcoran, Randy Cramer, Lenora Davelaar, Larry Dirksen, Gloria Dirksen, James R. Ellis, Ruth Ann Ellis, Ken Emmelkamp, Ardene Emmelkamp, Audrey Eppinga, Sydney Eppinga, Ben Eppinga, Robbin D. Eppinga, Sara K. Eppinga, Scott Eppinga, Nathan Fichter, Robert Fleming, Gary Harmelink, John Harmelink, Brent Hella, Bruce Hella, Kevin Hoogendoorn, Janelle Hoogendoorn, Hoogendoorn Construction, Robert Van't Hul, Leroy Intveld, Wanda Intveld, Keith Johs, Keith Johs, John Jones, Linda Jones, Paul Kats, Blake Kerbaugh, Mary Kerbaugh, Kyle Koedam, Clarence Kooima, Winifred Kooima, Tim R. Kooima, Clarine Kooima, Kenneth Krieg, Sandy Krieg, Cheryl Lange, Scott J. Lyftogt, Kim M. Lyftogt, Damon Maassen, Dave Maassen, Lisa Maassen, Mike Maassen, Juanita Maassen, Paul Maassen, Shelly Maassen, Tom Maassen, Paula Maassen, Kerry McAbee, Barbara McAbee, Allen B. Nelson, Tim Niemeyer, Mary Niemeyer, Lori Ohlemann, Scott Ohlemann, Mark Ohling, Ronald Owens, Karen Owens, Donald Peterson, Stacey Peterson, Bradley Pollema, Kerri Pollema, David M. Ransome, Stephen Richter, Joyce Richter, Ronan Roghair, Duane Rus, DLD Cattle, Lorn Rus, Marilyn Rus, Marion Rus, Mike Rus, Sam Vander Schaaf, Daniel Schreurs, Rachel Schreurs, Arnold Kelderman, Carol Kelderman, The Kelderman Living Trust, Vincent Thompson, Vincent Thompson IRA, Garlen Van Beek, Tammie Van Beek, Joyce Van Beek, Marvin Van Beek, Jeanette Van Beek, Wilmer Van Beek, Della Van Beek, Gary Van Den Berg, Norma Van Den Berg, Dan Van Ginkel, Michele Van Ginkel, Ross Van Kekerix, Oakwood Rentals, Jason Van Surksum, Becky Van Surksum, Ronald Van Veldhuizen, Gertrude Van Veldhuizen, Sturgis Van Vugt, John H. Van Zanten, Mary Van Zanten, Terry Van Zanten, Darrel Vande Vegte, Charles Witte, Linda Witte, Fred Ymker, Michelle Ymker, Mark Zomer, Karla Zomer, Joel Van Den Top, James Hawkins, Chuck Nejdl, Deann Nejdl, Dale Wacker, Connie Wacker, Donald Wacker, and Lori Wacker (collectively referred to as "Plaintiffs Group 4").

275.    Although Plaintiffs Group 4 purchased what are known as

"penny stocks," no penny stock risk disclosure was provided to most of these investors.

276.    Plaintiffs Group 4 received and read the SEC filings detailed herein and relied on the misrepresentations contained therein.

277.  Additionally, Plaintiffs Group 4's reliance is presumed because the securities of APL were actively traded on the stock exchange, an efficient, open market.

278.  The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the APL's securities.

279.  Plaintiffs Group 4, without knowledge of the misrepresented facts, purchased their APL securities between the time the defendants failed to disclose and/or misrepresented material facts and the time the truth was disclosed.

## *ADDITIONAL NONDISCLOSURES*

280.  In addition to the foregoing nondisclosures and misrepresentations, none of the plaintiff investors were ever informed that Craig Medoff had been permanently enjoined from the SEC from dealing with publicly traded companies.

281.  None of the plaintiff investors were ever informed that Suzanne Wonderly, an individual who had also been enjoined from dealing with publicly traded companies was being paid cash by APL, well after her criminal proceedings had become public and she had served 33 months in prison.

## *RESPONSIBLE PARTIES FOR REVIEWING AND CERTIFYING THE ACCURACY OF THE VARIOUS MISREPRESENTATIONS*

*The Executive Summary:*

282.  The officers and directors of APL prepared and were responsible for the misrepresentations contained in the Executive Summary.

283.  At the time of the closure of the first offering, Daniel Donahue was acting as APL's attorney.

### The CIM:

284.   Hughes Roth, a securities broker, prepared and certified the CIM.

285.   The officers and directors of APL also helped prepare and were responsible for the misrepresentations contained in the CIM.

### The PPM:

286.   The officers and directors of APL helped prepare and were responsible for the misrepresentations contained in the PPM.

287.   Defendants Preston Gates and Daniel Donohue prepared and reviewed APL's June 2004 Private Placement Offering.

288.   Defendants Preston Gates and Daniel Donahue, were paid fees to review the truth and accuracy of this PPM and they opined in writing as to its accuracy.

289.   The PPM listed both Tempus Financial, Inc. and Marshall W. Dooley as APL's financial advisors.

### Reverse Merger:

290.   With respect to the reverse merger transaction, Michael Morrison and Dan Donahue, as escrow agents and as attorneys at law, gave a written opinion saying that all the legal requirements and regulations and SEC and State securities regulations had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock.

*Press Releases and Newspaper Articles:*

291. The myriad press releases were based on representations and statements made by APL's officers and directors.

292. In addition, the attorneys, accountants and auditors representing APL at the time of the filing of the March 31, 2005 10-QSB were fully aware of the press releases filed on February 23, March 10, March 16, and May 10 of 2005.

*SEC Filings:*

293. Gersten, Savage, LLP was responsible for reviewing and opining to the March 31, 2005 10-QSB as well as the original and amended SB-2 and the filing of the June 2005 10-KSB.

294. Defendants Preston Gates and Daniel Donahue reviewed and helped prepare all of the SEC filings, except for the June 30, 2005, 10-KSB and the SB-2 filed in August of 2005.

295. Defendant Langley, Williams & Company, LLC on September 27, 2004, issued an unconditional audit and verified the accuracy of APL's representations about its financial condition.

296. Defendant Langley, Williams & Company, LLC, signed a letter dated August 5, 2005 consenting to the use of all of their reviewed documents in subsequent filings.

297. The New York law firm of Gersten, Savage LLP also represented they had reviewed APL's registration statement.

## COUNT I—RACKETEER INFLUENCED AND CORRUPT ORGANIZATION (RICO) § 1962(b)

298. The Plaintiffs restate the allegations contained in paragraphs 1 through 297 of this Complaint as if they had been fully set forth herein.

299. APL, its officers and directors engaged in a pattern of racketeering activity.

300. APL, its officers and directors, engaged in two or more acts of wire fraud, mail fraud, and/or securities fraud.

301. APL, a corporation, constitutes an enterprise.

302. APL engaged in activities affecting interstate commerce.

303. Through the pattern of racketeering activity APL, its officers and directors acquired or maintained an interest in or controlled the enterprise.

304. As a result of said racketeering activity, the Plaintiffs lost nearly 100% of their investments.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 2—RACKETEER INFLUENCED AND CORRUPT ORGANIZATION (RICO) § 1962(d)

305.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 304 of this Complaint as if they had been fully set forth herein.

306.   The directors and officers of APL, together with the other named Defendants were employed by or associated with APL.

307.   These Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of APL

308.   The Defendants did so knowingly and willfully through a pattern of racketeering activity.

309.   As a result of said racketeering activity, the Plaintiffs lost nearly 100% of their investments.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 3—RACKETEER INFLUENCED AND CORRUPT ORGANIZATION (RICO) § 1962(a)

310.    The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 309 of this Complaint as if they had been fully set forth herein.

311. The officers and directors of APL, together with the other named Defendant individuals and entities derived income from a pattern of racketeering activity.

312.    The other named Defendants had a symbiotic relationship with APL, whereby APL would funnel money and or stock to the other defendants for little or no services performed.

313.    Some part of the income so derived was used in acquiring an interest or operating various business entities, including Mercedis USA, NATCO, Tempus Financial, Gersten Savage LLP, Langley, Williams & Company, APL, and the other named defendant consultants and brokers and dealers.

314.    Each of these entities constituted an "enterprise" and engaged in activities affecting interstate commerce.    .

315.    As a result of said racketeering activity, the Plaintiffs lost nearly 100% of their investments.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 4—PROFESSIONAL NEGLIGENCE

316.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 315 of this Complaint as if they had been fully set forth herein.

317.   The Defendant accountants, auditors, lawyers, financial advisors, consultants and broker dealers, securities representatives and officers and directors of APL were negligent and such negligence was a proximate cause of the damages to the Plaintiffs.

318.   These defendants were negligent in the following particulars:

a.   Failure to uncover the misrepresentations and omissions detailed in this complaint;

b.   Failure to adequately investigate the securities being offered;

c.   Failure to review APL's internal financial forecasts, contracts and other documents;

d.   Failure to make a physical inspection of APL's facilities;

e.   Failure to employ analysts having expertise in the pallet business,

f.   Failure to conduct interviews with APL's officers and directors and other management officials;

g.   Failure to interview APL's major customers;

h. Failure to file the necessary Regulation D forms and representing that the shares had been issued legally;

h.   Failure to verify or check if APL's initial stock offerings were exemptions from registrations;

i.   Failure to file "Blue Sky" forms and representing that the shares had been issued legally; and

j. Failure to match the shares that were issued with the cash that was actually paid by investors.

319.   This negligence continued and tainted each and every subsequent stock offering, which were never verified or examined by the professional defendants.

320.   The defendant auditors, accountants, financial advisors and attorneys were negligent because they violated GAAP and GAAS principles in the following manner:

a.   Failure to exercise due care and professional skepticism;

b.   Failure to adequately staff, plan and supervise an audit;

c.   Failure to adequately assess the nature of the business;

d.   Failure to recognize risk factors or red flags, such as the 5 missed contract payments on the G & G facility;

e.   Violating the principal that interim financial reporting should be based upon the same accounting principals and practices used to prepare annual financial statements (APB No. 28);

f.   Violating the principal that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Standard of Concepts No. 1);

g.   Violating the principal that financial reporting should provide information about the economic resources of an enterprise, the claims

to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1);

h. Violating the principal that financial reporting should provide information about and enterprises financial performance during a period (FASB Statement of Concepts No. 1);

i. Violating the central principal that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2);

j. Violating the principal of completeness which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2);

k. Violating Regulation S-X of the SEC, 17 C.F.R. § 210.4-01 (a) (1), which requires that financial statements filed with the SEC to be prepared in compliance with GAAP and if they are not, they are presumed to be misleading and inaccurate, despite footnote disclosures or other disclosures.

321. Moreover, auditors, accountants, financial advisors and attorneys violated GAAP and GAAS standards by failing to disclose the misrepresentations or withdrawing from representation of APL once the misrepresentations became known.

322. Instead, the auditors, accountants, financial advisors and attorneys issued opinions verifying the accuracy of the APL's financial status and assets.

323. In addition, defendant NATCO was negligent in

a. complying with all of the instructions from Timothy Bumgarner without legal opinion or auditor's opinion, and in some cases, without Medallion guarantees; and

b. issuing stock without the co-owners signatures or the requisite 144 documentation.

324. The negligent actions of the Defendant accountants, auditors, lawyers, officers and directors of APL, APL, financial advisors, consultants and broker dealers and securities representatives were willful, wanton and in reckless disregard of the rights of the Plaintiffs.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 5—BREACH OF FIDUCIARY DUTY

325. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 324 of this Complaint as if they had been fully set forth herein.

326. At all relevant times, a special relationship existed between APL and its attorneys, accountants, transfer agents, investment bankers, financial advisors, consultants, broker dealers, and securities representatives.

327. At all relevant times, a special relationship existed between the directors and officers of APL and the potential and actual investors and shareholders.

328.   As a result of the special relationship between all of the above-referenced Defendants and APL, these Defendants owed investors, particularly the Plaintiffs, a fiduciary duty.

329.   These Defendants breached their fiduciary duty owed to investors by providing them with false and misleading information or failing to provide investors with full and complete information.

330.   These defendants breached their fiduciary duty by negligently performing their duty to make a reasonable investigation into the securities that were being offered and the statements being made in relation to the securities being offered as detailed in Paragraph 318 of this complaint.

331.   These defendants breached their fiduciary duty in failing to ensure APL was complying with laws and regulations and the representations made to the potential investors.

332.   The defendant auditors, accountants, financial advisors and attorneys breached their fiduciary duty by violating GAAP and GAAS principles as detailed in Paragraph 320.

333.   The, auditors, accountants, financial advisors and attorneys breached their fiduciary duty by violating GAAP and GAAS standards by failing to disclose the misrepresentations or withdrawing from representation of APL once the misrepresentations became known.

334.   Instead, the auditors, accountants, financial advisors and attorneys issued opinions verifying the accuracy of APL's financial status and assets.

335. The officers and directors of APL breached their fiduciary duty to APL's shareholders by refusing to call a shareholders meeting from 2003 to the present date even after the plaintiffs demanded such a meeting.

336. These breaches of fiduciary duty were a proximate cause of damages to the Plaintiffs.

337. The Defendants' behavior amounted to a willful and wanton disregard for the Plaintiffs' rights.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 6—CONVERSION

338. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 337 of this Complaint as if they had been fully set forth herein.

339. The officers and directors of APL, attorneys, accountants, auditors, brokers and securities representatives, other consultants and the Defendants identified in Paragraphs 36 and 40 of this Complaint obtained investments from the Plaintiffs through fraud.

340. The officers and directors of APL, attorneys, accountants, auditors, brokers and securities representatives, other consultants and the Defendants named in Paragraphs 36 and 40 of this Complaint exercised control over the

Plaintiffs' investments in a manner that was inconsistent with and in derogation of the uses for which the Plaintiffs agreed their money could be used.

341. The Plaintiffs were damaged by the misuse and fraudulent procurement of their money as such investments were lost as a proximate cause of the defendants' conversion of these funds.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 7—NEGLIGENT MISREPRESENTATIONS/NONDISCLOSURES

342. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 341 of this Complaint as if they had been fully set forth herein.

343. The accountants, auditors, lawyers, officers and directors of APL, APL, financial advisors, consultants, and broker dealers and securities representatives both negligently supplied information and failed to disclose material information about APL's financial condition, status, and business endeavors, contracts and customers which were false to the Plaintiffs in the Executive summary, the CIM, the PPM, the documents associated with the reverse merger transaction, various press releases and the SEC filings.

344. The Defendants failed to exercise reasonable care or skill of a person in the same business or profession in obtaining or communicating the information.

345. The Defendants failed to make an investigation that would have been made by a reasonable person in the same business or profession.

346. These Defendants were negligent as detailed in Paragraph 318 of this Complaint.

347. This negligence continued and tainted each and every subsequent stock offering, which were never verified or examined by the professional defendants and was continually misrepresented to investors.

348. The misrepresentations and omissions were statements, which in their professional capacities and positions, the defendants should have been known had a reasonable investigation been conducted, that such statements were false and fraudulent.

349. The Plaintiffs acted in reliance on the misrepresentations supplied in SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint and were justified in relying on the information.

350. The negligently supplied information was a proximate cause of the Plaintiffs' damage.

351. As a result of the Plaintiffs' reliance, the Plaintiffs lost nearly 100% of their investments and their expected benefit to be derived there from.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble

damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 8—FRAUDULENT MISREPRESENTATION

352. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 351 of this Complaint as if they had been fully set forth herein.

353. The accountants, auditors, lawyers, officers and directors of APL, APL, financial advisors, consultants, and broker dealers and securities representatives fraudulently supplied information about APL's financial condition, status, and business endeavors, contracts and customers which were false through SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint.

354. The representations were false.

355. The representations were material.

356. The Defendants acted knowingly and with the intent to deceive the plaintiffs.

357. These defendants had access to APL's financial and business records.

358. These defendants knew or should have known the representations about APL's financial status were false based on APL's wildly successful reported revenues but its decreasing cash flows.

359. A comparison of cash flow to reported revenue would have revealed the grossly overstated and inflated sales scheme being operated by APL.

360.   The defendants knew or should have known that most of APL's stock was fraudulently issued for little or no consideration.

361.   A comparison of those individuals who invested cash with those individuals who actually received shares of stock would have revealed the fraudulent issuances and transactions of stock.

362.   The defendants knew or should have known that most of APL's stock was issued illegally and in violation of the law.

363.   An examination of whether Regulation D filings had actually been filed or whether the initial stock offerings had been Blue Skied would have revealed that such filings never occurred.

364.   The defendants knew or should have known that the G & G contract was not financed as represented.

365.   An examination of the contract would have revealed the true nature of the G & G contract and financing.

366.   These defendants knew or should have known that the G & G contract had been misrepresented and that APL had not made the payments as required and was in default of the contract at some point prior to the filing of the lawsuit against APL by the G & G sellers.

367.   An examination of the financial records of APL would have revealed that the five contract payments on the G & G facility had not been paid.

368.   This fact was not revealed to the investors until well after G & G filed its lawsuit against APL.

369.   Even when the G & G lawsuit was revealed to the plaintiffs, the defendants revealed only that the lawsuit was for breach for contract, when they knew or should have known the lawsuit was for additional claims, such as fraud.

370.   The defendants knew or should have known that most of APL's assets and facilities were totally fabricated.

371.   A physical inspection of APL's facilities would have revealed that most of the facilities and assets claimed by APL were grossly overstated and inflated, if they existed at all. .

372.   In early as September 2004, the auditors, accountants, lawyers and directors and officers of APL knew that the assets of APL had been grossly overstated and inflated.

373.   Emails were exchanged between the parties indicating that certain assets did not exist and should be assigned zero values.

374.   The auditors, accountants, lawyers and directors and officers of APL took no action to correct these misrepresentations at any time, but continued to provide investors with false information.

375.   In addition, the officers and directors were notified that the TAMKO contract was void by TAMKO representatives in January 2005, but continued to represent that such a contract existed and was in place and never revealed this fact to the plaintiffs.

376.   Such Defendants further knew or should have known that the TAMKO contract was invalid or void, that the payments on the G & G facility had not been

made, and that various other contracts and sales data had been seriously misrepresented.

377. Defendants also knew or should have known that the reverse merger had been conducted illegally.

378. An investigation into where the money for the merger went and a comparison between who actually invested money and who received funds would have revealed the illegality of the transaction.

379. Defendants also knew or should have known that Medoff had been permanently enjoined by the SEC from practicing in securities.

380. In addition, such Defendants knew or should have known that numerous stock trades had been made all of which lacked consideration and shareholder approval.

381. An examination of the shareholder's meeting minutes and cash flows would have revealed that much of the stock was simply being given away at no cost.

382. Moreover, the large increases in stock, sometimes in excess of 10 million shares, warranted an examination into whether the shareholders had approved such large increases.

383. These facts, and others detailed in the complaint were misrepresented to the investors.

384. The truth of these facts was readily apparent to the defendants based upon the financial data of the company and various emails sent documenting the defendants' knowledge of the falsity of these representations.

385. As further evidence of fraud, the defendant auditors, accountants, financial advisors and attorneys violated GAAP and GAAS principles as detailed in Paragraph 320.

386. The, auditors, accountants, financial advisors and attorneys further violated GAAP and GAAS standards by failing to disclose the misrepresentations or withdrawing from representation of APL once the misrepresentations became known.

387. Instead, the auditors, accountants, financial advisors and attorneys issued opinions verifying the accuracy of the APL's financial status and assets through SEC filings, the Executive Summary, the CIM, the PPM and multiple press releases specifically identified previously in this Complaint.

388. These defendants recklessly and intentionally failed to:

a. adequately review APL's internal financial forecasts, contracts and other documents;

b. make a physical inspection of APL's major facilities;

c. employ analysts having expertise in the pallet business;

d. interview APL's officers and directors and other management officials; and

e. interview APL's major customers.

389. As a result of their deception, the defendants all profited, either personally, professionally or both, at the plaintiffs' expense.

390.   The officers and directors of APL, along with their friends and family and APL's consultants received most of the investors' invested funds and purchased stock.

391.   Dan Donahue gained a substantial profit on the reverse merger transaction and used most of the profit to pay off his friends and old debts.

392.   Tempus Financial, Dooley and Medoff made a substantial profit from selling essentially what were stolen securities.

393.   The Plaintiffs acted in reliance on the misrepresentations and were justified in relying on the representations made in the SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint..

394.   The misrepresentations were a proximate cause of the Plaintiffs' damage.

395.   As a result of the Plaintiffs' reliance, the Plaintiffs lost nearly 100% of their investments.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 9—FRAUDULENT NONDISCLOSURE

396.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 395 of this Complaint as if they had been fully set forth herein.

397.   Special circumstances existed which gave rise to a duty of disclosure between the Plaintiffs and the accountants, auditors, lawyers, officers and directors of APL, APL, financial advisors, and broker dealers and securities representatives in that each of these individuals owed a duty of care to the potential investors in APL.

398.   These defendants had access to APL's financial and business records.

399.   These defendants knew or should have known the representations contained in the SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint about APL's financial status were false based on APL's wildly successful reported revenues but its decreasing cash flows.

400.   A comparison of cash flow to reported revenue would have revealed the grossly overstated and inflated sales scheme being operated by APL.

401.   The defendants knew or should have known that most of APL's stock was fraudulently issued for little or no consideration.

402.   A comparison of those individuals who invested cash with those individuals who actually received shares of stock would have revealed the fraudulent issuances and transactions of stock.

403.   The defendants knew or should have known that most of APL's stock was issued illegally and in violation of the law.

404.   An examination of whether Regulation D filings had actually been filed or whether the initial stock offerings had been Blue Skied would have revealed that such filings never occurred.

405.   The defendants knew or should have known that the G & G contract was not financed as represented.

406.   An examination of the contract would have revealed the true nature of the G & G contract and financing.

407.   These defendants knew or should have known that the G & G contract had been misrepresented and that APL had not made the payments as required and was in default of the contract at some point prior to the filing of the lawsuit against APL by the G & G sellers.

408.   An examination of the financial records of APL would have revealed that the five contract payments on the G & G facility had not been paid.

409.   This fact was not revealed to the investors until well after the lawsuit was filed.

410.   At the time G & G filed the lawsuit against APL, the defendants knew or should have known the lawsuit was for additional claims, such as fraud, but only informed investors that the lawsuit was for breach of contract

411.   The defendants knew or should have known that most of APL's assets and facilities were totally fabricated.

412. A physical inspection of APL's facilities would have revealed that most of the facilities and assets claimed by APL were grossly overstated and inflated, if they existed at all. .

413. In early as September 2004, the auditors, accountants, lawyers and directors and officers of APL knew that the assets of APL had been grossly overstated and inflated.

414. Emails were exchanged between the parties indicating that certain assets did not exist and should be assigned zero values.

415. The auditors, accountants, lawyers and directors and officers of APL took no action to correct these misrepresentations at any time, but continued to provide investors with false information.

416. In addition, the officers and directors were notified that the TAMKO contract was void by TAMKO representatives in January of 2005, but continued to represent that such a contract existed and was in place and never revealed this fact to the plaintiffs.

417. Such Defendants further knew or should have known that the TAMKO contract was invalid or void, that the payments on the G & G facility had not been made, and that various other contracts and sales data had been seriously misrepresented.

418. Defendants also knew or should have known that the reverse merger had been conducted illegally.

419. An investigation into where the money for the merger went and a comparison between who actually invested money and who received funds would have revealed the illegality of the transaction.

420. Defendants also knew or should have known that Medoff had been permanently enjoined by the SEC from practicing in securities.

421 Defendants also knew or should have known that Suzanne Wonderly had been enjoined from dealing in publicly traded companies and that she was found guilty of wire fraud.

422. In addition, such Defendants knew or should have known that numerous stock trades had been made all of which lacked consideration and shareholder approval.

423. An examination of the shareholder's meeting minutes and cash flows would have revealed that much of the stock was simply being given away at no cost.

424. Moreover, the large increases in stock, sometimes in excess of 10 million shares, warranted an examination into whether the shareholders had approved such large increases.

425. Said Defendants knew or should have known that the Plaintiffs in investment Group 4 were purchasing penny stocks.

426. However, no penny stock risk disclosures or non-solicitation disclosures were ever provided to the Plaintiffs in Plaintiffs Group 4.

427. Plaintiffs Group 4 was also never asked to sign any penny stock risk disclosures or non-solicitation disclosures.

428.   The truth of these facts was readily apparent to the defendants based upon the financial data of the company and various emails sent documenting the defendants' knowledge of the falsity of these representations.

429.   As further evidence of fraud, the defendant auditors, accountants, financial advisors and attorneys violated GAAP and GAAS principles as detailed in Paragraph 320.

430.   The, auditors, accountants, financial advisors and attorneys further violated GAAP and GAAS standards by failing to disclose the misrepresentations or withdrawing from representation of APL once the misrepresentations became known.

431.   Instead, the auditors, accountants, financial advisors and attorneys issued opinions verifying the accuracy of the APL's financial status and assets in SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint.

432.   These defendants were recklessly and intentionally failed to perform the actions stated in paragraph 388 of this Complaint.

433.   These facts, and others detailed in the complaint were never disclosed to the investors.

434.   While such relationship existed, the defendants concealed or failed to disclose the facts stated in the preceding paragraphs.

435.   The undisclosed information was material to the transaction.

436.   The Defendants knowingly failed to make the disclosure.

437.  The Defendants acted knowingly and with the intent to deceive the plaintiffs.

438.  As a result of their deception, the defendants all profited, either personally, professionally or both, at the plaintiffs' expense.

439.  The Plaintiffs acted in reliance upon the misrepresentations contained in the SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint and were justified in such reliance.

440.  The failure to disclose was a proximate cause of the Plaintiffs' damage.

441.  As a result of the Plaintiffs' reliance, the Plaintiffs lost nearly 100% of their invested funds and expected profits.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 10—VIOLATION BY ALL DEFENDANTS OF SECTION 10(b) AND RULE 10(b-5) OF THE SECURITIES EXCHANGE ACT OF 1934

442.  The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 441 of this Complaint as if they had been fully set forth herein.

443.  APL used an instrumentality of interstate commerce, or a facility of a national securities exchange, in connection with the sale of securities.

444.   In connection with such sale, the officers and directors of APL, and APL's hired accountants, consultants and lawyers made untrue statements of material fact or failed to state a material fact necessary in order to make the statements that were made not misleading in the SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint.

445.   The officers and directors of APL, and APL's hired accountants, consultants and lawyers acted knowingly and with the intent to deceive the plaintiffs.

446.   The officers and directors of APL knew the representations were false, but were motivated to make the fraudulent statements as they stood to gain substantial profit from the plaintiffs' investments.

447.   APL's hired accountants, auditors and attorneys had reviewed the Executive Summary, the CIM, the PPM and the various SEC filings and knew or should have known had a reasonable investigation been conducted that representations made in these documents were misrepresented and concealed as detailed in Counts 9 and 10.

448.   The misrepresentations were statements, which in their professional capacities and positions, the defendants knew or should have known had a reasonable investigation been conducted, that such statements were false and fraudulent.

449. The auditors, accountants, lawyers and directors and officers of APL took no action to correct these misrepresentations at any time, but continued to provide investors with false information.

450. As further evidence of the fraud perpetrated on the plaintiffs, the defendant auditors, accountants, financial advisors and attorneys violated GAAP and GAAS principles as detailed in Paragraph 320.

451. Moreover, auditors, accountants, financial advisors and attorneys violated GAAP and GAAS standards by failing to disclose the misrepresentations or withdrawing from representation of APL once the misrepresentations became known.

452. Instead, the auditors, accountants, financial advisors and attorneys issued opinions verifying the accuracy of the APL's financial status and assets in the SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint.

453. The auditors, accountants, financial advisors and attorneys recklessly and intentionally failed to perform the actions identified in paragraph 388 of this Complaint.

454. The misrepresentations were statements, which in their professional capacities and positions, the defendants knew or should have known had a reasonable investigation been conducted, that such statements were false and fraudulent.

455.  The safe harbor provision for forward looking statements does not apply to the false statements pleaded in this complaint because:

a. The statements herein all relate to then-existing facts and conditions.

b. If certain statements can be characterized as forward-looking, they were not adequately identified as such when made.

c. There were no statements made with respect to any of those representations forming the basis of the complaint that actual results could differ materially from those projected or other meaningful cautionary statements.

d. Additionally, defendants are liable for any forward looking statements because at the time they were made, the particular speakers had actual knowledge that the particular forward-looking statement was materially misleading and based on untruthful and exaggerated presumptions, not in accord with sound actuarial or financial principles.

456.  The Plaintiffs justifiably relied upon the misrepresentations in the SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint.

457.  Plaintiffs Group 4 is entitled to rely on the fraud on the market presumption.

458.  The Plaintiffs suffered damages as a result of the defendants' conduct.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble

damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 11—VIOLATION OF STATE BLUE SKY LAWS

459. The Plaintiffs re-allege and restate paragraphs 1 through 458 contained in this Complaint and incorporate them by reference.

460. APL, its officers and directors, and APL's hired accountants, consultants and lawyers offered to sell securities in Arizona; Iowa; Minnesota; North Dakota; South Dakota and Wyoming.

461. The Defendants made untrue statements of material facts and/or failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in SEC filings, the Executive Summary, the CIM, the PPM, and multiple press releases specifically identified previously in this Complaint..

462. None of the Defendants in any of their capacities ever filed for "Blue Sky" protection under any of the states in which investors resided.

463. None of the American Pallet Leasing, Inc. an Iowa Corporation stock that was exchanged for Literary Playpen, Inc. a Delaware Corporation stock was ever exempt from registration because none of it was ever Blue Skied.

464. Due to the violations of all of the state Blue Sky laws listed here and before, any sales on the public market were illegal and void.

465. As a result, Plaintiffs lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 12—VIOLATION OF SECTION 11 OF THE SECURITIES EXCHANGE ACT OF 1933

466.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 465 of this Complaint as if they had been fully set forth herein.

467.   The Plaintiffs acquired a security registered under the Securities Exchange Act of 1933.

468.   When the registration statement became effective, it misrepresented a fact or omitted a fact, which under the circumstances, had to be made to keep the statements from being misleading.

469.   The misrepresented and/or omitted facts were material.

470. The Defendants were negligent as detailed in Paragraph 318 of this Complaint.

471.   This negligence continued and tainted each and every subsequent stock offering, which were never verified or examined by the professional defendants and was continually misrepresented to investors.

472.   APL's directors and officers, including those who were represented as about to be named, and the named accountants and law firms all "persons" under section 11.

473. The plaintiffs read the registration statement and relied on the misrepresentations contained in the registration statement.

474. As a result of their reliance on the misrepresentations, Plaintiffs lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 13—VIOLATION OF SECTION 12 OF
## THE SECURITIES EXCHANGE ACT OF 1933

475. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 474 of this Complaint as if they had been fully set forth herein.

476. APL, its officers and directors, together with the lawyer, accountants and financial advisors hired on behalf of APL, sold securities through a prospectus or oral communication using the instrumentalities of interstate commerce.

477. These Defendants sold, offered to sell, or solicited the sale of the security to the Plaintiffs.

478. The sale occurred by means of a prospectus or oral communication misstating a material fact or omitted a material fact that was necessary to keep the statements that were made from being misleading.

479. The Defendants were negligent as detailed in Paragraph 318 of this

Complaint.

480. This negligence continued and tainted each and every subsequent stock offering, which were never verified or examined by the professional defendants and was continually misrepresented to investors.

481. The plaintiffs justifiably relied on the misrepresentations contained in the a prospectus or oral communications.

482. As a result, Plaintiffs lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 14—VIOLATION OF SECTION 18 OF THE SECURITIES EXCHANGE ACT

483. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 482 of this Complaint as if they had been fully set forth herein.

484. APL, its officers and directors, together with the lawyer, accountants and financial advisors hired on behalf of APL filed documents with the SEC as detailed herein.

485. The SEC filings all contained false or misleading statements as detailed in this Complaint.

486. The false and misleading statements were material.

487.   The plaintiffs read each document filed with the SEC.

488.   Specifically, the plaintiffs relied on the misrepresentations detailed in paragraphs 214-273.

489.  As a result of their reliance on the misrepresentations made in the SEC filings, the plaintiffs invested into APL and ultimately lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 15—BREACH OF CONTRACT

490.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 489 of this Complaint as if they had been fully set forth herein.

491.   APL, its officers and directors created a contract with investor Plaintiffs.

492.   Under the contract, the Plaintiffs paid money in exchange for stock ownership in APL and certain rights with respect to that stock, including but not limited to, piggy back registration rights and the right to participate in corporate meetings.

493.   APL, its officers and defendants breached the contract with the Plaintiffs by failing to perform pursuant to the terms of the contract(s).

494.   As a direct and proximate cause of the breach, the Plaintiffs lost 100% of their investments and expected revenue.

495.   In the alternative, if a contract did not exist, APL, its officers and defendants have been unjustly enriched by retaining the benefits of the plaintiffs' investments.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 16—BREACH OF CONTRACT THIRD-PARTY BENEFICIARY

496.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 495 of this Complaint as if they had been fully set forth herein.

497. TAMKO created a contract with APL.

498.   Under the contract, TAMKO agreed to purchase timber or pallets or both from APL.

499. TAMKO breached the contract by failing to perform pursuant to the terms of the contract.

500.   The plaintiffs were known and identified third party beneficiaries of the TAMKO contract.

501.  As a direct and proximate cause of the breach, the Plaintiffs lost 100% of the expected revenue that was to be derived from the contract between TAMKO and APL.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 17—DISREGARD OF CORPORATE FORM

502.  The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 501 of this Complaint as if they had been fully set forth herein.

503.  APL disregarded its corporate form by commingling business funds and stock with personal finances.

504.  APL was a shell corporation, thereby depriving shareholders of their right to limited liability.

505.  The shareholders should be held personally liable in this action.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 18—CONTROLLING PERSONS UNDER § 20 OF
## THE SECURITIES EXCHANGE ACT

506. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 505 of this Complaint as if they had been fully set forth herein.

507. The named defendants in this action all controlled various other Defendants and individuals.

508. The defendants induced the illegal, fraudulent and/or negligent conduct of various other defendants, individuals and/or employees.

509. The officers and directors of these entities should be held jointly and severally liable with and to the same extent as such controlled person.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 19—PUNITIVE DAMAGES

510. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 509 of this Complaint as if they had been fully set forth herein.

511. In doing all the acts alleged herein, the defendants acted willfully, maliciously and unlawfully and were guilty of a wanton disregard of the rights of the plaintiffs.

512. By reason thereof, the plaintiffs demand exemplary and punitive damages be awarded against the defendant in an amount commensurate with the malicious nature of the defendants' conduct.

## JURY DEMAND

The Plaintiffs hereby request trial by jury on all issues.

Respectfully submitted,

HEIDMAN REDMOND, FREDREGILL,
PATTERSON, PLAZA, DYKSTRA & PRAHL, L.L.P.

By: */s/ Jeff W. Wright*

JEFF W. WRIGHT          AT0008716
DANIEL B. SHUCK         AT0007141
1128 Historic Fourth Street
P.O. Box 3086
Sioux City, IA 51102
Phone: (712) 255-8838
Fax:    (712) 258-6714

and

Mark Haggerty,
MN Attorney Lic. No.: 03938X
FFP Legal Services, LLC
8009 34th Ave South, Suite 185
Bloomington, MN 55425
Phone: (952) 854-9678
Fax:    (952) 854-9889

ATTORNEYS FOR PLAINTIFFS