IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| Timothy Armstrong, Wanda Armstrong, | CIV. C07-4107 |
| Todd Atenhan, Todd Atenhan IRA, | |
| Todd Atenhan SEP, Aaron Baart, Nicole Baart, | |
| Todd Bartman, Juliann Bartman, | |
| Jeffrey J. Benedict, Dennis Bertilson, | |
| Thomas Blauwet, Kim Blauwet, Clarence Boer, | |
| Karyn Boer, Jason A. Boer, Alvin Bylsma, | |
| Gene Collins, William Corcoran, Jack Corcoran, | |
| Michael P. Corcoran, | FIRST AMENDED |
| Lenora Davelaar, Earl DeBey, Paul DeBey, | COMPLAINT AND |
| Karmin DeBey, Dan DeRoon, Arline DeRoon, | JURY DEMAND |
| Derrick DeRoon, Larry Dirksen, Gloria Dirksen, | |
| James R. Ellis, Ruth Ann Ellis, | |
| Ken Emmelkamp, Ardene Emmelkamp, | |
| Audrey Eppinga, Sydney Eppinga, Ben Eppinga, | |
| Robbin D. Eppinga, Sara K. Eppinga, | |
| Scott Eppinga, Nathan Fichter, | |
| John Harmelink, Brent Hella, | |
| Bruce Hella, Kevin Hoogendoorn, | |
| Janelle Hoogendoorn, Peter Hoogendoorn, | |
| Connie Hoogendoorn, Hoogendoorn Construction, | |
| Robert Van't Hul, Leroy Intveld, Wanda Intveld, | |
| Keith Johs, John Jones, Linda Jones, Paul Kats, | |
| Blake Kerbaugh, Mary Kerbaugh, Kyle Koedam, | |
| Roger Koedam, Muriel Koedam, Bruce Kooima, | |
| Linda Kooima, Clarence Kooima, Winifred Kooima, | |
| Tim R. Kooima, Clarine Kooima, Kenneth Krieg, | |
| Sandy Krieg, Glenn Lange, Cheryl Lange, | |
| Jason D. Liles, Scott J. Lyftogt, Kim M. Lyftogt, | |
| Damon Maassen, Dave Maassen, Lisa Maassen, | |
| Mike Maassen, Juanita Maassen, Paul Maassen, | |
| Shelly Maassen, Tom Maassen, Paula Maassen, | |
| Craig Miller, Kerry McAbee, Barbara McAbee, | |
| Craig Miller, Allen B. Nelson, Tim Niemeyer, | |
| Mary Niemeyer, Lori Ohlemann, Scott Ohlemann, | |
| Mark Ohling, Ronald Owens, Karen Owens, | |
| Donald Peterson, Stacey Peterson, | |
| Bradley Pollema, Kerri Pollema, | |
| David M. Ransome, Stephen Richter, | |

Joyce Richter, Ronan Roghair, Christopher Rosen,  )
Bart Roskoski, Darwin Rus, Helen Rus,  )
Duane Rus, DLD Cattle, Lorn Rus, Marilyn Rus,  )
Marion Rus, Mike Rus,  )
Sam Vander Schaaf,  )
Daniel Schreurs, Rachel Schreurs, Seppinga, Inc.,  )
Jesse Van De Stroet, Tanya Van De Stroet,  )
Vincent Thompson, Vincent Thompson IRA  )
Bovine Technology, Inc., Arnold Kelderman,  )
Carol Kelderman, The Kelderman Living Trust,  )
Allan Van Beek, Colleen Van Beek,  )
Garlen Van Beek, Tammie Van Beek,  )
Joyce Van Beek, Marvin Van Beek,  )
Jeanette Van Beek, The Estate of Wilmer Van Beek,)
Della Van Beek, Gary Van Den Berg,  )
Norma Van Den Berg, Edward Van Der Brink,  )
Dan Van Ginkel, Michele Van Ginkel,  )
Ross Van Kekerix, Evert D. Van Maanen,  )
Kathy Van Maanen, Oakwood Rentals,  )
Jason Van Surksum, Becky Van Surksum,  )
Ronald Van Veldhuizen, Gertrude Van Veldhuizen, )
Sturgis Van Vugt, John H. Van Zanten,  )
Mary Van Zanten, Terry Van Zanten,  )
Darrel Vande Vegte, Andrew Vander Vliet,  )
Amber Vander Vliet, Charles Witte, Linda Witte,  )
Fred Ymker, Michelle Ymker, Mark Zomer,  )
Karla Zomer, Joel Van Den Top, James Hawkins,  )
Hoper Family Trust, Robert Matthiessen,  )
Craig Richie for Fishes & Loaves from  )
Jesus Christ Foundation, Chuck Nejdl,  )
Deann Nejdl, Robert Reese, Dale Wacker,  )
Connie Wacker, Donald Wacker, and Lori Wacker,  )
  )
        Plaintiffs,  )
  )
  )
vs.  )
  )
American Pallet Leasing, Inc., a Delaware  )
Corporation, formerly Literary Playpen, Inc., and  )
formerly American Pallet Leasing, an Iowa  )
Corporation; Langley, Williams & Company, LLC  )
and Daphne B. Clark and Danilo Cacciamatta;  )

Kirkpatrick & Lockhart, Preston, Gates, Ellis, LLP,)
f/k/a Preston, Gates & Ellis, LLP and also known )
as K L Gates, and Daniel K. Donahue; )
)
Michael J. Morrison;Marshall W. Dooley, )
Tempus Financial, Inc., )
Glast, Phillips & Murray and Gersten Savage, LLP;)
)
Timothy Bumgarner, Margaret Bumgarner, )
Byron Hudson, Kevin Bumgarner, )
James F. Crigler, CALA Group, Inc., Douglas H. )
Peterson, Keith Kerbaugh, Robert Vinson, )
and Elgin McDaniel, )
)
Steve Burman, Bradley Doss, )
Chris Curnutt, Jason Nichols, Jennifer Nichols, )
Gregory D. Frost, John Brda, Marianna Porcella )
Craig Medoff and Suzanne Wonderly; )
)
ACAP Financial, Inc., A.G. Edwards, )
Pennaluna & Company,
CALA Group, Inc., Penson Financial Services, Inc. )
Selective Consultants, LLC, Vincent Cerrone, )
South Coast Fund, LLC, Fiserv Securities, Inc., )
Frank Colmes, US Bancorp, Inc., US Bancorp )
Investment Services, Inc. and )
Suzanne Wonderly )

---

COME NOW the Plaintiffs, by their undersigned counsel, and for their cause

of action against the Defendants state:

## I. JURISDICTION AND VENUE

   1.    Jurisdiction herein is based upon federal question jurisdiction as the

Plaintiffs' Complaint is premised upon myriad federal statues, including, but not

limited to the Securities Exchange Acts of 1933 and 1934 and the Racketeer

Influenced and Corrupt Organizations Act.

2.     Section 27 of the 1934 Securities Act, 15 U.S.C. § 78aa, and 18 U.S.C. § 1965(d) contain provisions authorizing nationwide service of process, and thus creates personal jurisdiction over any defendant within the United States.

3.     Jurisdiction over any state law claims is proper pursuant to this court's supplemental jurisdiction as any state law claims are so related to the federal claims that they form part of the same controversy.

4.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or admissions giving rise to the claim occurred in the Northern District of Iowa.

5.     The activities of the Defendants and co-conspirators as described in this amended Complaint were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States of America.

## II.     ALLEGATIONS COMMON TO ALL COUNTS

6.     The Plaintiffs are comprised of individuals and entities that invested money into American Pallet Leasing, Inc. ("APL") from approximately 2003 through 2006.

7.     Defendant, APL, was originally incorporated under the laws of the State of Iowa on June 13, 2003, and maintained its principal place of business in Cedar Rapids, Iowa.

8.     APL purported to be in the business of manufacturing both wooden and metal pallets in Rock Valley, Iowa, as well as in South Carolina.

9.     In September of 2004, APL was reverse merged into the publicly traded

corporation of Literary Playpen, Inc., a Delaware Corporation.

10.    Following the reverse merger transaction, the name of Literary Playpen, Inc. was changed to American Pallet Leasing, Inc., a Delaware Corporation. (Hereinafter, "APL" will necessarily include all iterations of the company both before and after the reverse merger transaction).

11.    The corporate offices of American Pallet Leasing, Inc., a Delaware Corporation, f/k/a Literary Playpen, Inc., and their predecessor, American Pallet Leasing, Inc., were located in Cedar Rapids, Iowa, from June 2003 through 2006.

12.    Beginning in June 2003 and continuing through 2006, APL solicited investment funds from the Plaintiffs.

13.    APL reported wildly successful growth in its sales and assets, thereby luring and enticing investors to purchase its stock and artificially inflating the value of its stock.

14.    As elaborated herein, APL achieved this façade for success, growth and strong future business prospects by misrepresenting the company's finances and falsifying the company's financial statements.

15.    The scheme was used to run the stock price from $.60 per share to over $6.00 in less than 30 days, and then over the following year the stock price plummeted to less than $.10.

16.    The drop removed the inflation from the company stock price, causing real economic loss to investors who purchased the stock in reliance on the representations of various defendants detailed herein.

17.    There were approximately four investment offerings in which the various named Plaintiffs purchased stock in APL's enterprise.

### III.    THE PLAINTIFFS

18.    Commiserate with the four investment offerings, the named Plaintiffs consisted of four different groups as follows:

a. The following Plaintiffs made investments in an approximate amount of $300,000 at the first investment offering:

Earl DeBey, Sydney Eppinga, Audrey Eppinga, Bruce Kooima, Linda Kooima, Stephen Richter, Joyce Richter, Wilmer Van Beek, Della Van Beek, Ronald Van Veldhuizen, Gertrude Van Veldhuizen, Glenn Lange, Cheryl Lange, Roger Koedam, Muriel Koedam, Paul Kats, John Van Zanten, Mary Van Zanten, Tim Kooima, Clarine Kooima, Alvin Bylsma, Duane Rus, Clarence Kooima, Winifred Kooima, Larry Dirksen, Gloria Dirksen, Ronald Owens, Karen Owens, Lori Ohlemann, Scott Ohlemann, Chuck Witte, Linda Witte, Robert Van't Hul, Michael Corcoran, Brent Hella, Blake Kerbaugh, Keith Johs, and Scott Eppinga (all shall be described as "Plaintiffs Group 1").

b. The following Plaintiffs invested money to purchase APL's stock during

the

second campaign:

Aaron Baart, Nicole Baart, Todd Bartman, Juliann Bartman, Alvin Bylsma, Earl DeBey, Paul DeBey, Karmin DeBey, Dan DeRoon, Arline DeRoon, Derrick DeRoon, Ken Emmelkamp, Ardene Emmelkamp, Audrey Eppinga, Sydney Eppinga, Scott Eppinga, Brent Hella, Pete Hoogendoorn, Connie Hoogendoorn, Paul Kats, Roger Koedam, Muriel Koedam, Bruce Kooima, Linda Kooima, Clarence Kooima, Winifred Kooima, Kenneth Krieg, Sandy Krieg, Glenn Lange, Cheryl Lange, Paul Maassen, Shelly Maassen, Oakwood Rentals, Jason Van Surksum, Ronan Roghair, Darwin Rus, Helen Rus, DLD Cattle, Duane Rus, Bovine Technologies, Jesse Van De Stroet, Tanya Van De Stroet, Kelderman Living Trust, Arnold Kelderman, Carol Kelderman, Allan Van Beek, Colleen Van Beek, Garlen Van Beek, Tammie Van Beek, Edward Van Der Brink, Evert D. Van Maanen, Kathy Van Maanen, Jason Van Surksum, Becky Van Surksum, Sturgis Van Vugt, John H. Van Zanten, Mary

Van Zanten, Andrew Vander Vliet, Amber Vander Vliet, Fred Ymker, and Michelle Ymker (collectively referred to as "Plaintiffs Group 2").

c. The following named Plaintiffs invested money to purchase stock in APL pursuant to the Reverse Merger dated September of 2004 in the approximate amount of $595,000:

Alvin Bylsma, William Corcoran, Jack Corcoran, Michael P. Corcoran, Earl DeBey, Audrey Eppinga, Sydney Eppinga, Scott Eppinga, Brent Hella, Paul Kats, Roger Koedam, Muriel Koedam, Bruce Kooima, Linda Kooima, Clarence Kooima, Winifred Kooima, Glenn Lange, Cheryl Lange, Kerry McAbee, Barbara McAbee, Bart Roskoski, DLD Cattle, Duane Rus, John H. Van Zanten, Mary Van Zanten, James Hawkins, Hoper Family Trust, Robert Matthiessen, Craig Richie for Fishes & Loaves from Jesus Christ Foundation, Chuck Nejdl, Deann Nejdl, Robert Reese, Dale Wacker, Connie Wacker, Donald Wacker, and Lori Wacker (collectively referred to as "Plaintiffs Group 3").

d. The following Plaintiffs purchased stock in APL on the open market in the approximate amount of $1,800,000:

Todd Atenhan, Todd Atenhad IRA, Todd Atenhand SEP, Jeffrey J. Benedict, Thomas Blauwet, Kim Blauwet, Clarence Boer, Karyn Boer, Jason A. Boer, Corilee J. Boer, Gene Collins, Hoogendoorn Construction, Jack Corcoran, Randy Cramer, Lenora Davelaar, Larry Dirksen, Gloria Dirksen, James R. Ellis, Ruth Ann Ellis, Ken Emmelkamp, Ardene Emmelkamp, Audrey Eppinga, Sydney Eppinga, Ben Eppinga, Robbin D. Eppinga, Sara K. Eppinga, Scott Eppinga, Nathan Fichter, John Harmelink, Brent Hella, Bruce Hella, Kevin Hoogendoorn, Janelle Hoogendoorn, Hoogendoorn Construction, Robert Van't Hul, Leroy Intveld, Wanda Intveld, Keith Johs, Keith Johs, John Jones, Linda Jones, Paul Kats, Blake Kerbaugh, Mary Kerbaugh, Kyle Koedam, Clarence Kooima, Winifred Kooima, Tim R. Kooima, Clarine Kooima, Kenneth Krieg, Sandy Krieg, Cheryl Lange, Scott J. Lyftogt, Kim M. Lyftogt, Damon Maassen, Dave Maassen, Lisa Maassen, Mike Maassen, Juanita Maassen, Paul Maassen, Shelly Maassen, Tom Maassen, Paula Maassen, Kerry McAbee, Barbara McAbee, Allen B. Nelson, Tim Niemeyer, Mary Niemeyer, Lori Ohlemann, Scott Ohlemann, Mark Ohling, Ronald Owens, Karen Owens, Donald Peterson, Stacey Peterson, Bradley Pollema, Kerri Pollema, David M. Ransome, Stephen Richter, Joyce

Richter, Ronan Roghair, Duane Rus, DLD Cattle, Lorn Rus, Marilyn Rus, Marion Rus, Mike Rus, Sam Vander Schaaf, Daniel Schreurs, Rachel Schreurs, Arnold Kelderman, Carol Kelderman, The Kelderman Living Trust, Vincent Thompson, Vincent Thompson IRA, Garlen Van Beek, Tammie Van Beek, Joyce Van Beek, Marvin Van Beek, Jeanette Van Beek, Wilmer Van Beek, Della Van Beek, Gary Van Den Berg, Norma Van Den Berg, Dan Van Ginkel, Michele Van Ginkel, Ross Van Kekerix, Oakwood Rentals, Jason Van Surksum, Becky Van Surksum, Ronald Van Veldhuizen, Gertrude Van Veldhuizen, Sturgis Van Vugt, John H. Van Zanten, Mary Van Zanten, Terry Van Zanten, Darrel Vande Vegte, Charles Witte, Linda Witte, Fred Ymker, Michelle Ymker, Mark Zomer, Karla Zomer, Joel Van Den Top, James Hawkins, Chuck Nejdl, Deann Nejdl, Dale Wacker, Connie Wacker, Donald Wacker, and Lori Wacker (collectively referred to as "Plaintiffs Group 4").

## IV.   FACTS SPECIFIC TO INDIVIDUAL DEFENDANTS

### A.   *Incorporators, Officers and Directors of APL*

19.    Defendants Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Byron Hudson, and Elgin McDaniel were all at some period of time from June 2003 through 2006, Officers, Directors, relatives of APL's CEO or Senior Employees of APL or all four.

### The Executive Summary

20.    The Incorporators and original Officers and Directors of APL drafted and/or assisted in drafting a document entitled "American Pallet Leasing, Inc. Executive Summary", (hereinafter referred to as "Executive Summary") sometime before APL's incorporation.

21.    The Executive Summary contained the following falsities:

a. APL owned certain patents related to the production of wood pallets even though said patents were at all times held solely in the name of Timothy Bumgarner, personally.

b. A purchase agreement for RY-JO-BE had been negotiated and that RY-JO-BE's customers had agreed to make a contractual change to APL, including but not limited to the customer named TAMKO Roofing.

c. TAMKO did enter into an agreement to purchase pallets from APL, but claimed its signor on the agreement, Mark Hicks, exceeded his authority when entering into the contract.

d. APL received notice that TAMKO considered the contract invalid in January 2005, but APL never disclosed the information to Plaintiffs.

e. APL identified its purported customer base, none of whom were ever customers of APL.

f. Manufacturing and fabrication of the initial pallets would be performed by Iron Company Enterprises, located in Phoenix, Arizona, but Iron Company Enterprises never agreed to these terms.

g. APL's projected earnings were grossly and intentionally inflated, and were not based upon sound financial forecasting, accounting principles, or truthful assumptions.

h. The specific purposes for which the Plaintiffs' investment would be utilized.

i. Varying charges for the stock purchased by Plaintiffs, from as low as $0.25 to as high as $1.00 per share in less than a 6-month period, were never disclosed.

j. Failure to file a Regulation D exemption from securities registration as required by Federal and State Law for any of the sales of stock in the Iowa APL Corporation, which was never disclosed to the investors.

22.    All of the individuals comprising Plaintiffs Group 1 were given a copy of the Iowa APL Executive Summary from June 2003 through April 2004 and relied on the misrepresentations contained therein.

## CIM

23.    As part of the initial stock offering of APL, a "Funding Request Confidential Information Memorandum" was prepared by Defendant Hughes-Roth, one of APL's broker-dealers, in September 2003 with "information solely for use by potential investors." (hereinafter "CIM"). The officers and directors of APL assisted in the preparation of this document.

24.    The CIM contained the following misrepresentations:

a. APL had made considerable headway in its developmental plan and represented certain phases had been completed, even though no contracts with high volume pallet users had been secured as of October 2003.

b. APL was managing and operating a facility in Oklahoma which had increased revenue by 400% even though it did not have an Oklahoma facility nor had it increased monthly revenues.

c. APL entered into an agreement with TAMKO, as set forth in Paragraph 21(c) herein but failed to notify investors that TAMKO considered the contract void .

d. Projected net earnings for the Iowa APL to be $1,458,930 by September of 2004 and $9,252,134 by September of 2005 and $23,223,583 by September of 2006 all of which were intentionally and grossly inflated.

e. APL intended to enter into a reverse merger transaction with Literary Playpen, even though APL and Literary Playpen never intended to allow the plaintiff-investors to receive or realize any type of benefit under the reverse merger transaction.

25. All of the individuals comprising Plaintiffs Group 1 were given a copy of the CIM on or about October 2003 and relied on the misrepresentations contained therein.

## Confidential Private Placement Memorandum (PPM)

26. With respect to the second investment offering, the officers and directors of APL also helped prepare a Confidential Private Placement Memorandum (PPM) issued on June 2004 and finalized in August 2004.

27. The PPM contained the following misrepresentations:

a. The estimated value of APL's stock and the estimated book value, since APL's net book value was near zero as of June 30, 2004.

b. All investors who purchased would receive "piggy-back registration rights," but the investors never received the benefit of these rights, nor were they included in any of the subsequent SB-2 filings or S-8 filings.

c. Shares would only be sold to 35 Non-Accredited Investors, even though well over 35 Non-Accredited Investors invested pursuant to the PPM.

d. A down payment had been made on the purchase of the G & G / Cherokee Wood, Inc. facility located in Blacksburg, South Carolina (hereinafter "G & G").

e. Timothy Bumgarner personally invested substantial sums of money in APL, even though he had not.

f. Ryan Financial Group had issued a Financing Commitment Letter, which reasonably created the appearance that the G & G facility was completely funded, even though no such Letter was prepared, and APL had not secured appropriate financing, which resulted in APL defaulting on the purchase by failing to make four of five monthly payments of $30,000 and failing to make a balloon payment of $2,700,000.

g. The PPM also indicated a copy of the purchase agreement between APL and the G & G facility had been attached, but said Purchase

Agreement was never produced because it would have revealed the complete lack of financing.

h. Plaintiffs were told by agents of APL that there was no problem with the financing and that the investors could rely on the PPM

i. The State and local governments of South Carolina agreed to give APL certain tax benefits, even though no such commitments had been made.

j. G & G agreed to purchase timber from APL for the upcoming three years.

k. Certain patents were owned by APL and that Nucor had offered a large sum of money to purchase the patents, but said patents remained in Bumgarner's name at all relevant times, and Nucor never offered the amounts represented in the PPM for the steel pallet patents.

l. The PPM further listed a number of corporate customers of APL, even though APL never sold a single galvanized or steel pallet to any of the claimed customers.

m. The PPM listed the 2005 projected revenues, which were intentionally and grossly overstated and not based upon sound actuarial principles or truthful assumptions.

n. The PPM indicated Defendant Mercedis USA Limited agreed to purchase APL stock at $7.85 per share, even though Mercedis never

intended or agreed to buy APL stock, but was paid $50,000 in May or June 2004 to make the representations made in the PPM..

o. Mercedis would function as APL's investment bank and that a banking agreement had been signed, but no investment banking services ere performed.

p. Mercedis USA Limited was to pay $0.50 each for 6 million warrants to purchase APL common shares., under the purported banking agreement, but no such stock purchases were made.

q. The PPM indicated a facility was to be built in Burnsville, North Carolina and would be fully operational by September 1, 2004, but the facility never commenced nor materialized.

r. The PPM represented that a wood and steel pallet facility was to be constructed in Rock Valley, Iowa, but APL breached its contract with the City of Rock Valley and never intended to commence construction on such a facility.[1]

s. The PPM listed, specifically, the permissible uses of APL's net proceeds, but APL used little, if any, of the funds raised from Plaintiffs' Group 2 for the stated purposes.

t. The PPM represented an equity valuation analysis was done stating that the "Estimated Value of APL Common Stock" as of December 31, 2005, should have an "effective price per share of $9.58," but the

---

[1] The facility itself was foreclosed upon by creditors and governmental agencies and is no longer owned by APL.

analysis was based upon false assumptions and unsound actuarial and financial principles.

u. A business entity known as "US Consults" had awarded APL a total of $15 million of USTC's and that APL would receive a total of $1,233,600 in cash, but US Consults was never aware of these representation and never authorized them.

v. The PPM contained ten Pro Forma income statements and balance sheets and another twenty Pro Forma financial statements and projections, none of which were ever realized.

w. The PPM materially omitted the fact that Daniel Donahue was the General Partner of Templemore Partners, an original investor in a publicly traded company known as Literary Playpen, Inc., which would be reverse merged into APL in September of 2004.

### Reverse Merger

28.    With respect to the third investment offering, the officers and directors of APL organized and/or assisted in organizing a reverse merger with a company named Literary Playpen in September 2004.

29.    With respect to the reverse merger transaction, Michael Morrison of Nevada Agency and Trust, and Dan Donahue of Preston Gates & Ellis, as escrow agents and as attorneys at law, gave a written opinion saying that all the legal requirements and regulations and SEC and State securities regulations had been

met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock.

30.     Preston Gates & Ellis (hereinafter "Preston Gates) and Attorney Donahue were involved in the third investment campaign of APL which coincided with the reverse merger transaction between APL and Literary Playpen that occurred in September of 2004.

31.     In order to complete the reverse merger, the sellers and purchasers were divided into two different groups with different escrow account managers.

32.     One escrow account was managed by Michael J. Morrison and was allegedly comprised of thirteen investors when in fact only seven of the alleged thirteen investors had invested real cash for the free trading shares and restricted shares.

33.     Escrow agent attorney and Defendant, Michael J. Morrison was to have received a total of $350,000.00 and of that amount he received $245,000.00 from the seven cash Plaintiff investors.

34.     Another $55,000 was wired to Marshall Dooley and Tempus Financial by Timothy Bumgarner and his son Kevin Bumgarner from the PPM proceeds that had been invested by Plaintiffs' Group 2.

35.     The other six individuals listed as being contributors to the Morrison escrow and who were ultimately issued free trading stock were Jesse Navarro, Jason Nichols, Jennifer Nichols Gregory Frost, Christopher Curnutt and John Breda.

36. The six individuals named in paragraph 35 did not contribute any cash or money in exchange for the issuance of stock.

37. This transaction was never disclosed to any of the individuals in Plaintiffs Group 2, despite the fact that such a use of the Plaintiffs Group 2's funds violated the "use of proceeds" representations contained in the PPM.

38. The other escrow account was managed by Defendant Preston Gates.

39. The escrow account managed by Preston Gates allegedly had eight investors, seven of whom paid no consideration for their free trading stock and one Plaintiff, Scott Eppinga, representing a number of other cash investors contributed the full $350,000.

40. Another $50,000 was paid to Preston Gates as escrow agent by Aluma Investment Company, which was ultimately reimbursed.

41. Although Eppinga collected money from other individuals for the stock, none of those individuals were included or listed as being contributors.

42. The other seven (7) persons and entities listed as being contributors and who were ultimately issued stock were Mariana Porcella; Steve Burman; Bradley J. Doss; Curt Cramer; Aluma Investment Company, Harold Jensen, James Jeffery's corporations, and John Breda.

43. These seven purported investors did not contribute any cash or money in exchange for the issuance of stock.

44. This set-up enabled Donahue and the sellers to charge two different

prices for the shares, despite the fact the closings occurred on the same day and that the same purchase agreement was utilized.

45.    The sellers in the Preston Gates escrow account charged a substantially higher price for their shares of stock, thereby deriving massive profit from the sale of their shares.

46.    The sellers involved in the Preston Gates escrow transaction who received the benefit of the higher priced shares were all friends and relatives of Attorney Donahue.

47.    Upon information and belief, the $350,000 cash that was paid to the Preston Gates escrow account was inappropriately transferred in its entirety to Danilo Cacciamatta, CPA.

48.    Pursuant to the Shareholders Purchase Agreement, the plaintiff-investors were to receive approximately 97.5% of the restricted and free trading stock of Literary Playpen, Inc. in exchange for their cash contribution.

49.    This representation was false as the plaintiff-investors did not receive the percentage of stock as represented and in fact, received only a tiny percentage of the shares they were allegedly entitled to receive under the purchase agreement.

50.    Instead, the majority of the shares went to other individuals, including Timothy Bumgarner, Tempus Financial, Jesse Navarro, Jason Nichols, Jennifer Nichols, Attorney Gregory Frost, Christopher Curnutt, and John Breda, Mariana Porcella; Steve Burman; Bradley J. Doss; Curt Cramer; Aluma Investment Company, Harold Jensen, and Mercedis Ltd and James Jeffery.

51. These individuals either sold long or short on the market and made a substantial profit.

52. All of the Plaintiffs in Plaintiffs' Group 3 relied on the purchase agreement and the representations made by Donahue and Morrison.

53. These individuals who actually contributed money lost 100% of their investment.

## Open Market

54. The fourth investment offering occurred on the open market from September 2004 through 2006 and allowed for direct purchase of APL stock.

55. In order to inflate APL's stock, myriad press releases were issued based on representations and statements made by APL's officers and directors.

56. Specifically, the press releases contained the following material misrepresentations :

    a. On June 27, 2004, and June 30, 2004, several representations appeared in two local Rock Valley newspapers about APL's secured contracts and plans to build a manufacturing plant based on information obtained from interviews with APL, even though no contracts had been secured and APL never intended to build a plant in Rock Valley.

    b. The newspaper articles were based on statements made by the officers and directors of APL, specifically, APL's CEO Keith Kerbaugh and CFO Doug Peterson.

c. Most of the Plaintiff investors in this lawsuit are from northwest Iowa and the Rock Valley, Iowa area, and relied upon what these newspapers stated.

d. On September 22, 2004, October 21, 2004, and December 14, 2004, APL issued a number of press releases indicating contracts had been secured by APL and documenting its sound financial condition, even though APL's revenues, net income and assets represented were listed as "zero" in a subsequent audit.

e. A September 2004 press release announced APL had completed the initial closing of its reverse acquisition of Literary Playpen, Inc., even though the reverse merger cash investors had not yet reviewed or approved the plan of reorganization and purchase agreement.

f. A letter was also mailed to APL's shareholders containing similar omissions and misrepresentations about the financial condition, business revenues and current projects and contracts at this same time.

g. On January 4, 2005, APL issued a press release stating that it had increased production over the previous quarter by 30% in its G & G facility and that $150,000 had been invested in improvements, but no such improvements had been undertaken, no pallets had yet been produced from that facility and APL was defaulting on its purchase contract.

h. On January 11, 2005, APL issued another press release that equipment had been installed at its G & G facility and that contracts had been awarded which would add about $200,000 per month in a new revenue stream, but no such assets ever existed.

i. On March 10, 2005, APL issued a press release indicating it had obtained a 3-year contract with G & G for production of pallets and that it had purchased the G & G facility, even though APL was in complete default on the purchase of the G & G facility and the contracts for production never existed. APL had exhausted its timber inventory and was not even operating the G & G facility as of March 10, 2005.

j. The March 10, 2005 press release further represented that additional contracts for manufacturing facilities were being negotiated, which was false.

k. The March 2005 press release further represented that the G & G facility revenues would reach $9 million based on the G & G contract and current sales of pallets despite full knowledge of APL's default and utter lack of pallet production.

l. On March 16, 2005, APL issued another press release indicating that automated equipment was being installed in the G & G facility and that APL was expanding its capabilities.

m. On May 10, 2005, APL issued another press release indicating APL had received the exclusive right to market a new wood pallet cleansing product and that the product had been approved by the USDA and that it complied with federal regulations, but at no time has the USDA approved the purported cleansing product, which came from Defendant Cala Group, Inc.; owned by then APL Directors, James Crigler and Robert Vinson.

n. As of May 10, 2005, APL was totally out of business and almost totally out of cash.

## SEC Filings

57. The officers and directors of APL provided inaccurate information with respect to numerous SEC filings filed by APL, all of which were reviewed and repeatedly approved by APL's auditors and attorneys who knew or should have known most of the misrepresentations and omissions .

58. Specifically, the following false representations were made in APL's SEC filings:

*a.* *September/October 2004 8-K*

1) APL filed its Form 8-K for the period ending August 31, 2004, in September or October 2004, including an audit dated September 27, 2004, which increased the amount of shares and authorized a split of the common stock, and represented that a shareholders' meeting[2] was

---

[2] APL's officers and directors have refused to call a shareholders' meeting at any point since APL's formation in 2003 despite demands by some Plaintiffs, in violation of state corporation laws.

not required to approve the change because the Chairman and CEO had majority control of the stock, even though cash investors were to receive 97.5% of the stock and were never notified of or approved these changes.

2) The 8-K filing materially omitted the fact that the Regulation D offering was invalid.

3) The 8K filing and audit materially omitted that 95% of the PPM proceeds had been misused and not paid out pursuant to the "use of proceeds," but rather, were paid directly to officers, directors and insider consultants.

**b.** *November 22, 2004 10-KSB*

1) On November 22, 2004, APL filed its Form 10-QSB for what was then still known as Literary Playpen, Inc. for the three months ending September 30, 2004, and again omitted the invalidity of the Regulation D offering.

2) The 10-QSB omitted that APL had missed two payments on the G & G facility.

3) The 10-QSB omitted the fact that the Regulation D offering was invalid.

**c.** *February 7, 2005 Form S-8 Registration*

1) On February 7, 2005, APL filed a form S-8 Registration Statement under the Securities Act of 1933 with the SEC, which also failed to

mention the previously required Regulation D forms had never been filed and that the reverse merger had been transacted improperly.

2) The investors who were guaranteed "piggy-back registration" rights were not mentioned in the S-8.

3) A substantial number of the registered S-8 stocks were issued directly to Kevin Bumgarner and to other market manipulators or affiliates such as Tim Bumgarner, Margaret Bumgarner, Jim Crigler through his corporation, CALA Group, and Kevin Bumgarner, without consideration, notice or shareholder approval.

**d.**   *February 23, 2005 10-QSB*

1) On February 23, 2005, APL filed its 10-QSB for the 3 month period ending December 31, 2004.

2) The February 23, 2005, 10-QSB materially omitted that APL had missed its 5th contract payment on the G &G facility and that the entire 2.7 million dollars due on the contract had become payable in full.

3) The February 2005 10-QSB showed that cash had been depleted to $74,990 as of December 31, 2004, but that gross revenues for the three months ending December 31, 2004 had increased to $1,226,318.

4) These revenues were grossly and intentionally inflated and were based upon untruthful assumptions and unsound actuarial or financial principles.

5) The 10-QSB further showed that consultants fees for the period of July 1, 2004 through December 31, 2004 had increased to $666,301 and the office expense had increased to $499,767 without any narrative explanation.

6) In reality, most of the alleged "consultant fees" were paid to the officers and directors of APL and their respective friends and family or other business entities that performed no discernable service to APL.

e. *May 12, 2005 10-QSB*

1) On or about May 12, 2005, APL's form 10-QSB for the quarterly period ending March 31, 2005 suggested its issued shares of common stock had increased from 11,946,090 shares as of the February 23, 2005 10-QSB, to 19,825,742 shares as of May 12, 2005.

2) The 10-QSB failed to mention that the increase in shares occurred pursuant to Timothy Bumgarner's instructions to the transfer agent and that shareholder approval had not been obtained.

3) The 10-QSB further failed to mention that the transfer agent complied with all of the instructions from Timothy Bumgarner without legal opinion or auditor's opinion, and in some cases, without Medallion guarantees.

4) The 10-QSB further failed to indicate that the transfer agent issued stock without the co-owners' signatures or the required 144 documentation.

5) This transaction resulted in nearly doubling the number of free trading shares of APL without shareholder notice or approval, the majority of which were issued to Bumgarner and his family members.

6) The May 12, 2005, 10-QSB showed that APL's cash or cash equivalent was down to $16,539 and that inventories existed of $116,641 but none of the claimed assets actually existed.

7) The 10-QSB went on to state that sales from July 1, 2004 through March 31, 2005 were $2,418,256 and the company had assets valued at $3,402,697 even though sales did not rise to that level and APL was almost completely out of assets, cash and business.

8) Further, the May 12, 2005, 10-QSB went on to state that consultants had been paid $1,079,516 and that office expenses were $707,630 from July 1, 2004 through March 31, 2005, with no narrative explanation, even though most of the alleged "consultant fees" were paid to the officers and directors of APL and their respective friends and family or other business entities that performed no discernable service to APL.

9) The May 12, 2005, 10-QSB failed to mention that all of the monthly payments on the G & G contract were missed except the payment in September 2004.

10) The May 12, 2005, 10-QSB further indicated the purchase of the G & G facility was executed through an unsecured promissory note even

though the purchase was not on an unsecured promissory note but on a Contract for Deed that could be foreclosed upon within 30 days notice.

11) The May 12, 2005, 10-QSB further indicated the time to pay the balance due on the G & G facility had been extended even though no such extension had been granted.

### f. *June 2005 SB-2 Filing*

1) In June 2005, APL filed an SB-2, which was amended on August 5, 2005.

2) The SB-2 amendment filed on August 5, 2005 showed that the amount of shares of stock issued and outstanding were 26,881,720 shares, which equated to a more than 7 million share increase from the May 12, 2005 10-QSB filing and said increase had not been approved by the shareholders.

3) The SB-2 filing stated that all of the assets were intact as of July 15, 2005 but APL was insolvent and had no revenues.

### g. *October 17, 2005 10-KSB*

1) On October 17, 2005, APL filed its 10-KSB with the SEC for the period ending June 30, 2005, which stated the company had 24,534,651 shares issued and outstanding, many of which had not been approved by the shareholders and were therefore illegally issued.

2) The 10-KSB stated the reverse merger had been done legally when in fact it had not.

3) The 10-KSB failed to mention that the monthly payments on the G & G facility, with the exception of the September 2004 payment, had never been made.

4) Further, there was no mention that the entire $2.7 million dollars had become due on the contract and had not been paid.

5) The 10-KSB stated that APL had been sued for breach of contract by the sellers of the G & G facility but materially omitted counts for fraud and unfair trade practices.

6) The 10-KSB stated that it had received land in Rock Valley from the City of Rock Valley and that APL was going to be receiving numerous grants from Iowa, all of which was materially untrue.

7) The 10-KSB further listed the compensation of Timothy Bumgarner as $22,500 from July 1, 2004 through June 30, 2005 but he received hundreds of thousands of dollars of compensation.

8) Suddenly and in direct contradiction to the previously filed 10-KSB's and the SB-2, this 10-KSB eliminated 95% of all the assets from the balance sheets in comparison to the March 31, 2005 10-QSB.

9) In addition, the $2,418,256 in gross sales that was represented as being generated from July 1, 2004 through March 31, 2005 in the May 12, 2005 10-QSB was eliminated in its entirety in the October 17, 2005 10-KSB for the period ending June 30, 2005.

10) The 10-KSB misrepresented the price per share of APL's stock.

11) On November 14, 2005, an amendment to the 10-KSB was filed on behalf of APL with the SEC.

12) Most of the amended 10-KSB repeated the October 17, 2005 filing.

59.   All of the individuals in Plaintiffs Group 4 purchased stock on the open market and relied upon the SEC filings and press releases.

**B.   Defendant Kirkpatrick & Lockhart, Preston, Gates, Ellis, LLP, Daniel Donohue**

60.   Defendant Kirkpatrick & Lockhart, Preston, Gates, Ellis, LLP, f/k/a Preston, Gates & Ellis, LLP and also known as K L Gates, is a limited liability partnership law firm comprised of about 1,400 attorneys (hereinafter "Preston Gates").

61.   At all relevant times during the incidents alleged in this Complaint, Daniel Donohue was a licensed attorney, practicing at Preston Gates.

62.   Preston Gates and, specifically, Attorney Donahue acted as APL's attorneys from April 2004 through May 11, 2005.

63.   At the time of the closure of the first offering, Daniel Donahue was acting as APL's attorney and was involved in the review/approval of the documents associated with the first investment offering—namely the CIM and the Executive Summary.

64.   The CIM and/or the Executive Summary were relied upon by Plaintiffs Group 1 in making their investments into APL.

65.   Defendants Preston Gates and Daniel Donohue prepared and reviewed

APL's June 2004 Private Placement Offering (PPM) issued on June 2004 and finalized in August 2004.

66. The PPM investment offering sought to raise $2,500,000 at $2.50 per share and was part of the second investment offering with respect to APL.

67. Defendants Preston Gates and Daniel Donahue, were paid fees to review the truth and accuracy of this PPM and they opined in writing as to its accuracy.

68. The PPM contained numerous misrepresentations, including the misrepresentations stated in paragraph 27, which are expressly incorporated herein.

69. Donahue was motivated to falsify statements as a result of the substantial profit he stood to gain from the impending reverse merger transaction.

70. Preston Gates and Attorney Donahue were also involved in the third investment campaign, which coincided with a reverse merger transaction between APL and Literary Playpen, Inc. described in Paragraphs 28 through 53.

71. Dan Donahue, as escrow agent and as an attorney at law, gave a written opinion saying that all the legal requirements and regulations, including SEC and State securities regulations, had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock.

72. These statements were false as not all of the purchasers had paid consideration and the necessary Regulation D forms were not filed.

73. Donahue never matched the cash payments with the numbers of shares he authorized in his legal opinion to the transfer agents, which allowed most of the free trading share to be issued to individuals who had not paid any consideration to the detriment of the plaintiff-investors.

74. Plaintiffs Group 3 invested money to purchase stock in APL pursuant to the Reverse Merger dated September of 2004 in the approximate amount of $595,000.

75. Plaintiffs Group 3 relied on the misrepresentations contained in the purchase agreement and the other representations made by Morrison and Donahue concerning the structure of the reverse merger transaction.

76. Defendants Preston Gates and Daniel Donahue further reviewed and helped prepare all of the SEC filings, except for the June 30, 2005, 10-KSB and the SB-2 filed in August of 2005.

77. The SEC filings contained numerous representations set forth in Paragraph 58.

78. Moreover, APL's financial results and statements were prepared in a manner which violated Generally Accepted Accounting Principals (GAAP), including, but not limited to, the following Fundamental Accounting Principals:

    a. The principal that interim financial reporting should be based upon the same accounting principals and practices used to prepare annual financial statements was violated (APB 28, paragraph 10), which has been verified

by emails between the Chief Financial Officer of the company and Langley Williams as well as emails with Preston Gates;

b. The principal that financial reporting should provide financial information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Standard of Concepts 1, paragraph 34);

c. The principal that financial reporting should provide information about the economic resources of an enterprise, the claims of those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts 1, paragraph 40);

d. The principal that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stock holders and investors) for the use of enterprise recourses and entrusted to it was violated. To the extent that management offers securities to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts 1, paragraph 50);

e. The principal that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statements of Concepts 1, paragraph 42);

f. The principal that financial reporting should be reliable and that it represents what it purports to represent was violated. That information should be reliable as well as relevant in a notion that is central to accounting (FASB Statement of Concept 2, paragraphs 58-59);

g. The principal of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events in conditions (FASB Statement of Concepts 2, paragraph 79); and

h. The principal that conservatisms be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered was violated (FASB Statement of Concepts 2, paragraphs 95 & 97).

79. On September 8, 2004, Defendant Craig Medoff informed Preston Gates and Dan Donahue that millions of dollars in assets listed in the PPM were false and should not be listed in the audit or SEC filings.

80. Despite receiving this information, Dan Donahue and Preston Gates never informed the investors of this information and continued to approve all of the subsequent SEC filings and allowed APL to continue to collect funds from the Plaintiff-investors.

C. **Gersten, Savage, LLP**

81. Defendant Gersten, Savage, LLP is a limited liability partnership law firm.

82.    Gersten, Savage, LLP acted as APL's attorney from April 2005 through 2006.

83.    Gersten, Savage LLP represented they had reviewed APL's registration statement.

84.    Gersten, Savage, LLP was responsible for reviewing and opining to the March 31, 2005 10-QSB as well as the original and amended SB-2 and the filing of the June 2005 10-KSB.

85.    Both the registration statement and the March 31, 2005 10-QS B as well as the original and amended SB-2 and the June 2005 10-KSB contained numerous misrepresentations set forth in paragraph 58.

86.    Moreover, APL's financial results and statements were prepared in a manner which violated (Generally Accepted Accounting Principals (GAAP), including the Fundamental Accounting Principals as set forth in paragraph 78.

87.    In addition, Gersten Savage was responsible for reviewing and opining to approximately ten (10) stock sales for Brittney Capital, and stated that all state and federal regulations had been followed when in fact they had not, including that none of the shares of APL had exemptions from registration.

88.    The sales upon which Gersten Savage opined caused APL's stock to become greatly diluted, proximately causing losses incurred by those Plaintiffs who invested on the open market.

**D.**   **Langley Williams & Company and Daphne Clark, CPA**

89.   Defendants Langley, Williams & Company, LLC (hereinafter "Langley Williams) and Daphne Clark acted as APL's auditors from August 30, 2004 through the middle of 2006.

90.   Defendant Langley Williams is a limited liability company and provider of accounting, auditing and bookkeeping services, with its principal place of business in Lake Charles, Louisiana.

91.   At all relevant times asserted in this Complaint, Daphne B. Clark was a licensed CPAs employed at Langley Williams.

92.   Defendant Langley Williams, on September 27, 2004, issued an unconditional audit and verified the accuracy of APL's representations about its financial condition and the reverse merger transaction.

93.   Defendant Langley, Williams, signed a letter dated August 5, 2005 consenting to the use of all of their reviewed documents in subsequent filings.

94.   Based on an email dated November 17, 2004, the auditors Langley Williams and Daphne Clark reviewed and approved the balance sheets and profits and loss statements that were filed by APL in its November 22, 2004 10-QSB and in doing so approved all the misrepresentations contained therein.

95.   Based on an email dated February 17, 2005, the auditors Langley Williams and Daphne Clark reviewed and approved the balance sheets and profits and loss statements that were filed by APL in its February 23, 2005 10-QSB and in

doing so approved all the misrepresentations contained therein as set forth in paragraph 58.

96.     Based on an email dated May 12, 2005, the auditors Langley Williams and Daphne Clark reviewed and approved the balance sheets and profits and loss statements that were filed by APL in its May 12, 2005 10-QSB and in doing so approved all the misrepresentations contained therein as set forth in paragraph 58.

97.     Defendant Langley Williams and Daphne Clark also filed an opinion letter approving the June 2005 SB-2, which also contained numerous misrepresentations as set forth in paragraph 58.

98.     Moreover, APL's financial results and statements were prepared in a manner which violated (Generally Accepted Accounting Principals (GAAP), including the Fundamental Accounting Principals as set forth in paragraph 78.

99.     Defendants Langley Williams and Daphne Clark had a specialty fraud examiner and were put on alert that the assets and representations made in the PPM were false on September 8, 2004 in an email from Craig Medoff.

100.    Moreover, APL's bank records would have revealed that over 90% of the money invested by the 34 plaintiffs in the PPM was paid directly to insiders to APL in contradiction to the "use of proceeds" section.

101.    Despite receiving this information, Langley Williams and Daphne Clark never informed the investors of this information and continued to approve all of the subsequent SEC filings and allowed APL to continue to collect funds from the Plaintiff-investors.

102.   Langley Williams and Daphne Clark allowed these misrepresentations and omissions to be continued in excess of one year until they filed a report indicating the documents they reviewed and approved were false.

103.   Defendant Langley Williams and Daphne Clark knew of should have known that all of the SEC filings were materially false and had numerous material omissions based on the information they received as early as September 8, 2004.

**E.   Michael J. Morrison**

104.   Defendant Michael J. Morrison is a licensed attorney domiciled in Reno, Nevada.

105.   Defendant Michael J. Morrison acted as one of the escrow agents for the reverse merger transaction between Literary Playpen and APL as set forth in paragraphs 28 through 53 and 70 through 75 and knowingly accepted cash as the Plaintiffs' escrow agent.

106.   Morrison was sent an email by Daniel Donahue, which Morrison responded to by agreeing to act as an escrow agent for both the owners of Literary Playpen and the Plaintiff-Investors.

107.   Morrison stated he reviewed the purchase agreement in an email to Dan Donahue on September 9, 2004 and indicated it generally looked fine.

108.   Morrison, as escrow agent and as an attorney at law, gave a written

opinion saying that all the legal requirements and regulations, including SEC and State securities regulations, had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock.

109.   Morrison never matched the cash payments with the numbers of shares he authorized in his legal opinion to the transfer agents, which allowed most of the free trading share to be issued to individuals who had not paid any consideration to the detriment of the plaintiff-investors.

## F.   Marshall Dooley, Tempus Financial, Glast, Phillips & Murray, P.C. and Craig Medoff

110.   Defendant Marshall W. Dooley is a licensed attorney and served as financial advisor to APL at all relevant times, through Tempus Financial, Inc., a provider of financial services.

111.   Dooley was simultaneously serving as a lawyer and owner of Glast, Phillips & Murray, P.C., (hereinafter "GPM") a full-service law firm and professional corporation located in Dallas, Texas.

112.   Defendant Craig Medoff was hired by Tempus Financial during 2003 to act as a consultant in the investment banking arena and was made an officer of Tempus Financial, Inc.

113.   Medoff had previously been permanently enjoined by the SEC from dealing with publicly traded companies.

114.   Dooley, Medoff and Tempus Financial, Inc., utilized Glast, Phillips & Murray, P.C.'s  address, phone and web site as their own.

115.   The use of GPM's name and contact information lended credibility to

Dooley's operation.

116.   The PPM listed both Tempus Financial, Inc. and Marshall W. Dooley as APL's financial advisors.

117.   Marshall Dooley, Tempus Financial and Craig Medoff acted as the investment bankers and investment advisors to APL and were directly involved in structuring the PPM as well as the Reverse Merger documents and all of the misrepresentations contained therein set forth in paragraphs 27, 28 through 53 and 70 through 75 from April 2004 through the spring of 2005.

118.   Craig Medoff directed and used as illegal nominees Defendants Marianna Porcella, Steve Burman, Bradley Doss, Curt Cramer, Jason and Jennifer Nichols, Gregory Frost, Christopher Curnutt, Susan Wonderly and John Brda to take free trading APL stock or cash for no consideration for a period of over one year.

119.   Tempus Financial, Dooley and Medoff made a substantial profit from selling essentially what were stolen securities that they knew or should have known were illegally received by virtue of the reverse merger transaction.

120.   GPM's failure to timely repudiate the use of its address, telephone and web site for purposes of the APL stock offerings, provides the basis for a claim against GPM as the use of the law firm's address, phone and web site created the appearance that GPM was sanctioning or authorizing the actions and conduct of Dooley and Tempus Financial.

121.   The link between the actions of Tempus Financial and its owner,

Marshall Dooley, and the law firm in which Dooley has an ownership interest, GPM, is that GPM either knew or should have known that its address, telephone, and web site were being used to assist in the perpetration of the fraud and conversion upon APL investors.

## G.    US Bancorp, Inc. and US Bancorp Investment Services, Inc.

122.    US Bancorp, Inc. was responsible for both APL's banking transactions and Timothy Bumgarner's personal banking transactions.

123.    US Bank loaned a number of these Plaintiffs up to 100% of the funds needed to purchase stock in American Pallet Leasing, Inc. an Iowa Corporation in violation of Securities Margin Regulations.

124.    US Bancorp and US Bancorp Investment Services, Inc.'s Cedar Rapids employees maintained a special relationship with both Timothy and Kevin Bumgarner through which Timothy and Kevin Bumgarner were able to withdraw large sums of money from the APL business account and deposit the funds directly into their personal checking accounts.

125.    Specifically, between August 2, 2004 and August 6, 2004, thirty-four (34) individual checks from thirty-four (34) different Plaintiffs were deposited into APL's corporate checking account at US Bancorp, in amounts totally $1,600,000.

126.    Over 75% of those deposits were withdrawn on or about August 6, 2004 by Timothy Bumgarner and deposited into a new personal account with Timothy Bumgarner's social security number on the account with US Bancorp.

127.    Timothy Bumgarner then withdrew some of the money from his

personal account and loaned it back to American Pallet Leasing, Inc. an Iowa Corporation's US Bancorp checking account.

128.   Bumgarner also withdrew some of the money from his $1,300,000 personal account and deposited it into a US Bancorp Investment Services, Inc. securities account for personal investment purposes.

129.   Neither US Bancorp nor US Bancorp Investment Services, Inc. gave notice of large and unusual deposits to the federal agencies required to receive notice under the Patriot Act and in doing so violated Regulation "Z" of the Banking Acts.

130.   U.S. Bank failed to follow standard procedures and monitor transactions according to its own internal standards, all of which facilitated the fraud perpetrated upon the Plaintiffs in this case.

131.   These transactions occurred without shareholder notice and/or approval.

132.   To facilitate this controlling relationship, U.S. Bank went so far as to misrepresent and disguise Timothy Bumgarner's personal bank statements as being American Pallet Leasing Inc.'s bank statements, when they were not, commencing in August 2004.

133.   The disguised statements were viewed and relied upon by one or more Plaintiffs as well as the auditors who filed the 8-K and audit for August 30, 2004, with the SEC.

134.   More than 50% of the plaintiffs relied upon the 8-K, which was based

on the fraudulently disguised bank statements issued by U.S. Bank to purchase

nearly $2,000,000.00 worth of American Pallet Leasing, Inc. stock.

135. The arrangement the Bumgarners had with US Bank allowed Timothy

Bumgarner and APL to perpetrate the fraud alleged in the Complaint upon the

Plaintiffs, some of whom were also customers of US Bank and US Bancorp

Investment Services, Inc. and some of the Plaintiff customers relied upon advise

from US Bank employees in regard to the APL transactions.

136. Timothy Bumgarner and APL needed US Bank to allow the transactions

to go forward, without following the applicable policies or procedures, in order to

perpetrate the fraud upon the Plaintiffs.

## H.  Individual Defendants

137. Defendants Curt Kramer[3], Steve Burman, Bradley Doss, Chris

Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna

Porcella, and Craig Medoff were individuals and entities who were issued

approximately 80% of all the free trading stock of APL between September 20, 2004

and October 31, 2004 for little or no consideration whatsoever.

138. The defendants named in paragraph 137 knowingly accepted free

trading securities from APL, which they had signed subscription agreements for

stated that they had paid for the shares when they knew that they had not paid for

the free trading shares, but instead those shares had been paid for by the Plaintiff-

---

[3] Curt Cramer uses several aliases consisting of various forms of spelling alterations, to wit: Kurt Cramer, Curt Cramer, Curt Kramer and possibly other unknown iterations.

Investors and then the paragraph 139 Defendants knowingly sold the same at a profit into the market.

139. Defendants Selective Consultants, Inc., South Coast Funds, LLC, Vincent Cerrone and Frank Colmes received free trading shares of APL through an S-8 filing in February of 2005, without paying any consideration while acting as investment advisors to APL, which is against S-8 regulations.

140. The defendants named in paragraph 137 were known market consultants and S-8 shares are not permitted to be transferred to individuals or entities who are providing securities advice to an issuing company.

## I. **Broker-Dealers**

141. Defendants AG Edwards, ACAP Financial, Inc., Pennaluna & Company, Penson Financial Services, Inc., and Fiserv Securities, Inc. were at all relevant times Broker-Dealers and security representatives.

142. In particular, Pennaluna conducted APL stock transactions on behalf of Marianna Porcella, who had illegally converted stock and paid no consideration for the stock, which resulted in gains of $60,000 to $70,000.

143. Upon information and belief, as broker-dealers, Pennaluna acted as the signature guarantor on APL's securities transfers as it related at least to Defendant Marianna Porcella's transfers.

144. Fiserv conducted APL stock transactions on behalf of Curt Kramer, who had illegally converted stock for no consideration.

145. Fiserv acted as the signature guarantor on APL's securities transfers

as it related at least to Defendant Curt Kramer.

146. Upon information and belief, as broker-dealers, ACAP Financial, Inc. acted as the signature guarantor on APL's securities transfers as it related at least to Defendant Marianna Porcella's transfers.

147. Upon information and belief, as a broker-dealer, AG Edwards & Sons, Inc. acted as the signature guarantor on APL's securities transfers as it related to Defendant Bradley Doss for free trading APL stock and Mr. Doss signed a Subscription Agreement stating that he was paying $0.565 cents per share for free trading APL stock, when in fact he never paid any consideration whatsoever.

148. Upon information and belief, as a broker-dealer, Penson Financial Services, Inc. acted as a signature guarantor for John Brda, a Defendant in this case, who signed a Subscription Agreement stating he was paying $0.565 per share for APL free trading stock in the amount of 22,727 shares, when in fact he never paid any consideration at all.

149. By acting as a signature guarantors, these entities not only certified the rightfulness of the signatures involved, but under Iowa law, also certified the rightfulness of the entire transaction.

## COUNT 1 - RACKETEER INFLUENCED AND CORRUPT ORGANIZATION (RICO) § 1962(c)
### Against Defendants American Pallet Leasing, Inc., Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Elgin McDaniel, Craig Medoff, Marshall Dooley, Tempus Financial, Inc., Byron Hudson, Marianna Porcella, Steve Burman, Bradley Doss, Jason and Jennifer Nichols, Gregory Frost, Christopher Curnutt, Susan Wonderly, John Brda, Langley, Williams & Company, LLC, and Daphne B. Clark

150.    The Plaintiffs restate and re allege the allegations contained in paragraphs 1 through 149 of this Complaint as if they had been fully set forth herein.

151.    Section 1962(c) of the RICO Act makes it "Unlawful for any person employed by or associated with any enterprise engaged in, or the enterprises of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, and the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

152.    Defendants Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Elgin McDaniel, were either officers, directors or senior employees of American Pallet Leasing, Inc., separately and individually, and were or are a partnership, corporation, association, or other legal entity or individual and therefore constitutes a cognizable enterprise under § 1961(3) or § 1961(4) of the RICO Act and have been part of the enterprise from 2003 through 2005.

153.    Craig Medoff, Marshall Dooley, Tempus Financial, Inc., and Byron

Hudson, a CPA and Chief Financial Officer of American Pallet Leasing from September of 2004 through 2006 were also part of the enterprise.

154. Marshall Dooley, Tempus Financial and Craig Medoff acted as the investment bankers and investment advisors to American Pallet Leasing and were directly involved in structuring the PPM well as the Reverse Merger documents, including all of the misrepresentations and omissions stated in paragraphs 27 through 53 and 68 through 75 and 110 through 121 from April of 2004 through the spring of 2005 and were part of the enterprise.

155. Craig Medoff directed and used as illegal nominees Defendants, Marianna Porcella, Steve Burman, Bradley Doss, Jason and Jennifer Nichols, Gregory Frost, Christopher Curnutt, Susan Wonderly and John Brda, to take free trading APL stock or cash for no consideration in a pattern of racketeering during a period of over a year.

156. Marshall Dooley, Langley Williams and Daphne B. Clark, CPA, and the individuals listed in paragraphs 152 through 155 knew this and consented to it.

157. In addition, each of the Defendants named in the previous paragraphs separately formed an association-in-fact enterprise with each other with whom they combined both illegitimate and legitimate business to carry out their illegal pattern of fraudulent transactions as described herein.

158. The pattern of racketeering engaged in by each of the Defendants

named in the previous paragraphs were separate and distinct aspects of an otherwise lawful business association. The Defendants did not associate for the sole purpose of engaging in illegal activities.

159. Apart from any pattern of racketeering activity, each of the Defendants associated through American Pallet Leasing, Inc. for the legitimate business purpose of attempting to finance a pallet manufacturing business.

160. The enterprises through which the Defendant's engaged in their pattern of fraud were comprised of a consistent, and ongoing structure of entities and individuals associated from 2003 through 2006.

161. All of the Defendants named in paragraphs 152 through 155 knew that the material representations as to assets and income for American Pallet Leasing in the original business plan, the Hughes Roth business plan, the PPM, the Reverse Merger documents, and all of the SEC filings and press releases, contained falsities and were misleading to all of the Plaintiff investors, which was the proximate cause of the Plaintiff investors 100% loss of investments.

162. Each of the Defendants named in paragraphs 152 through 155 played a significant role in operating and managing the enterprises described herein in connection with each predicate act, and these Defendants named in paragraphs 152 through 155 knew that the representations as to assets, income and future income was false and further, that none of the contracts had allegedly existed.

163. These Defendants knew the Plaintiffs would relay on these material

misrepresentations and material omissions when investing millions of dollars and then took the money invested and used it to pay themselves hundreds of thousands of dollars in fees and income rather than for the uses represented in the PPM and other documents.

164. These actions were the direct and proximate cause of the loss suffered by the Plaintiff investors.

165. The material misrepresentations and omissions as to contracts, assets, current income and future income were presented to the investor Plaintiffs in actual presentations, but more specifically through written documents, press releases, SEC filings and mail communications constituting actionable mail and wire fraud and thus each constituted separate acts of racketeering actionable under the RICO Act.

166. The mails and wires were central to these Defendants' scheme and necessary to perpetrate the fraud in each and every improper transaction perpetrated through the Defendants' use of the mails and email transmissions as well as wires.

167. The Defendants named in paragraph 152 also telephoned and faxed a number of the investor Plaintiffs in continuing the mail and wire fraud and conspiracy. Said Defendants mailed or emailed the Business Summaries, PPM and/or the Reverse Merger Documents to the prospective investor Plaintiffs.

168. The prospective investor Plaintiffs relied upon said documented

representations or material omissions and sent to the Defendants named in paragraph 152 checks or wired funds, which they lost 100%.

169. As alleged herein, the Defendants named in paragraph 152 entered into each of these false and material misrepresentations or omissions to, from, and between and among several states with the prospective Plaintiff investors.

170. Defendants Langley Williams and Daphne B. Clark, CPA legitimized all of the illegal mail and wire fraud as well as racketeering actions by the Defendants named in paragraph 152 through their high profile.

171. Langley Williams, through Daphne Clark, was a legitimate operation dealing with American Pallet Leasing, Inc. and Literary Playpen, Inc., but it facilitated the illegal racketeering activities and wire mail fraud of the Defendants named in paragraph 152 herein.

172. Langley, Williams & Company, LLC and Daphne B. Clark, CPA willingly agreed to participate in the conspiracy of mail and wire fraud and further knew of the conspiracy goals and agreed to facilitate them and committed substantial violations of the RICO Act.

173. On September 8, 2004, Langley Williams was informed by an email from the financial advisor and investment banker of American Pallet Leasing that a number of the assets listed in the PPM of American Pallet Leasing, Inc. of June 2004 in fact did not exist.

174. Notwithstanding this information, Langley Williams did not make any

attempt to confront the management of APL nor did it stop doing business with APL when Langley Williams knew that it had committed serious mail and wire fraud upon the investor Plaintiffs who had provided 100% of the cash for the operations of APL.

175. Instead, Langley Williams proceeded to collect another $700,000 for a Reverse Merger and signed both Legal Opinions and Audit Opinions, which would be filed with the SEC and upon which a number of the investor Plaintiffs relied and upon which Plaintiffs lost an additional $1,800,000 in open market investments of APL and Literary Playpen stock.

176. Notwithstanding the fact Langley Williams was a legitimate enterprise, it participated in racketeering and facilitated it and made it appear to be legitimate to innocent outside investor Plaintiffs.

177. Therefore, Langley Williams was part and parcel and primary agents of the conspiracy to defraud innocent Plaintiff investors.

178. Langley Williams started reviews on August 30, 2004 and continued to review each and every 10-K and 10-Q SEC filing for June 30, 2004, August 31, 2004, September 30, 2004, December 31, 2004, March 31, 2005, June 30, 2005 and an August 5, 2005 SB-2 filing on behalf of American Pallet Leasing, while knowing APL had committed wire and mail fraud, racketeering and securities fraud in its PPM of June 2004 and ultimately it said that all of the increasing revenues and assets of APL and Literary Playpen that it had validated in its SEC filings in 2004 and 2005 were in fact zero and had no value whatsoever.

179.   Emails show that during that period of time the Reverse Merger, Plaintiff-investors had lost $595,000, and the open market Plaintiff-investors lost an additional $1,800,000.

180.   None of the money that was raised in the open market could have been raised without the SEC filings and the legitimization by the auditors Langley Williams.

181.   Therefore, Langley Williams and the other Defendants named in paragraph 152 through 155 are the direct and proximate cause of all of the Plaintiff investor's losses in the open market, which amounts to approximately $1,800,000 as well as the $595,000 lost in the Reverse Merger.

182.   The enterprise in question under the RICO Act is APL.

183.   Langley Williams and the acts of the Defendants named in paragraphs 152 through 155 predicate acts of racketeering were the multiple instances of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and the preparation of the PPM, the documents for the Reverse Merger and the ongoing review and approval of SEC filings and press releases by APL.

184.   These acts would have amounted to and posed a threat of continued criminal activity which was ongoing until APL went out of business and would have continued to pose such a threat had APL not gone out of business.

185.   The SEC filings' material misrepresentations and material omissions condoned by Langley Williams and the Defendants named in paragraphs 152 through 155 establish continuity.

186. Langley Williams as well as all of the Defendants named in Paragraphs 152 through 155 participated directly or indirectly in the conducts of the enterprises affairs and they directed the same to the extent that without their legitimacy the racketeering of a legitimate enterprise could have never taken place and would never have been believed and therefore they were in control.

187. Again, Langley Williams knew, based on the emails that had been supplied to it, that the enterprise had presented through mail, wire, emails, etc. material misrepresentations and material omissions as to asset values, present income and projected future income and contracts.

188. Notwithstanding, Langley Williams, through Daphne Clark, continued to review, condone and legitimize the filings with the SEC on behalf of APL and the Defendants named in paragraphs 152 through 155 herein.

189. Langley Williams participated in predicated acts of racketeering with APL and the Defendants named in paragraphs 152 through 155 herein from August 2004 through November 2005, which constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c)(d).

190. Further, Langley Williams objectively manifested an agreement to participate in the racketeering activity of APL and the Defendants named in paragraphs 152 through 155 herein and the affairs of the enterprise when after receiving emails that APL and its officers and directors had deliberately made material misrepresentations as to assets, profits, future profits and contracts in August and September 2004 and then continued to facilitate the filing of press

releases and SEC filings upon which the Plaintiff investors would rely and for which these parties knew they would rely to their detriment and which caused the proximate loss of their investments.

191. APL, an enterprise, and the Defendants noted in paragraphs 152 through 155 engaged in two or more acts of wire fraud, mail fraud and or securities fraud.

192. These actions, based upon the facts as alleged herein, constitutes an enterprise and an interference with said enterprise by a pattern of racketeering in a way and method affecting interstate commerce.

193. Through this pattern of racketeering activity Langley Williams, Tempus Financial, Marshall Dooley, Craig Medoff and the others named in paragraphs 152 through 155 acquired and maintained an interest in or control of the enterprise and were the primary and proximate cause of the loss that the investor Plaintiffs suffered herein. As a result of said racketeering activity, the Plaintiff investors lost nearly 100% of their investments.

WHEREFORE the Plaintiffs pray that the Court enter judgment, jointly and severely, against these Defendants awarding the Plaintiffs recover of treble damages, costs, attorneys fees and any and all other such relief as the Court may deem equitable.

## COUNT 2 - RACKETEERING INFLUENCED IN CORRUPT ORGANIZATION (RICO § 1962(a))
**Against Defendants American Pallet Leasing, Inc., Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Cala Group, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Elgin McDaniel Craig Medoff, Marshall Dooley, Tempus Financial, Inc., Byron Hudson Marianna Porcella, Steve Burman, Bradley Doss, Jason and Jennifer Nichols, Gregory Frost, Christopher Curnutt, Susan Wonderly John Brda, Langley, Williams & Company, LLC, Daphne B. Clark and Glast, Phillips & Murray**

194.    The Plaintiffs restate and re allege the allegations contained in paragraphs 1 through 193 of this Complaint as if they had been fully set forth herein.

195.    The Defendants named in paragraphs 152 through 155, together with other named Defendants, derived income from a pattern of racketeering activity through the American Pallet Leasing enterprise that constituted mail and wire fraud.

196.    Defendants American Pallet Leasing, Inc., Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, Keith Kerbaugh, James Criegler and his alter ego Cala Group, Inc., Douglas Peterson, Robert Vinson, Elgin McDaniels, Craig Medoff, Marshall Dooley and his alter egos Tempus Financial, Inc. and Glast, Phillips & Murray, and Susan Wonderly together received in excess of $2,000,000 between August 6, 2004 and September 15, 2005 in income derived from a pattern of racketeering activity to invest in the acquisition of an interest in or establishment of an operation of an enterprise, which resulted in a direct and proximate cause of the loss of the investment of the Plaintiff investors herein.

APL, an enterprise, and the Defendants noted in paragraphs 152 through 155 engaged in 2 or more acts of wire fraud, mail fraud and or securities fraud and all of them knew this was taking place and accepted money from said racketeering and fraud.

197. These actions, based upon the facts as alleged herein, constitute an enterprise and an interference with said enterprise by a pattern of racketeering in a way and method affecting interstate commerce.

198. Through this pattern of racketeering activity Langley Williams as well as Tempus Financial and Marshall Dooley and Craig Medoff and the others named in paragraphs 152 through 155 acquired and maintained an interest in or in control of the enterprise and were the primary cause of the proximate loss that the investor Plaintiffs suffered herein.

199. As a result of said racketeering activity, the Plaintiff investors lost nearly 100% of their investments.

WHEREFORE the Plaintiffs pray that the Court enter judgment, jointly and severely, against these Defendants awarding the Plaintiffs recover of treble damages, costs, attorneys fees and any and all other such relief as the Court may deem equitable.

# COUNT 3 - RACKETEERING INFLUENCED IN CORRUPT ORGANIZATION (RICO § 1962(d))

**Against Defendants American Pallet Leasing, Inc., Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Elgin McDaniel Craig Medoff, Marshall Dooley, Tempus Financial, Inc., Byron Hudson Marianna Porcella, Steve Burman, Bradley Doss, Jason and Jennifer Nichols, Gregory Frost, Christopher Curnutt, Susan Wonderly and John Brda, Langley, Williams & Company, LLC, Daphne B. Clark, and Glast, Phillips & Murray**

200.　The Plaintiffs restate and re allege the allegations contained in paragraphs 1 through 199 of this Complaint as if those paragraphs had been fully set forth herein again.

201.　The Defendants named in paragraphs 152 through 155, together with other named Defendants were employed by or associated with American Pallet Leasing an enterprise. Any reference hereinafter under this count shall include any and all Defendants referred to in this paragraph.

202.　These Defendants knowing and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of American Pallet Leasing, an enterprise.

203.　The Defendants in this count did so knowingly and willfully through a pattern of racketeering activity.

204.　The Defendants named in paragraphs 152 through 155 each knowingly agreed to participate in the conspiracy to commit a pattern of racketeering against the Plaintiff investors, which was the proximate cause of said Plaintiff investors losing nearly 100% of their investment.

205.　The Defendants' behavior amounted to a willful and wanton disregard

for the Plaintiffs' rights.

206.  The Defendants named in paragraphs 152 through 155 herein, unlawfully conspired to violate sections 1962(c) and 1962(a) and these Defendants agreed to join in the conspiracy and agreed to commit the predicate acts and knew that those acts were part of a pattern of racketeering activity under federal law.

207.  The pattern of racketeering and predicate acts of the pattern of racketeering are based on the alleged facts in this Complaint and exceed two acts of wire fraud and mail fraud and continued over a period of time far in excess of one year.

208.  Defendants committed numerous acts of mail and wire fraud upon the investor Plaintiffs named herein.

209.  As a direct and proximate result of said racketeering activity described under this count, the Plaintiff investors lost nearly 100% of their investments.

WHEREFORE the Plaintiffs pray that the Court enter judgment, jointly and severely, against these Defendants as described in this count, awarding the Plaintiff investors recovery of treble damages, costs, attorneys fees and any and all other such relief as the Court may deem equitable.

## COUNT 4 - BREACH OF FIDUCIARY DUTY
### Against Defendants American Pallet Leasing, Inc., its Officers and Directors, its Attorneys and Accountants, its Financial Advisors and Investment Advisors, the Escrow Agents involved in the Reverse Merger, US Bank and US Bancorp Investment Services, Inc., specifically Marshall Dooley, Tempus Financial, the Law Firm of Glast, Phillips & Murray, and Craig Medoff

210.    The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 209 of the Complaint as if they had been fully set forth herein.

211.    At all relevant times, a special relationship existed between the APL, its directors and officers, its financial advisors and investment advisors, transfer agents, escrow agents, US Bank, US Bancorp Investment Services, Inc., specifically Marshall Dooley, Tempus Financial, the law firm of Glast, Phillips & Murray and Craig Medoff (referred to hereinafter as "Defendants who breached fiduciary duty to Plaintiffs") with the Plaintiff investors and shareholders named herein.

212.    The Defendants who breached their fiduciary duty to the Plaintiffs owe to those Plaintiffs and APL a special duty of care which they breached by directly providing them on numerous occasions over a period of time, false and misleading information and/or failing to provide the Plaintiffs with full and complete information, upon which the Plaintiffs relied to their detriment and loss.

213.    The Defendants who breached their fiduciary duty did so by failing to ensure that APL, and its officers and directors were complying with laws and regulations of both the State of Iowa and the Federal Government and because of said breach of fiduciary duty lead to the direct and proximate loss of $4,300,000 by

the Plaintiffs. The Plaintiffs have an assignment of all of APL's rights for Breach of Fiduciary Duty against the Defendants.

214. The Defendants' behavior amounted to a willful and wanton disregard for the Plaintiffs' rights.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 5 - CONVERSION
### American Pallet Leasing, Inc., Officers and Directors of APL, Marshall Dooley, Tempus Financial, Inc., Glast, Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff, James Jeffrey and his corporations, Susan Wonderly, Danilo Cacciamatta, and Investment Advisors

215. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 214 of this Complaint as if they had been fully set forth herein.

216. APL, its officers and directors as well as senior employees, who are named as Defendants herein, along with Defendants Marshall Dooley, Tempus Financial, Inc., Glast, Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff, Danilo Cacciamatta and Susan Wonderly obtained money and free trading stock from the Plaintiffs through conversion and fraud. The

Defendants named in this paragraph shall be referred to hereinafter as the "Conversion Defendants".

217. The Conversion Defendants exercised control over the Plaintiffs' money and free trading stock in a manner that was inconsistent with and in derogation of the uses for which the Plaintiffs agreed their money should be used.

218. The Plaintiffs were damaged by the misuse and fraudulent procurement of their money and their free trading stock and the conversion by the Conversion Defendants was the proximate cause of the Plaintiffs actual financial loss and it was done in a willful and wanton disregard for the Plaintiffs rights and property.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Conversion Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and all other such relief the court may deem equitable.

## COUNT 6 - NEGLIGENT MISREPRESENTATIONS/NONDISCLOSURES
### American Pallet Leasing, Inc., its Officers and Directors and Senior Employees who have been listed as Defendants along with APL's Attorneys, Accountants, Financial Advisors and Investment Advisors, including but not limited to Langley Williams & Company and Daphne Clark, CPA and Danilo Cacciamatta, Michael J. Morrison, Marshall W. Dooley, Tempus Financial, Inc., Glast Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff, Susan Wonderly, US Bank and US Bancorp Investment Services shall be referred to hereinafter as the "Negligent Misrepresentation Defendants"

219. The Plaintiffs restate and re-allege the allegations contained in

paragraphs 1 through 218 of this Complaint as if they had been fully set forth herein.

220. The Negligent Misrepresentation Defendants negligently supplied information and failed to disclose material information about APL's financial condition, status, business endeavors, contracts and customers as set forth in Paragraphs 21, 24, 27, 29 through 51, 56 and 58.

221. In addition, Defendants Jason Nichols, Jennifer Nichols, Gregory Frost, Christopher Curnutt, John Brda, Marianna Porcella, Craig Medoff, Steve Burman, Bradley Doss and Marshall Dooley and Tempus Financial signed Subscription Agreements stating they were paying cash for free trading stock in APL when in fact they never paid cash.

222. The Negligent Misrepresentation Defendants had a financial interest in supplying or not disclosing the information.

223. The Negligent Misrepresentation Defendants intended to supply or refrain from supplying the information for the benefit for the benefit and guidance of Plaintiffs.

224. The Negligent Misrepresentation Defendants knew the recipients of such misinformation intended to supply it for the benefit and guidance of Plaintiffs including but not limited to the Subscription Agreements identified in Paragraph 221 having been provided to APL for dissemination to Plaintiffs.

225. The Negligent Misrepresentation Defendants intended the information to influence Plaintiffs to invest in APL.

226. The Negligent Misrepresentation Defendants intended the information to induce Plaintiffs to invest in APL.

227. The Plaintiffs acted in reliance on the truth of the information supplied by way of APL's executive summary, CIM, PPM, Reverse Merger documents, press releases, SEC filings and Subscription Agreements.

228. The Plaintiffs were justified in relying on the information.

229. The negligently supplied information or lack thereof was a proximate cause of Plaintiffs' damages.

230. Plaintiffs lost nearly 100% of their investments into APL and all expected benefits to be derived therefrom.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 7 - FRAUDULENT MISREPRESENTATION AND OMISSIONS
American Pallet Leasing, Inc., its Officers and Directors and Senior Employees who have been listed as Defendants along with APL's Attorneys, Accountants, Financial Advisors and Investment Advisors, including but not limited to Langley Williams & Company and Daphne Clark, CPA and Danilo Cacciamatta, Michael J. Morrison, Marshall W. Dooley, Tempus Financial, Inc., Glast Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff, Susan Wonderly, US Bank and US Bancorp Investment Services shall be referred to hereinafter as the "Fraudulent Misrepresentation Defendants"

231. The Plaintiffs restate and re-allege the allegations contained in

paragraphs 1 through 230 of this Complaint as if they had been fully set forth herein.

232.    The Fraudulent Misrepresentation Defendants conspired to make the representations and conspired to intentionally omit material information set forth in Paragraphs 21, 24, 27, 29 through 51, 56 and 58 and 221.

233.    The misrepresentations and omissions were regarding APL's financial condition, status, business, endeavors, contracts, patents and customers.

234.    All of the representations identified were false.

235.    All of the representations and omissions were material.

236.    The Fraudulent Misrepresentation Defendants knew the representations were false.

237.    The Fraudulent Misrepresentation Defendants intended to deceive the Plaintiffs and induce the Plaintiffs to invest money in APL.

238.    Plaintiffs were induced and did invest substantial sums in reliance upon the repeated misrepresentations and were justified in relying on these misrepresentations.

239.    The misrepresentations and omissions by the Fraudulent Misrepresentation Defendants were the proximate cause of Plaintiffs damages.

240.    Plaintiffs lost nearly 100% of their investments in APL and expected revenue as a direct and proximate result of the Defendants' conduct.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble

damages, costs, attorney fees and any and other such relief the court may deem equitable.

### COUNT 8 - VIOLATION OF SECTION 10(b) AND RULE 10(b-5) OF THE SECURITIES EXCHANGE ACT OF 1934
**American Pallet Leasing, Inc., its Officers and Directors and Senior Employees who have been listed as Defendants along with APL's Attorneys, Accountants, Financial Advisors and Investment Advisors, including but not limited to Langley Williams & Company and Daphne Clark, CPA and Danilo Cacciamatta, Michael J. Morrison, Marshall W. Dooley, Tempus Financial, Inc., Glast Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff, Susan Wonderly, US Bank and US Bancorp Investment Services, Inc. shall be referred to hereinafter as the "10(b-5) Securities Fraud Defendants"**

241.    The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 240 of this Complaint as if they had been fully set forth herein.

242.    The 10(b-5) Securities Fraud Defendants listed above used an instrumentality of interstate commerce, or facility of a national securities exchange, or were in violation of any exemption from registration which made them subject to the Rules of 10(b-5) in the connection with the sale of APL securities both as an Iowa corporation and a Delaware corporation.

243.    The 10(b-5) Securities Fraud Defendants made untrue statements of material fact or material omissions, all of which were misleading, in the Executive Summary, the CIM, the PPM, the SEC filings, the multiple press releases, numerous e-mails and subscription agreements, all specifically identified in this Complaint.

244. The 10(b-5) 10(b-5) Securities Fraud Defendants acted knowingly and with the intent to deceive Plaintiffs so as to induce Plaintiffs to invest in APL.

245. Neither APL nor its officers and directors made any attempt to correct any material misrepresentations or omissions despite full knowledge of their existence.

246. APL's accountants, auditors, attorneys and investment advisors failed to correct any material misrepresentations or omissions despite full knowledge of their existence.

247. All 10(b-5) Securities Fraud Defendants knew Plaintiffs would and were relying upon the representations made when investing in APL.

248. Plaintiffs were justified in relying upon the said misrepresentations.

249. The misrepresentations and omissions were the proximate cause of Plaintiffs having lost nearly 100% of their investments.

250. The 10(b-5) Securities Fraud Defendants do not qualify for safe harbor protection because:

a. The statements herein all relate to then-existing facts and conditions.

b. If certain statements can be characterized as forward-looking, they were not adequately identified as such when made.

c. There were no statements made with respect to any of those representations forming the basis of the complaint that actual results could differ materially from those projected or other meaningful cautionary statements.

d. Additionally, defendants are liable for any forward looking statements because at the time they were made, the particular speakers had actual knowledge that the particular forward-looking statement was materially misleading and based on untruthful and exaggerated presumptions, not in accord with sound actuarial or financial principles.

251. The 10(b-5) Securities Fraud Defendants failed to file for "Blue Sky" protection under any of the states where Plaintiffs resided, including AZ, IA, MN, ND, SD and WY.

252. Due to the violations of all of the state Blue Sky laws listed here and before, any sales on the public market were illegal and void.

253. Plaintiffs Group 4 is entitled to rely on the fraud on the market presumption.

254. The Plaintiffs lost nearly 100% of their investment in APL and expected revenue as a direct and proximate result of the Defendants' conduct.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

<u>COUNT 9 – VIOLATION OF § 11 OF SECURITIES & EXCHANGE ACT
OF 1933
American Pallet Leasing, Inc., its Officers and Directors and Senior
Employees who have been listed as Defendants along with APL's
Attorneys, Accountants, Financial Advisors and Investment Advisors,
including but not limited to Langley Williams & Company and
Daphne Clark, CPA and Danilo Cacciamatta, Michael J. Morrison,
Marshall W. Dooley, Tempus Financial, Inc., Glast Phillips & Murray,
Steve Burman, Bradley Doss, Christopher Curnutt,
Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda,
Marianna Porcella, Craig Medoff, Susan Wonderly, US Bank and US
Bancorp Investment Services</u>

255.    The Plaintiffs restate and re-allege the allegations contained in
paragraphs 1 through 254 of this Complaint as if they had been fully set forth
herein.

256.    The Plaintiffs acquired a security registered under the Securities
Exchange Act of 1933.

257.    When the registration statement became effective, it misrepresented a
fact or omitted a fact, which under the circumstances, had to be made to keep the
statements from being misleading.

258.    The misrepresented and/or omitted facts were material.

259.    The misrepresentations continued and tainted each and every
subsequent stock offering, which were never verified or examined by the
professional defendants and was continually misrepresented to investors.

260.    APL's directors and officers, including those who were represented as
about to be named, are all "persons" under section 11.

261.    The plaintiffs read the registration statement and relied on the
misrepresentations contained in the registration statement.

262.   As a result of their reliance on the misrepresentations, Plaintiffs lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

### COUNT 10 - VIOLATION OF § 12 OF THE SECURITIES & EXCHANGE ACT OF 1933
#### American Pallet Leasing, Inc., its Officers and Directors and Senior Employees who have been listed as Defendants along with APL's Attorneys, Accountants, Financial Advisors and Investment Advisors, including but not limited to Langley Williams & Company and Daphne Clark, CPA and Danilo Cacciamatta, Michael J. Morrison, Marshall W. Dooley, Tempus Financial, Inc., Glast Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff, Susan Wonderly, US Bank and US Bancorp Investment Services

263.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 262 of this Complaint as if they had been fully set forth herein.

264.   APL, its officers and directors sold securities through a prospectus or oral communication using the instrumentalities of interstate commerce.

265.   These Defendants sold, offered to sell, or solicited the sale of the security to the Plaintiffs.

266.   The sale occurred by means of a prospectus or oral communication misstating a material fact or omitted a material fact that was necessary to keep the statements that were made from being misleading.

267. These Defendants were negligent in the following particulars:

a. Failure to uncover the misrepresentations and omissions detailed in this complaint;

b. Failure to adequately investigate the securities being offered;

c. Failure to review APL's internal financial forecasts, contracts and other documents;

d. Failure to make a physical inspection of APL's facilities;

e. Failure to employ analysts having expertise in the pallet business,

f. Failure to conduct interviews with APL's officers and directors and other management officials;

g. Failure to interview APL's major customers;

h. Failure to file the necessary Regulation D forms and representing that the shares had been issued legally;

h. Failure to verify or check if APL's initial stock offerings were exemptions from registrations;

i. Failure to file "Blue Sky" forms and representing that the shares had been issued legally; and

j. Failure to match the shares that were issued with the cash that was actually paid by investors.

k. These defendants were negligent because they violated GAAP and GAAS principles set forth in 78.

268. This negligence continued and tainted each and every subsequent

stock offering, which were never verified or examined by the professional defendants.

269. The actions of these Defendants failed to comport with the standard of care expected of similarly situated professionals.

270. The plaintiffs justifiably relied on the misrepresentations contained in the prospectus or oral communications.

271. As a result, Plaintiffs lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

### COUNT 11 - VIOLATION OF § 18 OF THE SECURITIES & EXCHANGE ACT OF 1933
### American Pallet Leasing, Inc., its Officers and Directors and Senior Employees who have been listed as Defendants along with APL's Attorneys, Accountants, Financial Advisors and Investment Advisors, including but not limited to Langley Williams & Company and Daphne Clark, CPA and Danilo Cacciamatta, Michael J. Morrison, Marshall W. Dooley, Tempus Financial, Inc., Glast Phillips & Murray, Steve Burman, Bradley Doss, Christopher Curnutt, Jason Nichols, Jennifer Nichols, Gregory D. Frost, John Brda, Marianna Porcella, Craig Medoff and Susan Wonderly

272. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 271 of this Complaint as if they had been fully set forth herein.

273. APL, its officers and directors, filed documents with the SEC as

detailed herein.

274.    The SEC filings all contained false or misleading statements as detailed in this Complaint.

275.    The false and misleading statements were material.

276.    The plaintiffs read each document filed with the SEC.

277.    Specifically, the plaintiffs relied on the misrepresentations contained therein.

278.    As a result of their reliance on the misrepresentations made in the SEC filings, the plaintiffs invested into APL and ultimately lost 100% of their investments and expected revenue.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

### COUNT 12 - CONTROLLING PERSONS UNDER VIOLATION OF § 20 OF THE SECURITIES & EXCHANGE ACT
**Officers and Directors of APL, Kirkpatrick, Lockhart, Preston, Gates, Ellis, LLP f/k/a Preston , Gates & Ellis, LLP a/k/a KL Gates and Daniel K. Donahue, Michael J. Morrison, Gersten Savage, LLP, Langley Williams & Company, LLC, Daphne Clark, Marshall Dooley, Tempus Financial, and Craig Medoff**

279.    The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 278 of this Complaint as if they had been fully set forth herein.

280. The officers and directors, accountants, lawyers, financial advisors and banking entities of APL controlled APL.

281. The defendants induced the illegal, fraudulent and/or negligent conduct of various other defendants, individuals and/or employees.

282. These Defendants should be held jointly and severally liable with and to the same extent as such controlled person.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 13—PROFESSIONAL NEGLIGENCE
### Kirkpatrick, Lockhart, Preston, Gates, Ellis, LLP f/k/a Preston , Gates & Ellis, LLP a/k/a KL Gates and Daniel K. Donahue, Michael J. Morrison, Gersten Savage, LLP, Langley Williams & Company, LLC, Daphne Clark, Marshall Dooley, Tempus Financial, and Craig Medoff

283. The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 282 of this Complaint as if they had been fully set forth herein.

284. These Defendants were negligent in reviewing, certifying and/or legitimizing the various transactions and filings described herein in this Complaint.

285. These defendants were negligent as detailed in paragraphs 267, 268, and 269.

286. The actions of these Defendants were willful, wanton and in reckless disregard of the rights of the Plaintiffs.

287.   The professional negligence was a proximate cause of Plaintiffs losing nearly 100% of their investments in APL and expected revenues.

WHEREFORE, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of treble damages, costs, attorney fees and any and other such relief the court may deem equitable.

## COUNT 14—PUNITIVE DAMAGES—AGAINST ALL DEFENDANTS

288.   The Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 286 of this Complaint as if they had been fully set forth herein.

289.   In doing all the acts alleged herein, the defendants acted willfully, maliciously and unlawfully and were guilty of a wanton disregard of the rights of the plaintiffs.

290.   By reason thereof, the plaintiffs demand exemplary and punitive damages be awarded against the defendant in an amount commensurate with the malicious nature of the defendants' conduct.

### JURY DEMAND

The Plaintiffs hereby request trial by jury on all issues.


Respectfully submitted,


HEIDMAN LAW FIRM L.L.P.


By:   */s/Jeff W. Wright*_____

JEFF W. WRIGHT      AT0008716
DANIEL B. SHUCK     AT0007141
1128 Historic Fourth Street
P.O. Box 3086
Sioux City, IA 51102
Phone: (712) 255-8838
Fax:    (712) 258-6714

and


Mark Haggerty,
MN Attorney Lic. No.: 03938X
FFP Legal Services, LLC
8009 34th Ave South, Suite 185
Bloomington, MN 55425
Phone: (952) 854-9678
Fax:    (952) 854-9889

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 10, 2008, the foregoing instrument was filed electronically. Notice of this filing will be sent automatically to all parties who are registered users of the Court's electronic case filing (ECF) system. Parties may access this filing through the Court's system.

The undersigned further certifies that on October 10, 2008, the foregoing instrument was sent to the following parties by U.S. Mail, duly addressed as follows, postage prepaid:

Chris Curnutt
1125 Horseshoe Bend
Irving, TX 75061

W. Ross Forbes
Jason P. Shanks
Jackson Walker LLP
901 Main Street, Suite 6000
Dallas, TX 75202

Douglas H Peterson
106 S 5th Street
Moorhead, MN 56560

*/s/ Jeff W. Wright*