**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

TIMOTHY ARMSTRONG, et al.,

        Plaintiffs,

vs.

AMERICAN PALLET LEASING INC., et al.,

        Defendants.

No. C07-4107-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS**

———————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION AND BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      *1. Facts Drawn From First Amended Complaint* . . . . . . . . . . . 6
      *2. Facts Related Solely To Personal Jurisdiction* . . . . . . . . . . 20

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   *A. U.S. Bank's Rule 12(b)(1) Challenge to Jurisdiction* . . . . . . . . . . 21
      *1. General law regarding supplemental jurisdiction* . . . . . . . . 22
      *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   *B. Motions To Dismiss For Lack Of Personal Jurisdiction* . . . . . . . . . . 30
      *1. Rule 12(b)(2) standards* . . . . . . . . . . . . . . . . . . . . . . 30
      *2. Nationwide service of process* . . . . . . . . . . . . . . . . . . . 30
   *C. Motions To Dismiss For Failure To State A Claim* . . . . . . . . . . . . . 34
      *1. Rule 12(b)(6) standards* . . . . . . . . . . . . . . . . . . . . . . 34
      *2. Pleading fraud under Rule 9(b)* . . . . . . . . . . . . . . . . . 37
      *3. Analysis of civil RICO claims* . . . . . . . . . . . . . . . . . . . 39
      *4. Analysis of securities claims* . . . . . . . . . . . . . . . . . . . 43
         *a. Section 10(b) and Rule 10b-5 claims* . . . . . . . . . . . 43
            *i. The Langley defendants* . . . . . . . . . . . . . . . 45

*ii.*     ***Defendant Morrison*** . . . . . . . . . . . . . . . . . . . 49

*iii.*    ***Defendants Frost and the Nichols*** . . . . . . . . . 50

*iv.*    ***The Bumgarners*** . . . . . . . . . . . . . . . . . . . 51

*v.*     ***Defendant Gersten Savage*** . . . . . . . . . . . . . 52

*b.*    ***Section 11 claims*** . . . . . . . . . . . . . . . . . . . . . . 54

*i.*     ***The Langley defendants*** . . . . . . . . . . . . . . . 57

*ii.*     ***Defendant Morrison*** . . . . . . . . . . . . . . . . . . 58

*iii.*    ***Defendants Frost and the Nichols*** . . . . . . . . . 59

*iv.*    ***The Bumgarners*** . . . . . . . . . . . . . . . . . . . 60

*v.*     ***Defendant Gersten Savage*** . . . . . . . . . . . . . 60

*c.*    ***Section 12 claims*** . . . . . . . . . . . . . . . . . . . . . . 61

*i.*     ***Sellers of APL stock*** . . . . . . . . . . . . . . . . . 63

*ii.*     ***Statute of limitations*** . . . . . . . . . . . . . . . . 63

*d.*    ***Section 18 claims*** . . . . . . . . . . . . . . . . . . . . . . 65

*e.*    ***Section 20 claims*** . . . . . . . . . . . . . . . . . . . . . . 70

**5.**    ***State law claims*** . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*a.*    ***Conversion claims*** . . . . . . . . . . . . . . . . . . . . . . 73

*b.*    ***Breach of fiduciary duty claims*** . . . . . . . . . . . . . 74

*i.*     ***U.S. Bank*** . . . . . . . . . . . . . . . . . . . . . . . 77

*ii.*     ***The Langley defendants*** . . . . . . . . . . . . . . . 78

*c.*    ***Fraudulent misrepresentation and omission claims*** . . . 80

*i.*     ***U.S. Bank*** . . . . . . . . . . . . . . . . . . . . . . . 81

*ii.*     ***The Langley defendants*** . . . . . . . . . . . . . . . 82

*iii.*    ***Morrison*** . . . . . . . . . . . . . . . . . . . . . . . . 82

*iv.*    ***The Nichols*** . . . . . . . . . . . . . . . . . . . . . . 83

*d.*    ***Negligent misrepresentation/nondisclosure claims*** . . . 84

*i.*     ***The Langley defendants*** . . . . . . . . . . . . . . . 85

*ii.*     ***Morrison*** . . . . . . . . . . . . . . . . . . . . . . . . 86

*iii.*    ***The Nichols*** . . . . . . . . . . . . . . . . . . . . . . 88

*e.*    ***Professional Negligence*** . . . . . . . . . . . . . . . . . . 89

*i.*     ***Morrison and Gersten Savage*** . . . . . . . . . . . 89

*ii.*     ***The Langley defendants*** . . . . . . . . . . . . . . . 91

*f.*    ***Punitive damages*** . . . . . . . . . . . . . . . . . . . . . . 91

**D.**   **Leave To Amend** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

**III.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

The court is confronted in this case with a myriad of claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), both the Securities Act of 1933 and the Securities Exchange Act of 1934, as well as several state law claims all arising from an alleged Ponzi scheme orchestrated around the selling of securities in the publically traded company, American Pallet Leasing, Inc.[1]

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On November 30, 2007, plaintiffs, all investors in the corporation American Pallet Leasing, Inc. ("APL") filed their complaint in this case.[2] On October 10, 2008, plaintiffs filed their First Amended Complaint against defendants, including defendants US Bancorp,

---

[1]Ponzi schemes take their name from Charles Ponzi. *See Cunningham v. Brown*, 265 U.S. 1, 7 (1924) (describing Ponzi's fraudulent investment scheme). "A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. 'The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.'" *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (quoting *In re United Energy Corp.,* 944 F.2d 589, 590 n.1 (9th Cir. 1991)).

[2]The complaint named 177 plaintiffs and 76 defendants and set out eighteen claims for the following: violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(b), 1962(d), and 1962(a); professional negligence; breach of fiduciary duty; conversion; negligent misrepresentations/nondisclosures; fraudulent nondisclosure; violation of § 10(b) and Rule 10(b-5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); violation of State Blue Sky Laws; violation of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k; violation of § 12 of the Securities Act of 1933, 15 U.S.C. § 77l; violation of § 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r; breach of contract; disregard for corporate form; controlled persons under § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t; and, punitive damages.

Inc. and US Bancorp Investment Services, Inc. (collectively "U.S. Bank" unless otherwise indicated), Langley, Williams & Company, L.L.C. and Daphne B. Clark (collectively the "the Langley defendants" unless otherwise indicated), Jason Nichols, Jennifer Nichols, Gregory Frost, Margaret Bumgarner, Kevin Bumgarner, and Gersten Savage, L.L.P. ("Gersten Savage").[3] In their First Amended Complaint, plaintiffs set out the following fourteen causes of action against the named defendants: (1) violation of Racketeer Influenced and Corrupt Organizations Act § 1962(c), 18 U.S.C. § 1962(c) (Count 1); (2) violation of RICO § 1962(a), 18 U.S.C. § 1962(a) (Count 2); violation of RICO § 1962(d), 18 U.S.C. § 1962(d) (Count 3); (4) breach of fiduciary duty (Count 4); (5) conversion (Count 5); (6) negligent misrepresentations/nondisclosures (Count 6); (7) fraudulent misrepresentations and omissions (Count 7); (8) violation of § 10(b) and Rule 10(b-5) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b) (Count 8); (9) violation of § 11 of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. § 77k (Count 9); (10) violation of § 12 of the Securities Act of 1933, 15 U.S.C. § 77l (Count 10); (11) violation of § 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r (Count 11); (12) controlling persons under § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t (Count 12); (13) professional negligence (Count 13); and, (14) punitive damages (Count 14).

---

[3]The First Amended Complaint reduced the number of named to defendants to 43. U.S. Bank asserts that the First Amended Complaint incorrectly named US Bancorp, Inc. and US Bancorp Investment Services, Inc. as defendants in this case. U.S. Bank asserts that US Bancorp, Inc. is not a legal entity and that US Bancorp Investment Services, Inc. no longer exists. U.S. Bank asserts that the entities that plaintiffs meant to name in the complaint are U.S. Bank National Association and U.S. Bancorp Investments, Inc. U.S. Bank, however, does not seek dismissal, or any other action, on this ground, and on the record before the court, the court cannot determine the validity of these assertions.

Defendants U.S. Bank, the Langley defendants, Jason Nichols, Jennifer Nichols, Gregory Frost, Margaret Bumgarner and Kevin Bumgarner (referred to jointly as the "Bumgarners"), and Gersten Savage have filed motions to dismiss which are presently before the court.[4] In their respective motions to dismiss, Frost, the Langley defendants, and the Nichols assert that they have insufficient minimum contacts within the state of Iowa to establish personal jurisdiction and, therefore, the First Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). Frost, the Langley defendants and the Nichols, alternatively, move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Langley defendants, Gersten Savage and the Bumgarners each move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). U.S. Bank moves to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1), on the ground that the court lacks subject matter jurisdiction over plaintiffs' claims against U.S. Bank because all federal claims against U.S. Bank have been dismissed and the court lacks supplemental jurisdiction over plaintiffs' remaining state law claims against it because those claims allegedly do not share a common nucleus of operative facts with the RICO and securities claims against the other defendants. U.S. Bank, alternatively, moves to dismiss the claims asserted against it for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs have filed timely responses to each defendant's respective motion to dismiss.

---

[4]Defendants Jason Nichols and Jennifer Nichols have each filed mirror motions to dismiss in which they advance identical arguments. Because the factual allegations contained in the First Amended Complaint concerning these two defendants are also identical, for the sake of simplicity, the court will refer to these two individual defendants as "the Nichols" unless otherwise indicated.

### B. Factual Background

### 1. Facts Drawn From First Amended Complaint

On a motion to dismiss, the court must assume all facts alleged in plaintiffs' First Amended Complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Therefore, the following factual background is drawn from plaintiffs' First Amended Complaint in such a manner.

Plaintiffs are 177 individuals and entities that purchased stock in defendant American Pallet Leasing, Inc. ("APL") from 2003 through 2006. APL was originally incorporated under the laws of Iowa on June 13, 2003, and maintained its principal place of business in Cedar Rapids, Iowa. APL held itself out to be in the business of manufacturing both wooden and metal pallets in Rock Valley, Iowa, as well as in South Carolina. In September 2004, APL was reverse merged into the publicly traded corporation Literary Playpen, Inc. ("Literary Playpen"), a Delaware Corporation. Following the reverse merger, the name of Literary Playpen was changed to American Pallet Leasing, Inc. a Delaware Corporation ("APL" will refer to all variants of the company unless otherwise indicated). The corporate offices of APL remained in Cedar Rapids, Iowa. At some point between 2003 and 2006, defendants Timothy Bumgarner, Margaret Bumgarner, Kevin Bumgarner, James F. Crigler, Robert Vinson, Douglas H. Peterson, Keith Kerbaugh, Byron Hudson and Elgin McDaniel were officers, directors, and/or senior employees of APL. Keith Kerbaugh was APL's Chief Executive Officer and Doug Peterson was APL's Chief Financial Officer.

Beginning in June 2003 and continuing through 2006, APL solicited investment funds from plaintiffs. To entice investors to purchase its stock, APL falsely reported growth in its sales and assets through misrepresentations in the company's financial statements. As a result, at one point, the company's stock rose in price from 60 cents a

share to over $6.00 in less than thirty days. Within a year, however, APL's stock price had fallen to less than 10 cents a share.

Prior to APL's incorporation, those individuals who would become its incorporators and original officers and directors drafted a document entitled "American Pallet Leasing, Inc. Executive Summary ("the Executive Summary"). The Executive Summary contained the following allegedly false statements:

a. APL owned certain patents related to the production of wood pallets though said pallets were at all times held solely in the name of Timothy Bumgarner, personally.

b. A purchase agreement for RY-JO-BE had been negotiated and that RY-JO-BE's customers had agreed to make a contractual change to APL, including but not limited to the customer named TAMKO Roofing.

c. TAMKO did enter into an agreement to purchase pallets from APL, but claimed its signor on the agreement, Mark Hicks, exceeded his authority when entering into the contract.

d. APL received notice that TAMKO considered the contract invalid in January 2005, but APL never disclosed the information to Plaintiffs.

e. APL identified its purported customer base, none of whom were ever customers of APL.

f. Manufacturing and fabrication of the initial pallets would be performed by Iron Company Enterprises, located in Phoenix, Arizona, but Iron Company Enterprises never agreed to these terms.

g. APL's projected earnings were grossly and intentionally inflated, and were not based upon sound financial

forecasting, accounting principles, or truthful assumptions.

First Am. Compl. ¶¶ 21(a)-(h). Thirty-eight plaintiffs made investments totaling approximately $300,000 during the first investment offering ("the Group 1 Plaintiffs").[5] All of the Group 1 Plaintiffs were given a copy of the Executive Summary between June 2003 and April 2004 and relied upon it.

In September 2003, as part of APL's initial stock offering, defendant Hughes-Roth, one of APL's broker-dealers, prepared, with the assistance of APL's officers and directors, a document entitled "Funding Request Confidential Information Memorandum" ("the CIM"). The CIM purported to contain "information solely for use by potential investors." First Am. Compl. ¶ 23. The CIM contained the following misrepresentations:

    a.    APL had made considerable headway in its developmental plan and represented certain phases had been completed, even though no contracts with high volume pallet users had been secured as of October 2003.

    b.    APL was managing and operating a facility in Oklahoma which had increased revenue by 400% even though it did not have an Oklahoma facility nor had it increased monthly revenues.

---

[5] The Group 1 Plaintiffs are: Earl DeBey, Sydney Eppinga, Audrey Eppinga, Bruce Kooima, Linda Kooima, Stephen Richter, Joyce Richter, Wilmer Van Beek, Della Van Beek, Ronald Van Veldhuisen, Gertrude Van Veldhuizen, Glenn Lange, Cheryl Lange, Roger Koedam, Muriel Koedam, Paul Kats, John Van Zanten, Mary Van Zanten, Tim Kooima, Clarine Kooima, Alvin Bylsma, Duane Rus, Clarence Kooima, Winifred Kooima, Larry Kirksen, Gloria Dirksen, Ronald Owens, Karen Owens, Lori Ohlemann, Scott Ohlemann, Chuck Witte, Linda Witte, Robert Van't Hul, Michael Corcoran, Brent Hella, Blake Kerbaugh, Keith Johs, and Scott Eppinga.

c.     APL entered into an agreement with TAMKO, as set forth in paragraph 21(c) herein but failed to notify investors that TAMKO considered that contract void.

d.     Projected net earnings for the Iowa APL to be $1,458,930 by September of 2004 and $9,252,134 by September 2005 and $23,223,583 by September of 2006 all of which were intentionally and grossly inflated.

e.     APL intended to enter into a reverse merger transaction with Literary Playpen, even though APL and Literary Playpen never intended to allow the plaintiff-investors to receive or realize any type of benefit under the reverse merger transaction.

First Am. Compl. at ¶¶ 24(a)-(e). In October 2003, the Group 1 Plaintiffs were all given a copy of the CIM and relied upon it.

APL made a second investment offering to potential investors. As part of this second investment offering, APL's officers and directors helped prepare a Confidential Private Placement Memorandum ("PPM") which was issued in June 2004 and finalized in August 2004. The PPM contained the following alleged misrepresentations:

a.     The estimated value of APL's stock and the estimated book value, since APL's net book value was near zero as of June 30, 2004.

b.     All investors who purchased would receive "piggy-back registration rights," but the investors never received the benefit of these rights, nor were they included in any of the subsequent SB-2 filing or S-8 filings.

c.     Shares would only be sold to 35 Non-Accredited Investors, even though well over 35 Non-Accredited Investors invested pursuant to the PPM.

d.    A down payment had been made on the purchase of the G & G/Cherokee Wood, Inc. facility located in Blacksburg, South Carolina (hereinafter "G & G").

e.    Timothy Bumgarner personally invested substantial sums of money in APL, even though he had not.

f.    Ryan Financial Group issued a Financing Commitment Letter, which reasonably created the appearance that the G & G facility was completely funded, even though no such Letter was prepared, and APL had not secured appropriate financing, which resulted in APL defaulting on the purchase by failing to make four of five monthly payments of $30,000 and failing to make a balloon payment of $2,700,000.

g.    The PPM also indicated a copy of the purchase agreement between APL and the G & G facility had been attached, but said Purchase Agreement was never produced because it would have revealed the complete lack of funding.

h.    Plaintiffs were told by agents of APL that there was no problem with the financing and that the investors could rely on the PPM.

i.    The State and local governments of South Carolina agreed to give APL certain tax benefits, even though no such commitments had been made.

j.    G & G agreed to purchase timber from APL for the upcoming three years.

k.    Certain patents were owned by APL and that Nucor had offered a large sum of money to purchase the patents, but said patents remained in Bumgarner's name at all

relevant times, and Nucor never offered the amounts represented in the PPM for the steel pallet patents.

l.      The PPM further listed a number of corporate customers of APL, even though APL never sold a single galvanized or steel pallet to any of the claimed customers.

m.      The PPM listed the 2005 projected revenues, which were intentionally and grossly overstated and not based upon sound actuarial principles or truthful assumptions.

n.      The PPM indicated Defendant Mercedis USA Limited agreed to purchase APL stock at $7.85 per share, even though Mercedis never intended or agreed to buy APL stock, but was paid $50,000 in May or June 2004 to make the representations made in the PPM.

o.      Mercedis would function as APL's investment bank and that a banking agreement had been signed, but no investment banking services ere [sic] performed.

p.      Mercedis USA Limited was to pay $0.50 each for 6 million warrants to purchase APL common shares, under the purported banking agreement, but no such stock purchases were made.

q.      The PPM indicated a facility was to be built in Burnsville, North Carolina and would be fully operational by September 1, 2004, but the facility never commenced nor materialized.

r.      The PPM represented that a wood and steel pallet facility was be constructed in Rock Valley, Iowa, but APL breached its contract with the City of Rock Valley and never intended to commence construction of such a facility.

s.    The PPM listed, specifically, the permissible uses of APL's net proceeds, but APL used little, if any, of the funds raised from Plaintiffs' Group 2 for the stated purposes.

t.    The PPM represented an equity valuation analysis was done stating that the "Estimated Value of APL Common Stock" as of December 31, 2005, should have an "effective price per share of $9.58," but the analysis was based on false assumptions and unsound actuarial financial principles.

u.    A business entity known as "US Consults" had awarded APL a total of $15 million of USTC's and that APL would receive a total of $1,233,600 in cash, but US Consults was never aware of these representation [sic] and never authorized them.

v.    The PPM contained ten Pro Forma income statements and balance sheets and another twenty Pro Forma financial statements and projections, none of which were ever realized.

w.    The PPM materially omitted the fact that Daniel Donahue was the General Partner of Templemore Partners, an original investor in a publicly traded company known as Literary Playpen, Inc., which would be reverse merged into APL in September 2004.

First Am. Compl. at ¶¶ 27(a)-(w) (footnote omitted).    Sixty-one plaintiffs made investments during the second investment offering ("the Group 2 Plaintiffs").[6]

_____

[6]The Group 2 Plaintiffs are: Aaron Baart, Nicole Baart, Todd Bartman, Julian Bartman, Alvin Bylsma, Earl DeBey, Paul DeBey, Karmin DeBey, Dan DeRoon, Arline DeRoon, Derrick DeRoon, Ken Emmelkamp, Ardene Emmelkamp, Audrey Eppinga, Sydney Eppinga, Scott Eppinga, Brent Hella, Pete Hoogendoorn, Connie Hoogendoorn,

(continued...)

APL made a third investment offering in conjunction with a reverse merger, organized by APL's officers and directors, with Literary Playpen in September 2004. Defendant Michael Morrison of Nevada Agency and Trust, as an escrow agent and attorney, gave a written opinion, concerning the reverse merger, that all the requirements and regulations of the Securities Exchange Commission ("SEC") and state securities regulations had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen stock.

In order to facilitate the reverse merger, the sellers and purchasers were divided into two groups, each managed by a different escrow account manager. One escrow account was managed by Michael Morrison. Morrison was to have received $350,000 from thirteen investors for the escrow account he was managing. Morrison, however, only received $245,000 from seven cash investors. The other six individuals who were listed as being contributors to Morrison's escrow account did not contribute any money in exchange for the issuance of stock to them. These six individuals were Jesse Navarro, Jason Nichols, Jennifer Nichols, Gregory Frost, Christopher Curnutt and John Breda. Their receipt of free stock in the reverse merger was not disclosed to any of the Group 2 Plaintiffs even though such actions violated provisions of the PPM.

---

[6](...continued)
Paul Kats, Roger Keodam, Muriel Koedam, Bruce Kooima, Linda Kooima, Clarence Kooima, Winifred Kooima, Kenneth Krieg, Sandy Krieg, Glenn Lange, Cheryl Lange, Paul Maassen, Shelly Maasen, OakwoodRentals, Jason Van Surksum, Ronan Roghair, Darwin Rus, Helen Rus, DLD Cattle, Duane Rus, Bovine Technologies, Jesse Van De Stroet, Tanya Van De Stroet, Kelderman Living Trust, Arnold Kelderman, Carol Kelderman, AllanVan Beek, Colleen Van Beek, Garlen Van Beek, Tammie Van Beek, Edward Van Der Brink, Evert D. Van Maanen, Kathy Van Maanen, Jason Van Surksum, Becky Van Surksum, Sturgis Van Vugt, John H. Van Zanten, Mary Van Zanten, Andrew Vander Vliet, Amber Vander Vliet, Fred Ymker, and Michelle Ymker.

According to the terms of the Shareholders Purchase Agreement, the plaintiff-investors were to have received approximately 97.5 percent of the restricted and free trading stock of Literary Playpen in exchange for their cash contributions. Instead, the majority of shares went to other individuals, including Timothy Bumgarner, Jason Nichols, Jennifer Nichols and Gregory Frost. These individuals, in turn, sold the stock they received on the market and made substantial profits. Thirty-six plaintiffs invested approximately $595,000 during the reverse merger offering ("the Group 3 Plaintiffs").[7] The Group 3 Plaintiffs lost 100 percent of their investment.

From September 2004 through 2006, APL made a fourth investment offering to potential investors through the open market. In order to inflate APL's stock price, numerous press releases were issued based on APL officers and directors' representations. These press releases contained material misrepresentations. APL's officers and directors also provided inaccurate information in filings with the SEC. APL made false representations on the following filings: its Form 8-K filed in September or October 2004; its Form 10-QSB filed on November 22, 2004; its Form S-8 Registration Statement filed on February 7, 2005; its Form 10-QSB filed on February 23, 2005; its Form 10-QSB filed on May 12, 2005; its Form SB-2 filed in June 2005 and amended on August 5, 2005; and, its Form 10-KSB filed on October 17, 2005.

---

[7]The Group 3 Plaintiffs are: Alvin Blysma, William Corcoran, Jack Corcoran, Michael Corcoran, Earl DeBey, Audrey Eppinga, Sydney Eppinga, Scott Eppinga, Brent Hella, Paul Kats, Roger Koedam, Muriel Keodam, Bruce Kooima, Linda Kooima, Clarence Kooima, Winifred Kooima, Glenn Lange, Cheryl Lange, Kerry McAbee, Barbara McAbee, Bart Roskoski, DLD Cattle, Duane Rus, John Van Zanten, Mary Van Zanten, James Hawkins, Hoper Family Trust, Robert Matthiessen, Craig Richie for Fishes & Loves from Jesus Christ Foundation, Chuck Nejdl, Deann Nejdl, Robert Reese, Dale Wacker, Connie Wacker, Donald Wacker, and Lori Wacker.

Defendant Gersten Savage is a limited liability partnership law firm. Gersten Savage acted as APL's legal counsel from April 2005 through 2006. Gersten Savage represented that it had reviewed APL's registration statement. Gersten Savage was responsible for reviewing and providing an opinion regarding APL's Form 10-QSB filed on May 12, 2005, as well as APL's Form SB-2 filed in June 2005 and amended on August 5, 2005, and the Form 10-KSB filed on October 17, 2005. Each of these documents contained numerous misrepresentations. Specifically, the Form 10-QSB filed on May 12, 2005, which indicated that since February 23, 2005, the number of APL's shares of common stock had increased from 11,946,090 to 19,825,742, contained the following allegedly false representations:

2)      The 10-QSB failed to mention that the increase in shares occurred pursuant to Timothy Bumgarner's instructions to the transfer agent and that shareholder approval had not been obtained.

3)      The 10-QSB further failed to mention that the transfer agent complied with all of the instructions from Timothy Bumgarner without legal opinion or auditor's opinion, and in some cases, without Medallion guarantees.

4)      The 10-QSB further failed to indicate that the transfer agent issued stock without the co-owner's signatures or the required 144 documentation.

5)      This transaction resulted in nearly doubling the number of free trading shares of APL without shareholder notice or approval, the majority of which were issued to Bumgarner and his family members.

6)      The May 12, 2005, 10-QSB showed that APL's cash or cash equivalent was down to $16,539 and that the

inventories existed of $116,641 but none of the claimed assets actually existed.

7) The 10-QSB went on to state that sales from July 1, 2004 through March 31, 2005 were $2,418,256 and the company had assets valued at $3,402,697 even though sales did not rise to that level and APL was almost completely out of assets, cash and business.

8) Further, the May 12, 2005, 10-QSB went on to state that consultants had been paid $1,079,516 and that office expenses were $707,630 from July 1, 2004 through March 31, 2005, with no narrative explanation, even though most of the alleged "consultant fees" were paid to the officers and directors of APL and their respective friends and family or other business entities that performed no discernable service to APL.

9) The May 12, 2005, 10-QSB failed to mention that all of the monthly payments on the G & G contract were missing except the payment in September 2004.

10) The May 12, 2005, 10-QSB further indicated the purchase of the G & G facility was executed though an unsecured promissory note even though the purchase was not on an unsecured promissory note but on a Contract for Deed that could be foreclosed upon within 30 days notice.

11) The May 12, 2005, 10-QSB further indicated the time to pay the balance due on the G & G facility had been extended even though no such extension had been granted.

First Am. Compl. at ¶¶ 58(e)(2) -(11).

APL's Form SB-2 filed in June 2005 and amended on August 5, 2005, contained the following two allegedly false representations:

2)      The SB-2 amendment filed on August 5, 2005 showed that the amount of shares of stock issued and outstanding were 26,881,720 shares, which equated to a more than 7 million share increase from the May 12, 2005 10-QSB filing and said increase had not been approved by the shareholders.

3)      The SB-2 filing states that all of the assets were intact as of July 15, 2005, but APL was insolvent and had no revenues.

First Am. Compl. at ¶¶ 58(f)(2) -(3).

The Form 10-KSB filed on October 17, 2005, contained the following alleged misrepresentations:

2)      The 10-KSB stated that the reverse merger had been done legally when in fact it had not.

3)      The 10-KSB failed to mention that the monthly payments on the G & G facility, with the exception of the September 2004 payment, had never been made.

4)      Further, there was no mention that the entire $2.7 million dollars had become due on the contract and had not been paid.

5)      The 10-KSB stated that the APL had been sued for breach of contract by the sellers of the G & G facility but materially omitted counts for fraud and unfair trade practices.

6)      The 10-KSB stated that it had received land in Rock Valley from the City of Rock Valley and that APL was going to be receiving numerous grants from Iowa, all of which was materially untrue.

> 7) The 10-KSB further listed the compensation of Timothy Bumgarner as $22,500 from July 1, 2004 through June 30, 2005 but he received hundreds of thousands of dollars of compensation.

First Am. Compl. at ¶¶ 58(g)(2)-(7).

The Langley defendants acted as APL's auditors from August 30, 2004 through the middle of 2006. Defendant Langley Williams is a limited liability company and a provider of accounting, auditing and bookkeeping services, with its principal place of business in Lake Charles, Louisiana. Defendant Daphne Clark is a licensed Certified Public Accountant employed at Langley Williams. On September 8, 2004, in an email from Craig Medoff, the Langley defendants were "put on alert that the assets and representations made in the PPM were false. . ." First Am. Comp. at ¶ 99. The Langley defendants never informed APL's investors of this information. Instead, on September 27, 2004, Langley Williams issued an unconditional audit and verified the accuracy of APL's representations regarding its financial condition and the reverse merger transaction. On November 17, 2004, the Langley defendants reviewed and approved the balance sheets and profits and loss statements that were filed by APL in its November 22, 2004, 10-QSB. Likewise, on February 17, 2005, the Langley defendants reviewed and approved the balance sheets and profits and loss statements that were filed by APL in its February 23, 2005, 10-QSB. Again, on May 12, 2005, the Langley defendants reviewed and approved the balance sheets and profits and loss statements that were filed by APL in its May 12, 2005, 10-QSB. The Langley defendants also filed an opinion letter approving APL's Form SB-2 filed in June 2005.

Defendant Michael J. Morrison is a licensed attorney who lives in Reno, Nevada. He acted as one of the escrow agents for the reverse merger between APL and Literary Playpen. Morrison agreed to act as an escrow agent for both the owners of Literary

Playpen and the plaintiffs. On September 9, 2004, Morrison stated in an e-mail to Dan Donahue that he had reviewed the purchase agreement and it generally looked fine. In his capacity as an attorney and escrow agent, Morrison provided a written opinion in which he stated that all of the legal requirements and regulations had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen stock. Morrison never matched the cash payments received with the number of shares being issued.

U.S. Bank was responsible for both APL's banking transactions and Timothy Bumgarner's personal banking transactions. U.S. Bank loaned money to some plaintiffs to purchase stock in APL. U.S. Bank's employees in Cedar Rapids maintained a special relationship with Timothy and Kevin Bumgarner and permitted Timothy and Kevin Bumgarner to withdraw large sums of money from APL's business account and deposit the funds directly into their personal checking accounts.[8] Between August 2, 2004, and August 6, 2004, checks from plaintiffs totally $1,600,000 were deposited in APL's corporate checking account at U.S. Bank. On August 6, 2004, Timothy Bumgarner withdrew approximately $1,200,000 from APL's corporate checking account at U.S. Bank, deposited the money into his personal U.S. Bank account, and then withdrew some of the money and loaned it back to APL's U.S. Bank checking account. Timothy Bumgarner also withdrew some money from his personal account at US. Bank and deposited it in his personal investment account at US Bancorp Investment Services, Inc.

US. Bank did not provide notice of these deposits to federal agencies. U.S. Bank also failed to follow standard procedures and monitor transactions according to its own internal standards. Starting in August 2004, U.S. Bank misrepresented and disguised Timothy

---

[8]Kevin Bumgarner is Timothy Bumgarner's son.

Bumgarner's personal bank statements as APL's bank statements. Auditors relied on the disguised statements when filing a Form 8-K and audit for August 30, 2004 with the SEC. More than 50 percent of the plaintiffs relied on the Form 8-K to purchase APL stock.

### 2. *Facts Related Solely To Personal Jurisdiction*

Defendants Morrison, Frost, Jason Nichols and Jennifer Nichols have supplied affidavits in support of their request to dismiss the complaint on the ground of lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). The court has extracted the following facts, all uncontroverted, from those affidavits which relate to defendants' contacts with the State of Iowa.

Michael Morrison has never lived in Iowa, or owned property in Iowa. He has never been to Iowa or driven through the state. Morrison does not conduct any business in Iowa. He is licensed to practice law in Nevada. He is not licensed to practice law in Iowa. He has never advertised in Iowa, or otherwise taken any action with the intention of soliciting business from a resident of Iowa. Morrison has never had a client from Iowa. Morrison was counsel and corporate secretary for Literary Playpen, Inc. Literary Playpen, Inc. was a Delaware Corporation with offices in Reno, Nevada. Morrison did not conduct any business in Iowa in his capacity as counsel and corporate secretary for Literary Playpen, Inc.

Gregory Frost is a resident of the State of New York and resides in New York City, New York. He has never lived in Iowa or visited the state. He does not own any property in Iowa and does not conduct any business in Iowa. He is an attorney licensed to practice in New York. He is not licensed to practice in Iowa. Frost has never had a client from Iowa and has never advertised in Iowa with the intention of soliciting business from a resident of Iowa. Frost was involved in the execution of a subscription agreement to purchase shares of common stock in Literary Playpen, Inc. Frost executed the subscription

agreement in New York. He had no dealings with Literary Playpen, Inc. which were conducted in Iowa. He had no communications with any person or entity in Iowa in any capacity involving Literary Playpen, Inc.

Jason Nichols is a resident of the State of Texas, and currently resides in Dallas, Texas. He has never lived in Iowa or been to the state. He does not own any property in Iowa and has never maintained a bank account in Iowa. He does not conduct any business in Iowa and has not entered into any contracts in Iowa. He does not pay taxes in Iowa.

Likewise, Jennifer Nichols is a resident of the State of Texas, and currently resides in Dallas. She has never lived in Iowa or visited Iowa. She does not own any property in Iowa and has never maintained a bank account in Iowa. She also does not conduct any business in Iowa and has not entered into any contracts in Iowa. She does not pay taxes in Iowa.

## II. LEGAL ANALYSIS

### A. U.S. Bank's Rule 12(b)(1) Challenge to Jurisdiction

Because all federal claims against it have been voluntarily dismissed by plaintiffs, defendant U.S. Bank seeks dismissal of the remaining state law claims against it on the basis of lack of supplemental jurisdiction. Defendant U.S. Bank contends that the court lacks subject matter jurisdiction over plaintiffs' state law claims against it because the state law claims do not share a common nucleus of operative facts with the RICO and securities claims against the other defendants. To understand the arguments of defendant U.S. Bank in regard to dismissal of the state law claims against it, the court will briefly set out the context of each of the state law counts against U.S. Bank. In Count 4, plaintiffs assert a claim of breach of fiduciary duty against U.S. Bank based on U.S. Bank's alleged failure to ensure that APL complied with the state and federal laws and regulations. In Count 6,

plaintiffs assert a claim of negligent misrepresentation/nondisclosure against U.S. Bank for negligently failing to disclose material information regarding APL's financial condition. In Count 7, plaintiffs assert a claim of fraudulent misrepresentation and omission against U.S. Bank for conspiring to omit disclosure of material information regarding APL's financial condition. In Count 14, plaintiffs request punitive damages against U.S. Bank.

### 1. *General law regarding supplemental jurisdiction*

Section 1367 of Title 28 of the United States Code governs a district court's supplemental jurisdiction, and lack thereof, over state law claims:

> **(a)** Exception as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims *that are so related to claims in the action within the original jurisdiction that they form part of the same case or controversy* under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve joinder or intervention of additional parties.

28 U.S.C. § 1367(a) (emphasis added). Whether a court has supplemental jurisdiction is determined by the following test: "'a federal court has jurisdiction over an entire action, including state-law claims, wherever the federal-law and state law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Kansas Public Employees Retirement Sys. v. Reimer & Koger, Assoc., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (in turn quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966)); *see OnePoint Solutions, L.L.C. v. Borchert*, 486 F.3d 342, 350 (8th Cir. 2007) ("'Claims within the action are part of the same case or controversy if they 'derive from a common nucleus of operative fact.'' A plaintiff's claims derive from a common nucleus of operative fact if the

"'claims are such that he would ordinarily be expected to try them all in one judicial proceeding.'") (quoting *Myers v. Richland County,* 429 F.3d 740, 746 (8th Cir. 2005) (quoting in turn *Gibbs,* 383 U.S. at 725);*Cossette v. Minnesota Power & Light*, 188 F.3d 964, 973 (8th Cir. 1999) ("A district court may exercise supplemental jurisdiction over state law claims that arise from the same nucleus of operative fact as the plaintiff's federal claims and when the plaintiff would ordinarily be expected to try all the claims in one judicial proceeding.") (citing *Kansas Public Employees Retirement Sys.*); *Meyers v. Trinity Med. Ctr*, 983 F.2d 905, 907 (8th Cir. 1993); *see also Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1005 (8th Cir. 1990); *Appelbaum v. Ceres Land Co.*, 687 F.2d 261, 262-63 (8th Cir. 1982); *Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 578 F.2d 727, 734-35 (8th Cir. 1978).   In sum, supplemental jurisdiction under subsection (a), is appropriate where the federal-law claims and the state-law claims in the case "derive from a common nucleus of operative fact" and are such that a plaintiff would ordinarily be expected to bring all of the claims in one suit. *See Kansas Public Employees Retirement Sys.*, 77 F.3d at 1067.

Once the court has determined supplemental jurisdiction is proper under subsection (a), subsection (c) provides the list of circumstances under which the court can decline to exercise such supplemental jurisdiction:

> **(c)** The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>> **(1)** the claim raises a novel or complex issue of State law,
>> **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
>> **(3)** the district court has dismissed all claims over which it has original jurisdiction, or

> **(4)** in exceptional circumstances, there are other
> compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c); *see International Ass'n of Firefighters of St. Louis, Franklin and Jefferson v. City of Ferguson*, 283 F.3d 969, 976 (8th Cir. 2002) (noting, without expressing an opinion as to what the district court should do on remand, that a district court "would always be free . . . to proceed on the merits of the state claim, in its discretion, even if one of the conditions in 28 U.S.C. § 1367(c) for dismissal of the state claim had been satisfied."); *Southern Council of Industrial Workers v. Ford*, 83 F.3d 966, 969 (8th Cir. 1996) ("Where original jurisdiction exists, exercise of supplemental jurisdiction over all adequately related claims is mandatory absent certain exceptions . . . ."); *Tinius v. Carroll County Sheriff Dept.*, 255 F. Supp. 2d 971, 977 (N.D. Iowa 2003) ("'The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein.'") (quoting *McLaurin v. Prater*, 30 F.3d 982, 984 (8th Cir. 1994)).

## 2. *Analysis*

U.S. Bank asserts that plaintiffs' Iowa state law claims do not derive from a common nucleus of operative facts as plaintiffs' RICO and securities claims against the other defendants. U.S. Bank contends that plaintiffs' federal claims are based on a series of securities schemes and securities violations to inflate the value of APL stock in order to induce plaintiffs to invest in APL while the state law claims against it are grounded on allegations that it failed to notify federal authorities of unusual deposits and Timothy Bumgarner's disguised bank accounts. U.S. Bank argues that the lack of any discernable overlap between the state law claims asserted against it and the federal RICO and securities claims against the other defendants is best demonstrated by the fact that plaintiffs have voluntarily dismissed all of their federal claims against U.S. Bank. U.S. Bank contends

that this demonstrates that plaintiffs do not believe the factual allegations underpinning their claims for RICO violations and federal securities law violations involve U.S. Bank. In contrast, plaintiffs respond that all of their claims, both federal and state, derive from a common nucleus of operative fact, namely the investment scheme and fraud allegedly perpetrated by APL and other defendants who participated in the investment scheme. Plaintiffs argue that while U.S. Bank's actions do not rise to a level sufficient to create liability under RICO or security law, U.S. Bank's actions nonetheless were used in facilitating the fraud that is alleged to have been perpetrated by other defendants on plaintiffs.

In support of its position, U.S. Bank directs the court's attention to this court's decision in *Schuster v. Anderson*, 378 F. Supp. 2d 1070 (N.D. Iowa 2005). Plaintiffs respond that the facts in *Schuster* are clearly distinguishable from those in this case and that the *Schuster* decision does not support U.S. Bank's position here. A review of the *Schuster* decision bears out plaintiffs' assertions. In *Schuster*, plaintiff investors brought suit against a bank, investment advisors, and accountants alleging that some of the defendants perpetrated a scheme to defraud them by inducing them to make certain investments in entities to which some of the defendants had an undisclosed interest. *Id.* at 1078-79. Plaintiffs alleged twenty causes of action, including RICO claims asserted by some, but not all, of the plaintiffs. *Id.* at 1076. In addition to the RICO claims, plaintiffs asserted a variety of state law claims, including three counts for professional negligence in the preparation of tax returns. The defendants named in the professional negligence claims moved for dismissal of those claims on the basis of lack of supplemental jurisdiction, arguing that the professional negligence claims were unrelated to the alleged fraudulent schemes which were at the center of the RICO claims. *Id.* at 1115. The court summarized plaintiffs' argument in response as follows:

> The plaintiffs' arguments as to why the court has supplemental jurisdiction over the Carl Anderson defendants can be described as a "trickle down" effect: the allegations against the Anderson defendants in Count I are loosely related to the RICO claims; Count II against both the Anderson defendants and the Carl Anderson defendants is related to Count I as Schuster's individual tax returns (basis of Count I) and Schuster Co.'s tax returns (basis of Count II) overlap in some regard; therefore, Count II is loosely predicated on the RICO claims; and finally, Count III should be tried with Counts I and II under principles of economy and convenience.

*Id.* at 1120. The court dismissed Counts II and III, but not Count I. *Id.* at 1120-22. In reaching this result, the court observed that "Counts II and III involve the preparation of tax returns by parties not part of the RICO claims forming this court's original jurisdiction, and *for parties that are also not a part of the RICO claims.*" *Id.* at 1121. Moreover, the court rejected plaintiffs' assertion that Count II was connected to the RICO claims due to its connection to Count I, which the plaintiffs alleged was connected to the RICO claims, finding such an assertion "far to nebulous to provide such a 'discernable overlap'—especially in this instance where neither the Carl Anderson defendants, Schuster Co. or LTT are parties to the federal RICO claims forming this court's jurisdiction." *Id.* On the other hand, the court denied defendants' motions to dismiss Count I, concluding:

> At first glance it is evident that Count I is unlike Counts II and III in that it encompasses more than the failure to properly prepare Schuster's tax returns, but also includes negligence in failing to properly inform Schuster of the tax consequences of investments and loans the Anderson defendants recommended—the same investments and loans that comprise the circumstance constituting fraud in the RICO claims.

*Id.* at 1122.

Here, the claims against U.S. Bank more closely resemble Count I in *Schuster*, which the court did not dismiss, than Counts II and III, which the court dismissed. In reaching this conclusion, the court is mindful of the Third Circuit Court of Appeals's observation that, "[i]n trying to set out standards for supplemental jurisdiction and to apply them consistently, we observe that, like unhappy families, no two cases of supplemental jurisdiction are exactly alike." *Lyon v. Whisman,* 45 F.3d 758, 760 (3rd Cir. 1995) (quoting *Nanavati v. Burdette Tomlin Memorial Hosp.,* 857 F.2d 96, 105 (3d Cir. 1988), *cert. denied,* 489 U.S. 1078 (1989)). The allegations against U.S. Bank are broader than just the bank's failure to follow federal reporting standards and include allegations that the bank "went so far as to misrepresent and disguise Timothy Bumgarner's personal bank statements as being American Pallet Leasing Inc.'s bank statements, when they were not, commencing in August 2004." First Am. Complaint at ¶ 132. These disguised bank statements, in turn, were incorporated into the reports filed with the SEC in August 30, 2004, and subsequently were relied upon by more than 50 percent of the plaintiffs in making the decision to purchase nearly $2,000,000 in APL stock. Thus, U.S. Bank's actions are alleged to have facilitated Timothy Bumgarner's scheme to defraud plaintiffs through misrepresentations in APL's financial documents. Accordingly, the federal-law claims against APL, Timothy Bumgarner and other defendants and the state-law claims against U.S. Bank "derive from a common nucleus of operative fact" and are such that would ordinarily be expected to be brought in a single lawsuit. Consequently, the court has supplemental jurisdiction over all of plaintiffs' claims against U.S. Bank raised in the First Amended Complaint. *OnePoint Solutions, L.L.C. v. Borchert,* 486 F.3d 342, 350 (8th Cir. 2007).

U.S. Bank, alternatively, argues that the state law claims against it should be dismissed pursuant to 28 U.S.C. § 1367(c)(3), which permits a federal district court to

decline to exercise supplemental jurisdiction where all the claims over which the district court had original jurisdiction have been dismissed. Under 28 U.S.C. § 1367, a federal district court "may decline to exercise supplemental jurisdiction" if-

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). This subsection gives a court the discretion to reject jurisdiction over supplemental claims, "but only to a point." *McLaurin v. Prater*, 30 F.3d 982, 985 (8th Cir. 1994). "The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein." *Id*. Thus, where the case clearly fits within one of the subsections listed above, the court may decline to exercise supplemental jurisdiction. *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1287 (8th Cir. 1998); *McLaurin*, 30 F.3d at 985; *Packett v. Stenberg*, 969 F.2d 721, 726-27 (8th Cir. 1992).

Although U.S. Bank does not indicate which specific subsection it believes this case allegedly fits, since all claims over which this court has original jurisdiction have been dismissed, the court infers that U.S. Bank's argument is grounded on the third category, 28 U.S.C. § 1367(c)(3). When determining whether a court should exercise supplemental jurisdiction, courts must balance the interests of judicial economy, convenience, fairness, and comity. *See Quinn v. Ocwen Federal Bank FSB*, 470 F.3d 1240, 1249 (8th Cir. 2006); *Barstad v. Murray County*, 420 F.3d 880, 888 (8th Cir. 2005); *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 993 (8th Cir. 1999). "'In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under

the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Barstad*, 420 F.3d at 888 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)). This, however, is an unusual case where jurisdiction should be retained. After considering "judicial economy, convenience, fairness and comity," the court finds it appropriate to exercise supplemental jurisdiction over the state law claims against U.S. Bank. First, retaining the state law claims promotes judicial economy. U.S. Bank is not the only defendant named in each of the state law claim counts. Accordingly, the court's retention of jurisdiction of the state law claims against U.S. Bank avoids the appreciable problem of parallel lawsuits in state and federal court and avoids duplication of work and the resulting dissipation of judicial resources. Additionally, it is far more convenient for the parties to have near identical claims resolved in a single forum. Finally, the court's investment of judicial time and resources expended in the case weighs in favor of retaining supplemental jurisdiction over the state law claims against U.S. Bank. *See Grain Land Coop.*, 199 F.3d at 993 (finding that when the district court has invested substantial resources in ruling on summary judgment, it is not an abuse of discretion for the court to exercise supplemental jurisdiction, even when all federal claims are disposed of before trial); *Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 558 (8th Cir. 1989) (concluding that a substantial investment of judicial time and resources may justify a district court's exercise of jurisdiction over state law claims even when all federal claims are dismissed). Therefore, the court will exercise supplemental jurisdiction over the remaining state law claims against U.S. Bank. Accordingly, this portion of U.S. Bank's motion to dismiss is denied.

### B. Motions To Dismiss For Lack Of Personal Jurisdiction

#### 1. Rule 12(b)(2) standards

The court turns next to defendants Frost, the Langley defendants, and the Nichols' respective motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Plaintiffs' First Amended Complaint "must state sufficient facts . . . to support a reasonable inference that [each defendant] may be subjected to jurisdiction in the forum state." *Steinbuch v. Cutler,* 518 F.3d 580, 585 (8th Cir. 2008). "'Once jurisdiction ha[s] been controverted or denied, [plaintiffs] ha[ve] the burden of proving such facts.'" *Dever v. Hentzen Coatings, Inc.,* 380 F.3d 1070, 1072 (8th Cir. 2004) (quoting *Block Indus. v. DHJ Indus., Inc.,* 495 F.2d 256, 259 (8th Cir. 1974)). Plaintiffs need not, however, establish jurisdiction by a preponderance of the evidence until an evidentiary hearing is held, or until trial. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1387 (8th Cir. 1991). For plaintiffs to survive defendants' motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, plaintiffs "'need only make a prima facie showing of jurisdiction,' and may do so by affidavits, exhibits, or other evidence." *Romak USA, Inc. v. Rich,* 384 F.3d 979, 983 (8th Cir. 2004) (quoting *Epps v. Stewart Information. Services Corp.,* 327 F.3d 642, 647 (8th Cir. 2003)). When examining plaintiffs' prima facie showing, the court "must view the evidence in the light most favorable to [plaintiffs] and resolve factual conflicts in its favor." *Id.* at 983-84.

#### 2. Nationwide service of process

With respect to Frost, the Langley defendants and the Nichols' motions to dismiss, plaintiffs assert that RICO § 1965(b), as well as § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, creates nationwide service of process. The RICO statute provides, in pertinent part:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965.

Although the Eighth Circuit Court of Appeals has yet to weigh in on the issue, seven federal circuit courts of appeals have held, and another, the Third Circuit Court of Appeals, has implied, that RICO § 1965(b) authorizes nationwide service of process. *See FC Inv. Group LEDYARD COOP v. IFX Markets, Ltd.,* 529 F.3d 1087, 1099 (D.C. Cir. 2008); *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1230-31 (10th Cir. 2006); *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.,* 333 F.3d 763, 768 (7th Cir. 2003); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 71-72 (2d Cir. 1998); *Brink's Mat Ltd. v. Diamond,* 906 F.2d 1519, 1521 (11th Cir. 1990); *Combs v. Bakker,* 886 F.2d 673, 675 (4th Cir. 1989); *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671-72 (7th Cir. 1987); *Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 538-39 (9th Cir. 1986); *see also United States v. Contents of Accounts Nos. 3034504504 & 144-07143,* 971 F.2d 974, 980 (3d Cir. 1992) (dicta noting that "Congress has expressly provided for nationwide service of process in the civil Racketeer Influenced and Corrupt

Organizations Act . . ."), *cert. denied*, 507 U.S. 985 (1993).[9] The right to nationwide service, however, is not unlimited. *See Butcher's Union Local No. 498,* 788 F.2d at 539 (noting that "the right to nationwide service in RICO suits is not unlimited."); *see also PT United Can Co.,* 138 F.3d at 71 (finding "that § 1965 does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found."). Rather, the majority of the federal circuit courts of appeals have concluded that all sections of § 1965 must be read "in a way to give that renders a coherent whole" and that a district court has jurisdiction to entertain a civil RICO claim only where personal jurisdiction, based on minimum contacts, is first established as to at least one defendant. *See FC Inv. Group L.C.,* 529 F.3d at 1099 (quoting *PT United Can Co.,* 138 F.3d at 71-72); *Cory,* 468 F.3d at 1229; *Lisak,* 834 F.2d at 671; *Butcher's Union Local No. 498,* 788 F.2d at 538. Once the plaintiff has established personal jurisdiction over at least one defendant under § 1965(a), the nationwide service of process provision of § 1965(b) permits the plaintiff to bring other nonresident defendants before a single court. *See FC Inv. Group L.C.,* 529 F.3d at 1099; *Cory,* 468 F.3d at 1229; *PT United Can Co.,* 138 F.3d at 71-72; *Lisak,* 834 F.2d at 671; *Butcher's Union Local No. 498,* 788 F.2d at 538.

Here, it cannot be disputed that at least one RICO defendant is subject to personal jurisdiction in Iowa. Defendant APL was originally incorporated under the laws of the State of Iowa and maintained its principal place of business in Cedar Rapids. Following

---

[9]The Fourth Circuit Court of Appeals and the Eleventh Circuit Court of Appeals have held that RICO § 1965(d) is the relevant subsection. *See ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 626-27 (4th Cir. 1997), *cert. denied,* 523 U.S. 1048 (1998); *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 942 (11th Cir. 1997). No party in this case has argued that the court should apply the minority rule advanced by these two circuits.

the reverse merger with Literary Playpen, Inc., APL's corporate offices continued to be located in Cedar Rapids, Iowa. From there, APL solicited investment funds from plaintiffs. Accordingly, defendant APL is clearly subject to both general and specific personal jurisdiction in Iowa. Because the action against defendant APL is properly before this court, the court has jurisdiction over the other defendants, pursuant to § 1965(b), who are alleged to be part of the RICO enterprise, including the Langley defendants and defendants Frost and the Nichols. The Nichols argue that even if the RICO statute authorizes nationwide service of process, the court's exercise of personal jurisdiction over them cannot be based on plaintiffs' RICO allegations against them because the RICO claims all fail to state a claim upon which relief can be granted. A Rule 12(b)(2) motion to dismiss, however, is not a proper motion for such an attack on the RICO claims in this case. Rather, such an argument falls within the scope of Federal Rule of Civil Procedure 12(b)(6). Accordingly, those portions of Frost, the Langley defendants and the Nichols' motions to dismiss which seek dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2) are denied.[10]

---

[10]Even if the Eighth Circuit Court of Appeals were to conclude that the RICO statute does not provide for nationwide service of process, the Eighth Circuit Court of Appeals has recognized that § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, authorizes nationwide service of process. *See Ocepek v. Corporate Transp., Inc.*, 950 F.2d 556, 557 n.1 (8th Cir. 1991) ("Indeed, in some instances Congress has provided for nationwide service of process, see, *e.g.,* § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1988), and no one supposes that this provision is constitutionally infirm."); *see also Warfield v. Alaniz*, 569 F.3d 1015, 1029 (9th Cir. 2009); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 665 n.15 (6th Cir. 2005); *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 369 (3rd Cir. 2002); *Robinson Eng'g Co. Pension Plan and Trust v. George*, 223 F.3d 445, 449 (7th Cir. 2000); *Busch v. Buchman, Buchman & O'Brien Law Firm,* 11 F.3d 1255, 1258 (5th Cir. 1994); *United Liberty Life Ins. co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993). Under § 78aa, the

(continued...)

### C. Motions To Dismiss For Failure To State A Claim

Defendants U.S. Bank, the Langley defendants, the Nichols, Frost, the Bumgarners, and Gersten Savage each seek dismissal of the claims asserted against them for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). After reviewing the standards for a 12(b)(6) motion to dismiss, the court will address the specific issues raised by defendants' motions. Because of the overlap in the issues raised in the parties' motions, the court will proceed by addressing the issues *seriatim*.

### 1. Rule 12(b)(6) standards

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss on the basis of "failure to state a claim upon which relief can be granted."[11] In its decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court

---

[10](...continued)
Nichols' averments that they are citizens of Texas and Frost's assertion that he is a resident of New York are sufficient to give this court personal jurisdiction over them. *See Warfield*, 569 F.3d at 1029 ("'[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court.'") (quoting *Securities Investor Prot. Corp. v. Vigman,* 764 F.2d 1309, 1316 (9th Cir. 1985)); *Busch,* 11 F.3d at 1258 ("[W]hen a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States.").

[11]Effective December 1, 2007, Federal Rule of Civil Procedure 12 was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." FED. R. CIV. P. 12, advisory committee's note. The advisory committee notes make it clear that the "changes are to be stylistic only." *Id.* The stylistic changes to Rule 12(b)(6) are in fact minimal, as Rule 12(b)(6) continues to authorize a motion to dismiss "for failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Thus, this amendment did not change the standards for a Rule 12(b)(6) motion.

revisited the standards for determining whether factual allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004) (hereinafter Wright & Miller) (" [T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the ASSUMPTION THAT ALL THE allegations in the complaint are true (even if doubtful in fact), see, *e.g.*, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic*, 550 U.S. at 555-56 (footnote omitted); *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (instructing that "short and plain statement" requirement "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation."). Thus, the Eighth Circuit Court of Appeals has recognized that, under *Bell Atlantic*, "To survive a motion to dismiss, a complaint must contain factual allegations sufficient 'to raise a right to relief above the speculative level. . . .'" *Parkhurst v. Tabor*, 569 F.3d 861, 865 (8th Cir. 2009) (quoting *Bell Atlantic*, 550 U.S. at 555). To put it another way, "the complaint must allege 'only enough facts to state a claim to relief that is plausible on its face.'" *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 387 (8th Cir. 2009) (quoting *Bell Atlantic*, 550 U.S. at 570); *accord Iqbal*, 129 S. Ct. at 1949 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'") (quoting *Bell Atlantic*, 550 U.S. at 557).

Nevertheless, the court must still "accept as true the plaintiff's well pleaded allegations." *Parkhurst*, 569 F.3d at 865 (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)); *B&B Hardware, Inc.*, 569 F.3d at 387 ("[W]e 'assume[ ] as true all factual allegations of the complaint'" (quoting *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007)). The court must also still "construe the complaint liberally in the light most favorable to the plaintiff." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (post-*Bell Atlantic* decision). On the other hand, "[w]here the allegations show on the face of the complaint that there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is [still] appropriate." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997), for this standard in a discussion of Rule 12(b)(6) standards in light of *Bell Atlantic*).

## 2. *Pleading fraud under Rule 9(b)*

Because defendants challenge some of plaintiffs' fraud based claims on the ground that plaintiffs have failed to plead those claims with sufficient particularity as required by Federal Rule of Civil Procedure 9(b),[12] the court will review the standards required under Rule 9(b). This court has articulated the standards for pleading fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure in a number of prior decisions. *See Remmes v. International Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1087-88 (N.D. Iowa 2005); *Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1086 (N.D. Iowa 2005); *Iowa Health Sys. v. Trinity Health Corp.*, 177 F. Supp. 2d 897, 914 (N.D. Iowa 2001); *Wright v. Brooke Group, Ltd.*, 114 F. Supp. 2d 797, 832-33 (N.D. Iowa 2000); *Doe v. Hartz*, 52 F. Supp.2d 1027, 1055 (N.D. Iowa 1999); *Brown v. North Cent. F.S., Inc.*, 987 F. Supp. 1150, 1155-57 (N.D. Iowa 1997); *Brown v. North Cent. F.S., Inc.*, 173 F.R.D. 658, 664-65 (N.D. Iowa 1997); *North Cent. F.S., Inc. v. Brown*, 951 F. Supp. 1383, 1407-08 (N.D. Iowa 1996); *DeWit v. Firstar Corp.*, 879 F. Supp. 947, 970 (N.D. Iowa 1995). Thus, only a brief discussion of these matters is required here.

Rule 9(b) of the Federal Rules of Civil Procedure "'requires a plaintiff to allege with particularity the facts constituting the fraud.'" *Brown*, 987 F. Supp. at 1155 (quoting *Independent Business Forms v. A-M Graphics*, 127 F.3d 698, 703 n.2 (8th Cir. 1997)).

---

[12]Federal Rule of Civil Procedure Rule 9(b) provides as follows:

> (b) **Fraud, Mistake, Condition of the Mind**. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b).

"'When pleading fraud, a plaintiff cannot simply make conclusory allegations.'" *Id.* (quoting *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir. 1997)). Rather, Rule 9(b) requirements "'mean[] the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, (8th Cir. 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941 (1990)). In *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639 (8th Cir. 1995), the Eighth Circuit Court of Appeals explained:

> Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "'Circumstances' include such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S. Ct. 527, 78 L. Ed.2d 710 (1983). Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir. 1985), conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule. *In re Flight Transp. Corp. Sec. Litig.*, 593 F. Supp. 612, 620 (D. Minn. 1984).

*Commercial Property*, 61 F.3d at 644; *see United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) ("To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."); *Roberts*, 128 F.3d at 651 (noting that factors a court should examine in determining whether the "circumstances" constituting fraud are stated with particularity under Rule 9(b)

"include the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud."). However, the Eighth Circuit Court of Appeals has also noted that this rule of pleading is to be interpreted "'in harmony with the principles of notice pleading.'" *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)). That is, "[a]lthough a pleading alleging fraud need not provide anything more than notice of the claim, it must contain 'a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.'" *Id.* (quoting *Abels*, 259 F.3d at 920).

### 3.    *Analysis of civil RICO claims*

Plaintiffs allege civil RICO violations against defendants under §§ 1962 (c), (a), and (d), in Counts 1, 2 and 3, respectively.  These sections provide:

> (a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding

securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

. . . .

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1962(a),(c), and (d); *see H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232-33 (1989) ("RICO renders criminally and civilly liable 'any person' who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering activity,' § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' § 1962(c), or, finally, who conspires to violate the first three subsections of 1962. § 1962(d).").

The Eighth Circuit Court of Appeals has observed that "'[t]he major purpose behind RICO is to curb the infiltration of legitimate business organizations by racketeers.'" *Sinclair v. Hawke*, 314 F.3d 934, 944 (8th cir. 2003) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 990 (8th Cir. 1989)). The court of appeals, however, has cautioned that a court's focus must be "to ensure that RICO's severe penalties are limited to 'enterprises consisting of more than simple conspiracies to perpetrate the acts of

racketeering.'" *United States v. Davidson*, 122 F.3d 531, 534 (8th Cir.) (quoting *United States v. Bledsoe*, 674 F.2d 647 (8th Cir. 1982)), *cert. denied*, 522 U.S. 1034 (1997).

The Langley defendants contend that plaintiffs' RICO claims are barred by § 107 of the Private Securities Litigation Reform Act of 1965 ("PSLRA") because those claims are all based on securities fraud as predicate acts. In 1995, Congress enacted the PSLRA, Pub.L. No. 104-67, 109 Stat. 737 (1995), which amended RICO by restricting the type of conduct that could qualify as a predicate act. Congress enacted the PSLRA in response to a perceived harm to securities markets from frivolous private federal securities lawsuits. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006). The PSLRA provided more stringent procedural and substantive requirements on such lawsuits. *See Tellabs, Inc.*, 551 U.S. at 313; *Dabit*, 547 U.S. at 81-82. Section 107 of the PSLRA amended 18 U.S.C. § 1964(c), to provide, in relevant part, as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.*

18 U.S.C. § 1964(c)(emphasis added). Significantly, as the Third Circuit Court of Appeals observed,

> the Conference Committee Report accompanying § 107 states that the amendment was intended not simply "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under

> civil RICO if such offenses are based on conduct that would
> have been actionable as securities fraud."

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3rd Cir. 1999)

(quoting H.R. Conf. Rep. No. 104-369, at 47 (1995)).

Here, each of the moving defendants charged with civil RICO violations is also alleged to have violated §§ 8, 10(b) and Rule 10(b-5) of the 1934 Act and §§ 11, 12, and 18 of the 1933 Act. Plaintiffs concede that actionable securities fraud claims are subject to the PSLRA's bar, but argue that their RICO claims are not barred because some of the alleged conduct constitutes wire fraud and mail fraud but does not constitute securities fraud. Nonetheless, the court notes that plaintiffs offer only a conclusory response to the defendants' contention that their civil RICO claims are based on securities fraud allegations. Defendants contend that, like the plaintiff in *Bald Eagle*, plaintiffs here cannot avoid the PSLRA's bar by pleading mail and wire fraud as predicate acts for their RICO claims. Defendants are correct. In *Bald Eagle*, the plaintiff pleaded mail fraud, wire fraud, and bank fraud as predicate offenses under RICO. The Third Circuit Court of Appeals, in affirming the trial court's dismissal of the RICO claim, concluded that "a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud, and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." *Id.* at 330. Here, all of Plaintiffs' RICO claims are based on allegations in the nature of securities fraud. Specifically all of the moving defendants' alleged conduct occurred in connection with the purchase or sales of APL stock. Accordingly, the court has before it the type of RICO claims which are the subject of the PSLRA bar to prevent plaintiffs from "plead[ing] . . . offenses . . . based on conduct that would have been actionable as securities fraud," *Bald Eagle Area,* 189 F.3d at 327 (quoting H.R. Conf. Rep. No. 104-369 at 47, U.S. Code Cong. & Admin.

News 1995, p. 746).  Therefore, the court will grant defendants' the Langley defendants, the Bumgarners and the Nichols' motions to dismiss the RICO claims and Counts 1, 2, and 3 of the First Amended Complaint are dismissed.

### 4.  *Analysis of securities claims*

### a.  *Section 10(b) and Rule 10b-5 claims*

In Count 8, plaintiffs have alleged claims against, *inter alia*, the Langley defendants, Morrison, Gersten Savage, the Nichols and Frost under § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  Each of these defendants seeks dismissal of the § 10(b) and 10b-5 claims against them for failure to state a claim upon which relief may be granted.

Under § 10(b), it is unlawful for any person, "directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." 15 U.S.C. § 78j(b).  Section 10(b) is not limited to a purchaser or seller of securities, but rather "reaches any deceptive device used 'in connection with the purchase or sale of any security.'" *Id.*

The Securities and Exchange Commission, pursuant to this section, promulgated Rule 10b-5, which states that "[i]t shall be unlawful for any person, directly or indirectly,"

> (a) To employ any device, scheme or artifice to defraud,
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Rule 10b-5 is coextensive in scope with § 10(b). *See Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlantic, Inc.*, 128 S. Ct. 761, 768 (2008) (Rule 10-b encompasses only conduct already prohibited by § 10(b).");see also *SEC v. Zandford,* 535 U.S. 813, 816 n.1 (2002); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214 (1976); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 173 (1994).

The Supreme Court has stressed that § 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Zanford*, 535 U.S. at 1903 (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151 (1972)). This flexibility is necessary to realize the goal of Congress: "'substitut[ing] a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Id.* (quoting *Affiliated Ute,* 406 U.S. at 151).

While allegations of fraud are generally subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, certain aspects of § 10(b) and Rule 10b-5 fall under special pleading standards of the PSLRA. Specifically, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In a § 10(b) private action a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation

or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, L.L.C.*, 128 S. Ct. at 768 (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341-342 (2005)). Accordingly, the Eighth Circuit Court of Appeals has directed that in order to survive a Rule 12(b)(6) motion to dismiss,

> a securities plaintiff must point to:

> > "(1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule;
> > (2) causation, often analyzed in terms of materiality and reliance;
> > (3) scienter on the part of the defendants; and
> > (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security."

*Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002)). A § 10(b) private right of action does not extend to aiders and abettors. *Stoneridge Inv. Partners, L.L.C.*, 128 S. Ct. at 769; *Central Bank of Denver, N.A,* 511 U.S. at 177.[13] Rather, "[t]he conduct of a secondary actor must satisfy each of the elements or preconditions for liability. . ." *Stoneridge Inv. Partners, L.L.C.*, 128 S. Ct. at 769.

### i. *The Langley defendants*

Here, the Langley defendants contend that plaintiffs have not pleaded facts creating a strong inference of scienter, "i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc.,* 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 and n.12 (1976)). Plaintiffs respond that this element has been properly pleaded.

---

[13]In § 104 of the PSLRA, prosecution of aiders and abettors falls to the SEC. 15 U.S.C. § 78t(e); *see Stoneridge Inv. Partners, L.L.C.*, 128 S. Ct. at 769.

The Eighth Circuit Court of Appeals has instructed that:

> Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity. *See K-tel.*, 300 F.3d at 893-94. The relevant inquiry is "whether *all* the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any allegation, scrutinized in isolation meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2502, 168 L. Ed. 2d 179 (2007).

*Cornelia I. Crowell GST Trust*, 519 F.3d at 782; *see Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) (quoting *Cornelia I. Crowell GST Trust*, 519 F.3d at 782). Moreover, "[n]ot only must a plaintiff state with particularity facts giving rise to an inference of scienter that is strong when viewed in isolation, the inference "'must be more than merely plausible or reasonable-it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*.'" *In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008) (emphasis in original) (quoting *Tellabs, Inc.*, 551 U.S. at 314). As one court of appeals has observed, "To judges raised on notice pleading, the idea of drawing a 'strong inference' from factual allegations is mysterious." *Makor Issues & Rights, Ltd. v. Tellabs*, 513 F.3d 702, 705 (7th Cir. 2008).

Plaintiffs argue that a strong inference of scienter is apparent because the Langley defendants continued to violate Generally Accepted Accounting Principles ("GAAP") even though they received notice of falsities in APL's PPM. The Eighth Circuit Court of Appeals has instructed that "[a]llegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P.*, 395 F.3d 851, 855 (8th Cir. 2005); *see Kushner v.*

*Beverely Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) ("Allegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent."); *see also Financial Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 290 (5th Cir. 2006) ("[F]ailure to follow accounting standards, without more, does not establish scienter."); *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1191 (10th Cir. 2003) ("Claims of accounting irregularities or violations of [GAAP] support a claim of scienter only when coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors.") (internal quotation marks omitted); *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir. 1999) ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."); *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").  As the Eighth Circuit Court of Appeals has explained:

> Because GAAP is an "elaborate hierarchy" of sources that accountants consult, rather than a "canonical set of rules," *In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 890 (8th Cir. 2002) (quotation omitted), pleading an amalgam of unrelated GAAP violations, without more, does not give rise to a strong inference of scienter. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 552, 555 (5th Cir. 2007). Without something more, the opposing inference of nonfraudulent intent-that these were mistakes by accounting personnel undetected because of faulty accounting controls-is simply more compelling.

*In re Ceridian Corp. Secs. Litig.*, 542 F.3d at 246.

The Court finds that, even accepting all factual allegations as true and viewing the complaint in its entirety, plaintiffs do not meet the strict pleading requirements for scienter

under the PSLRA as to the Langley defendants. As discussed above, in order to plead securities fraud against an accountant requires more than alleging that the defendant failed to detect and report fraudulent conduct by its client. Although the First Amended Complaint alleges a variety a GAAP violations by the Langley defendants and that their reviews failed to disclose any of the ongoing problems at APL or sound any warning bells, the complaint is bereft of any specific allegations of knowledge on the part of the Langley defendants. Rather, plaintiffs have strung together a series of red flags that allegedly should have alerted the Langley defendants to APL's financial problems. For example, plaintiffs claim that: "Defendants Langley Williams and Daphne Clark had a specialty fraud examiner and were put on alert that the assets and representations made in the PPM were false on September 8, 2004 in an email from Craig Medoff." First Am. Compl. at ¶ 99. This conclusory allegation does not adequately plead scienter under the PSLRA. Nothing in the First Amended Complaint sheds light on what Medoff's email specifically stated, why the information in the email should have been considered by the Langley defendants, or how it would have specifically alerted them about problems with APL's PPM.[14] The allegations in the First Amended Complaint are resoundingly general and amount to a convincing claim of accounting malpractice rather than securities fraud. The PSLRA requires plaintiffs to plead specific facts that give rise to a strong inference of scienter, and conclusory allegations about the Langley defendants' general failure to follow GAAP are clearly insufficient. *See Ferris, Baker Watts, Inc.,* 395 F.3d at 855; *see*

---

[14]Medoff is alleged to have been an officer in Tempus Financial who had previously been banned by the SEC from dealing with publicly traded companies. First Am. Compl. at ¶¶ 112-113. He, Marshall Dooley and Tempus Financial are alleged to "have acted as the investment bankers and investment advisors to APL and were directly involved in structuring the PPM as well as the Reverse Merger documents and all of the misrepresentations contained therein. . ." First Am. Compl. at ¶ 117.

*Kushner*, 317 F.3d at 831. Therefore, the court grants this portion of the Langley defendants' motion to dismiss because plaintiffs have failed to adequately plead scienter. Count 8 of the First Amended Complaint is dismissed as to the Langley defendants.

### ii. *Defendant Morrison*

Defendant Morrison similarly contends that plaintiffs have not pleaded sufficient facts generating a strong inference of scienter on his part. In their response, plaintiffs do not address Morrison's argument that they have failed to adequately plead scienter. As was the case with the Langley defendants, the Court finds that, even accepting all factual allegations as true and viewing the complaint in its entirety, plaintiffs do not meet the strict pleading requirements for scienter with respect to Morrison. Although the First Amended Complaint alleges that Morrison "acted knowingly and with the intent to deceive Plaintiffs so as to induce plaintiffs to invest in APL," First Am. Compl. at ¶ 244, the specific factual allegations contained in the First Amended Complaint regarding Morrison do not give rise to a strong inference that he acted with scienter. Morrison is alleged to have acted as an escrow agent and attorney at law concerning the reverse merger. First Am. Compl. at ¶ 29. In that role he is alleged to have authored "a written opinion saying that all the legal requirements and regulations and SEC and State securities regulations had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock." First Am. Compl. at ¶ 29. Plaintiffs, however, have not alleged that the representations in Morrison's legal opinion were knowingly false. At most, plaintiffs have alleged that Morrison "never matched" the cash he received as an escrow agent with "the number of shares he authorized in his legal opinion to the transfer agents. . ." First Am. Compl. at ¶ 109. While such an allegation may make out a possible clam of legal malpractice, it does not meet the PSLRA's requirement to plead specific facts that give rise to a strong inference of scienter. Therefore, the court grants

this portion of Morrison's motion to dismiss on the ground that plaintiffs have failed to adequately plead that he acted with scienter. Count 8 of the First Amended Complaint is dismissed as to defendant Morrison.

### iii.     *Defendants Frost and the Nichols*

Defendants Frost and the Nichols each make identical arguments in support of this portion of their motions to dismiss; arguing that plaintiffs have failed to plead allegations that they have made any oral or written misrepresentation or omission, that they acted with scienter, or that plaintiffs relied upon their conduct. Plaintiffs contest each of these assertions.

The allegations in the First Amended Complaint regarding Frost and the Nichols are indistinguishable. These defendants are alleged to have "signed Subscription Agreements stating that they were paying cash for free trading stock in APL when in fact they never paid cash." First Am. Compl. at ¶ 221. It is further alleged that they "conspired to intentionally omit" the fact that they had not paid cash for their APL stock. First Am. Compl. at ¶¶ 232. Moreover, it is alleged that these defendants' actions were taken with the intent to deceive plaintiffs and induce them to invest in APL stock, *id.* at ¶ 237, that plaintiffs relied upon these defendants' misrepresentations, *id.* at ¶¶ 238, and suffered economic losses as a result. *Id.* at ¶ 240.

The crux of this portion of these defendants' motions lie in their assertions that their signing of the subscription agreements fails to qualify as a material misrepresentation or omission for the purposes of § 10(b). Defendants, however, have not identified any legal authority for this proposition. For the purposes of a § 10(b) claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed. *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) ("Material information

is 'information that would be important to a reasonable investor in making his or her investment decision.'") (internal citation omitted). The court finds that plaintiffs have sufficiently pled materiality by raising a substantial likelihood that a reasonable investor would not have purchased APL stock upon learning that, contrary to statements made by Frost and the Nichols in their subscription agreements, they, along with other defendants, had been issued approximately 80 percent of all free trading APL stock for little or no consideration. This misrepresentation radically altered the picture of the market for APL stock. Thus, plaintiffs have successfully pled the materiality of Frost and the Nichols' misrepresentations in their stock subscription agreements. Moreover, the court finds that plaintiffs have plead scienter adequately, having set forth with particularity facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness on the part of Frost and the Nichols. Accordingly, this portion of the Frost and the Nichols' respective motions to dismiss are denied.

### iv. *The Bumgarners*

The Bumgarners similarly argue that plaintiffs have failed to plead allegations that they have made any oral or written misrepresentation or omission. Plaintiffs respond that have met this requirement because both Bumgarners were officers, directors and/or senior employees of APL and, as a result, the misrepresentations made by APL in the various SEC filings and investment documents are directly attributable to them. "[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir. 2000). Employees and directors who sign or prepare financial disclosures can be held liable for misstatements and omissions in the disclosures. *Id*. In this case, the First Amended Complaint alleges that the financial reports and statements issued during the

relevant time period contained misrepresentations or omissions because they incorrectly represented the financial situation of APL. Moreover, it is alleged that the Bumgarners assisted in the preparation of the Executive Summary, the CIM, and the PPM. Accordingly, the court finds that the First Amended Complaint adequately pleads that the Bumgarners made material misrepresentations. Therefore, this portion of the Bumgarners' motion to dismiss is denied.

### v. *Defendant Gersten Savage*

Gersten Savage contends that plaintiffs cannot establish their § 10(b) claim against them because they were "minimally involved" with the preparation of the APL and that it was acting in "good faith" when preparing other filings with the SEC. Gersten Savage attempts to substantiate its claims by attaching an affidavit which contains facts not in the First Amended Complaint. Plaintiffs argue that such fact-based argument is inappropriate for a Rule 12(b)(6) motion unless it is converted to a motion for summary judgment. The court agrees. Rule 12(d) provides, in pertinent part, that: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). Even where matters outside of the pleadings are presented to the court, however, a motion to dismiss is not converted into a motion for summary judgment "where the district court's order makes clear that the judge ruled only on the motion to dismiss." *Skyberg v. United Food and Commercial Workers Int'l Union, AFL-CIO*, 5 F.3d 297, 302 n.2 (8th Cir. 1993); *Casazza v. Kiser*, 313 F.3d 414, 418 (8th Cir. 2002) (noting that "a district court does not convert a motion to dismiss into a motion for summary judgment when it does not rely upon an affidavit in dismissing a claim. . ."). The court has wide discretion to determine whether or not to accept the submission of extra-pleading materials and rely upon it, and, as a result, convert a Rule 12(b)(6) motion into a Rule 56 summary

judgment motion. *See Skyberg*, 5 F.3d at 302 n.2 ("A court has wide discretion in electing to consider matters outside the pleadings."); *see also Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir. 2000); *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 44 n. 2 (2d Cir. 1997). Here, Gersten Savage has not requested that its motion to dismiss be converted to summary judgment. Moreover, the circumstances here do not support converting Gersten Savage's motion to dismiss to a motion for summary judgment. Accordingly, the court will not consider matters outside the pleadings and will address Gersten Savage's motion according to the standards of Rule 12(b)(6). Reviewing the four corners of the First Amended Complaint only, the court concludes that plaintiffs have properly alleged a claim under § 10(b) against Gersten Savage. Plaintiffs allege that Gersten Savage prepared several filings for APL for the SEC. First Am. Compl. at ¶ 78. These filings are alleged to have contained numerous misrepresentations. First Am. Compl. at ¶ 58. Plaintiffs further allege that Gersten Savage either did not investigate or verify the accuracy of the representations made in these filings or actually knew about some of the falsities contained in these statements. First Am. Compl. at ¶ 87, 245-247. While allegations of negligent conduct are not sufficient to establish scienter, *see Hochfelder,* 425 U.S. at 215, conduct which rises to the level of severe recklessness may be sufficient to meet the scienter requirement. *K & S P'ship v. Continental Bank, N.A.,* 952 F.2d 971, 978 (8th Cir. 1991). Conduct which will meet this standard is limited to "highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (citing *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1010 (11th Cir. 1985)). Here, plaintiffs have alleged facts that give rise to a strong inference that Gersten Savage departed from the standards of ordinary care to an extraordinary degree and that such

actions presented a danger of misleading buyers of APL stock which should have been so obvious to Gersten Savage that it must have been aware of it. Accordingly, the court finds that the First Amended Complaint adequately pleads a § 10(b) claim against Gersten Savage. Therefore, this portion of the Gersten Savage's motion to dismiss is denied.

### b.  *Section 11 claims*

Count 9 of the First Amended Complaint alleges claims against various defendants, including the Langley defendants, Morrison, Gersten Savage, Nichols and Frost, and the Bumgarners under § 11 of the 1933 Act, 15 U.S.C. § 77k. Each of these defendants seeks dismissal of the § 11 claims against them for failure to state a claim upon which relief may be granted.

Section 11(a) of the 1933 Act provides in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--
>
> > (1) every person who signed the registration statement;
> >
> > (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
> >
> > (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).[15]

---

[15]The term "registration statement" is defined as:

the statement provided for in section 77f of this title, and includes any amendment thereto and any report, document, or memorandum filed as part of such statement or incorporated therein by reference.

15 U.S.C. § 77b(8).  Section 77f, in turn, sets out the method of registration as follows:

Any security may be registered with the Commission under the terms and conditions hereinafter provided, by filing a registration statement in triplicate, at least one of which shall be signed by each issuer, its principal executive officer or officers, its principal financial officer, its comptroller or principal accounting officer, and the majority of its board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board having the power of management of the issuer), and in case the issuer is a foreign or Territorial person by its duly authorized representative in the United States; except that when such registration statement relates to a security issued by a foreign government, or political subdivision thereof, it need be signed

(continued...)

Section 11 "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381 (1983). Section 11 imposes "a stringent standard of liability to ensure that registration statements are prepared in compliance with the disclosure provisions of the Act." *Romine v. Acxiom Corp.,* 296 F.3d 701, 704 (8th Cir. 2002). "To establish a Section 11 claim, a plaintiff must show that he or she bought the security and that there was a material misstatement or omission." *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005); *see Romine,* 296 F.3d at 704. Once these two elements are proven, "[t]he issuer's liability is 'virtually absolute, even for most innocent misstatements.'" *Romine*, 296 F.3d at 704 (quoting *Herman & MacLean*, 459 U.S. at 382).

There is no scienter requirement for a § 11 claim. *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d at 903; *In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 315 (8th Cir. 1997), *cert. denied sub nom. NationsMart Corp. v. Carlon*, 118 S. Ct. 2321 (1998). In addition, the particularity requirements of Federal Rule of Civil Procedure 9(b) are inapplicable to § 11 claims. *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d at 903; *In*

---

[15](...continued)
> only by the underwriter of such security. Signatures of all such persons when written on the said registration statements shall be presumed to have been so written by authority of the person whose signature is so affixed and the burden of proof, in the event such authority shall be denied, shall be upon the party denying the same. The affixing of any signature without the authority of the purported signer shall constitute a violation of this subchapter. A registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered.

15 U.S.C. § 77f(a).

*re NationsMart Corp. Sec. Litig.,* 130 F.3d at 314. Thus, plaintiffs alleging § 11 violations are only required to "comply with the short and plain statement requirements of Rule 8(a)." *Romine,* 296 F.3d at 705.

Claims under section 11 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and in any event no later than three years after the securities in question were offered to the public. 15 U.S.C. § 77m. Section 11's three-year limitation is absolute, and applies whether or not the investor could have discovered the violation. *Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co.,* 32 F.3d 697, 704 (2d Cir. 1994).

### i.    *The Langley defendants*

The Langley defendants challenge plaintiffs' § 11 claims against them on the grounds that they did not prepare or sign a registration statement. The Langley defendants further contend that the First Amended Complaint does not allege that the Langley defendants had knowledge of the falsity of matter prepared or certified by them which was included in a registration statement prior to its issuance. In response, plaintiffs do not direct the court to those portions of the First Amended Complaint which they contend meet § 11's requirements, but instead provide the conclusionary statement that "Plaintiffs' Amended Complaint adequately complies with these requirements for the same reasons Plaintiffs have adequately alleged a violation of Section 10(b)." Plaintiffs' Br. at 22. Plaintiffs' response fails to take into account the acute differences and requirements for claims made under § 10(b) and those under § 11.

Section 11 creates liability only for misstatements or omissions in registration statements; it does not reach all alleged accounting and audit problems. Unlike other § 11 defendants, who are liable for any and all material misstatements or omissions within a

registration statement, an accountant may be liable only for those statements "which purport[ ] to have been prepared or certified by him." 15 U.S.C. § 77k(a)(4); *see also Huddleston,* 459 U.S. at 381 n.11 ("Accountants are liable under Section 11 only for those matters which purport to have been prepared or certified by them."). Plaintiffs have not alleged that the Langley defendants prepared or certified any specific matter in any APL registration statement. Accordingly, the court grants the Langley defendants' motion to dismiss Count 9 as to them.

### ii.    *Defendant Morrison*

Defendant Morrison argues that plaintiffs' § 11 claim against him must be dismissed because he does not fall into any of the limited categories of persons potentially liable under § 11. Alternatively, defendant Morrison contends that plaintiff's § 11 claim against him must be dismissed as time barred. Plaintiffs respond that defendant Morrison may be held liable as an attorney and escrow agent under § 77k(a)(4). Plaintiffs also contend that their claim against Morrison under § 11 is timely.

Morrison argues that he does not fall within any of the categories enumerated in § 11. As noted above, liability under § 11 can only be asserted against a "person who signed the registration statement," 15 U.S.C. § 77k(a)(1); a "person who was a director of . . . the issue at the time of the filing of the part of the registration statement with respect to which his liability is asserted," *id.* at § 77k(a)(2); a "person who, with his consent, is named in the registration statement as being or about to become a director," *id.* at § 77k(a)(3); "accountant[s], engineer[s], . . . appraiser [s]" or other professionals who have prepared or certified the registration statement or materials delivered in connection with the registration statement, *id.* at § 77k(a)(4); and "underwriters" of the subject security, *id.* at § 77k(a)(5). In their resistance, plaintiffs argue only that Morrison is liable under 15 U.S.C. § 77k(a)(4) because of his role as an attorney and escrow agent.

Plaintiffs, however, cite no authority which would support such an extension of § 11 liability. Although plaintiffs have alleged that Morrison gave a legal opinion regarding some aspect of the reverse merger transaction, there are no allegations that Morrison's opinion was prepared in connection with a registration statement, or that he prepared or certified any portion of a registration statement. Accordingly, the court concludes that Morrison does not fall within one of the categories of proper § 11 defendants and grants his motion to dismiss plaintiffs' § 11 claim against him.[16]

### iii. Defendants Frost and the Nichols

Defendants Frost and the Nichols' argument regarding plaintiffs' § 11 claim against them is nearly identical to the one advanced by Morrison, namely that plaintiffs' § 11 claim against them must be dismissed because none of these defendants fall within any of the limited categories of persons potentially liable under § 11. Unlike, Morrison, who as an attorney, at least had the potential to fall within § 77k(a)(4), there is no indication in the First Amended Complaint that Frost or either of the Nichols is a "person[s] whose profession gives authority to a statement made by him. . . ." 15 U.S.C. § 77k(a)(4). Moreover, there is no allegation that Frost or either of the Nichols signed any registration statement, was a "person who was a director of . . . the issue at the time of the filing of the part of the registration statement with respect to which his liability is asserted," a "person who, with his consent, is named in the registration statement as being or about to become a director," or was an underwriter. 15 U.S.C. §§ 77k(a)(1)-(3), (5). Therefore, the court concludes that neither Frost nor the Nichols fall within one of the limited groups

---

[16]Because plaintiffs' § 11 claim against Morrison is dismissed on the ground that he does not fall into any of the limited categories of proper § 11 defendants, the court need not reach Morrison's alternative argument that this claim is barred by the statute of limitations.

of proper § 11 defendants and grants Frost and the Nichols' motions to dismiss with respect to Count 9.

### iv.    The Bumgarners

The Bumgarners also contend that plaintiffs' § 11 claims against them must be dismissed because neither falls into any of the limited classes of individuals who can potentially be liable under § 11.  Alternatively, the Bumgarners contend that plaintiffs' § 11 claims against them must be dismissed as time barred.  In their resistance to the Bumgarners' motion, plaintiffs do not state what subsection of § 77k(a) the Bumgarners fall under.  Although the First Amended Complaint alleges that the Bumgarners were officers, directors and/or senior employees of APL "at some period of time from June 2003 through 2006. . .", it does not allege that either Bumgarner was a "person who was a director of . . . the issue *at the time of the filing* of the part of the registration statement with respect to which his liability is asserted," or was a "person who, with his consent, is named in the registration statement as being or about to become a director. . ."  15 U.S.C. §§ 77k(a)(2)-(3) (emphasis added).  Moreover, there are no allegations that either Bumgarner signed the APL registration statement, was a professional who has prepared or certified the registration statement or materials delivered in connection with the registration statement, or were underwriters of APL securities.  15 U.S.C. §§ 77k(a)(1), (4)-(5).  Accordingly, the court concludes that the First Amended Complaint does not allege that either of the Bumgarners come within one of the limited groups of individuals who may be held liable under § 11 and grant their motion to dismiss plaintiffs' § 11 claim against them.

### v.    Defendant Gersten Savage

Gersten Savage contends that it cannot be liable under § 11 because the registration statement it prepared never became effective.  This argument, however, is based on

materials outside the First Amended Complaint. As the court discussed above, the court has chosen not to convert Gersten Savage's motion to dismiss to a motion for summary judgment and, as a result, will not consider matters outside the pleadings. Considering only allegations in the First Amended Complaint, plaintiffs allege that Gersten Savage reviewed APL's registration statement. First Am. Compl. ¶ 83. It is further alleged that APL's registration statement contained a number of misrepresentations. First Am. Comp. at 58, 85. Accordingly, the court concludes that, as alleged in the First Amended Complaint, Gersten Savage falls within § 11(a)(4) as a proper § 11 defendant and denies its motion to dismiss plaintiffs' § 11 claim against it.

### c. Section 12 claims

In Count 10, plaintiffs also bring claims against a number of defendants, including the Langley defendants, Morrison, the Bumgarners, the Nichols, and Frost under § 12 of the 1933 Act, 15 U.S.C. § 77l. Section 12(a)(2) imposes civil liability on the following:

> [a]ny person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission. . . .

15 U.S.C. § 77l(a)(2). Thus, to plead adequately a claim under section 12(a)(2), a plaintiff need only allege that a defendant offered or sold a security to the plaintiff by means of a prospectus or oral communication that was false or misleading with respect to material

facts. *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1541 (8th Cir. 1996); *see* 15 U.S.C, § 77l(a)(2). As the Eighth Circuit Court of Appeals has explained:

> Section 12(2) of the Securities Act of 1933 creates a private remedy for the buyer of a security against the seller for material misrepresentations in connection with the offer and the sale. A "seller" of the security is defined as anyone who offers or sells a security "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication. . . ." 15 U.S.C. § 77 *l* (2). Once a buyer can establish privity with a seller, the buyer need prove only that there was a material misstatement or omission in the prospectus or oral communication. The seller's only defense is that he did not know of the false material misstatement and, in the exercise of due diligence, could not have discovered the misstatement. 15 U.S.C. § 77 *l* (2). The plaintiff need not prove reliance on the prospectus or oral statement. *Austin v. Loftsgaarden,* 675 F.2d 168, 176 n. 16 (8th Cir. 1982). Fraud and scienter are not elements of a § 12(2) claim. *Wigand v. Flo-Tek, Inc.,* 609 F.2d 1028, 1034 (2d Cir. 1979).

*In re NationsMart Corp. Secs. Litig.*, 130 F.3d at 318.

Because a plaintiff need not allege fraud or scienter to make out a § 12 claim, plaintiffs are not required to meet Federal Rule of Civil Procedure 9(b)'s pleading requirements. *In re NationsMart Corp. Sec. Lit.,* 130 F.3d at 319 ("Rule 9(b) does not apply to claims brought under § 12(2) because, as in the case of § 11, proof of fraud and scienter are not necessary for recovery.").

The Langley defendants, Frost, the Nichols and the Bumgarners assert the court should dismiss plaintiffs' § 12(a)(2) claims against them because they neither sold nor offered APL stock to plaintiffs. The Langley defendants, Morrison, the Nichols and the Bumgarners also contend that plaintiffs' claims against them are untimely. The court will take up each of these arguments in turn.

### i. Sellers of APL stock

The Langley defendants, Frost, the Nichols and the Bumgarners contend that they neither sold nor offered APL stock to plaintiffs. Under § 12(a)(2), only a person who "offers or sells a security" can be liable. 15 U.S.C. § 77l(a)(2). However, the First Amended Complaint alleges that:

> 265. These Defendants sold, offered to sell, or solicited the sale of the security to the Plaintiffs.

> 266. The sale occurred by means of a prospectus or oral communication misstating a material fact or omitted a material fact that was necessary to keep the statements that were made from being misleading.

First Am. Compl. at ¶¶ 265-266.

Because § 12 claims are only subject to the notice pleading requirements of Federal Rule of Civil Procedure 8, *see In re NationsMart Corp. Sec. Lit.,* 130 F.3d at 319, the court concludes that plaintiffs have alleged facts that these defendants all either sold or offered APL stock to plaintiffs. Accordingly, this portion of these defendants' respective motions to dismiss are denied.

### ii. Statute of limitations

The Langley defendants, Morrison, the Nichols and the Bumgarners also contend that plaintiffs' § 12(a)(2) claims against them are time-barred. The applicable statute of limitations for § 12(a)(2) claims is governed by § 13 of the 1933 Act, 15 U.S.C. § 77m. Section 13 provides that:

> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title,

> unless brought within one year after the violation upon which
> it is based. In no event shall any such action be brought to
> enforce a liability created under section 77k or 77*l*(a)(1) of this
> title more than three years after the security was bona fide
> offered to the public, or under section 77*l*(a)(2) of this title
> more than three years after the sale.

15 U.S.C. § 77m.  Thus, § 13 contains both a one-year and three-year limitations period, requiring claims to be brought "within one year after the violation" and no more than "three years after the security was bona fide offered to the public." 15 U.S.C. § 77m.  The three-year period is a statute of repose, not of limitations.  *P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92, 99-107 (2d Cir. 2004); *Pacific Mut. Life Ins. Co. v. First RepublicBank Corp.,* 997 F.2d 39, 52 (5th Cir. 1993).

Defendants argue that plaintiffs' § 12(a)(2) claims should be dismissed because they have failed to plead facts establishing that their claims fall within § 13's one-year statute of limitations.  In response, plaintiffs contend that because their § 12(a)(2) claims must be brought within one year of discovery of the untrue statement or omission, there is a fact issue as to when the untrue statements were discovered.  Plaintiffs further argue that § 13's three-year statute of repose period runs from when the security was "bona fide offered to the public," 15 U.S.C. § 77m, and contend that, because the registration statement at issue here did not become effective until February 2005, their claims are timely under the statute of repose.

Determination of when each of the 177 plaintiffs in this case discovered "the untrue statement or the omission", or "such discovery should have been made by the exercise of reason and diligence…", 15 U.S.C. § 77m, are fact driven questions which cannot be answered from review of the First Amended Complaint.  Accordingly, the court concludes that the issue of whether plaintiffs § 12(a)(2) claims are barred by § 13's statute of limitations, is a factual one which cannot be resolved on defendants' motions to dismiss.

*See Dietrich v. Bauer,* 76 F. Supp. 2d 312, 345 (S.D.N.Y.1999) ("[T]he question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide."). With respect to § 13's statute of repose, defendant Morrison contends that "the latest date on which a 'bona fide offer' could have logically occurred was September 16, 2004, which was the date of the transaction." Morrison Br. at 6. In response, plaintiffs contend that the bona fide offer that triggers the repose period is the effective date of the security's registration statement, and the registration statement at issue here did not become effective until sometime in February 2005. As a result, plaintiffs had until February 2008 to file their § 12 claims. Ordinarily, a security is "bona fide offered to the public" at the effective date of the registration statement. *See P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 102-103 (2d Cir. 2004); *Finkel v. Stratton Corp.,* 962 F.2d 169, 173 (2d Cir. 1992). Here, the only registration statement date mentioned in the First Amended Complaint is February 7, 2005. The filing of this case was within three years of such a registration date, making this case timely filed. To the extent there may be, as defendant Morrison argues, an earlier registration date, that date does not appear on the face of the First Amended Complaint. As such, the court further concludes that the issue of whether plaintiffs § 12(a)(2) claims are barred by § 13's statute of repose, is also a factual issue which cannot be resolved on defendants' motions to dismiss. Therefore, this portion of these defendants' respective motions to dismiss are also denied.

### d.    Section 18 claims

Plaintiffs have also brought claims under § 18 of the 1934 Act against several defendants, including the Langley defendants, Morrison, Gersten Savage, the Nichols, Frost, and the Bumgarners.[17] Each of these defendants seeks dismissal of plaintiffs' § 18

---

[17]Although Count 11 of the First Amended Complaint is entitled "Violation of § 18
(continued...)

claims against them. "Section 18 creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act." *In re Supreme Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 283 (3rd Cir. 2006). Section 18(a) states in pertinent part:

> Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.

15 U.S.C. § 78r(a).

In order to state a claim under § 18, plaintiffs must plead that:

> (1) the defendant made or caused to be made a statement of material fact that was false or misleading at the time and in light of the circumstances under which it was made, (2) the statement was contained in a document filed pursuant to the

_____

[17](...continued)
of the Securities and Exchange Act of 1933", because § 18 of the 1933 Act concerns exemption from state regulation of securities offerings and does not create a private right of action, plaintiffs presumably made a typographic error in designating the 1933 Act and intended, instead, to allege a violation of § 18 of the 1934 Act here. Plaintiffs and all of the defendants have treated plaintiffs' claim in Count 11 as being brought under the 1934 Act and the court will proceed under that premise too.

> Exchange Act or any rule or regulation thereunder, (3) reliance on the false statement, and (4) resulting loss to the plaintiff.

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1171 (10th Cir. 2006); *see In re Stone & Webster Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005).

Plaintiffs are required to plead actual, as opposed to presumed, reliance upon a false or misleading statement. *See In re Supreme Specialties, Inc. Secs. Litig.*, 438 F.3d at 283; *see also Howard v. Everex Sys.*, 228 F.3d 1057, 1063 (9th Cir. 2000) (noting that "courts have required a purchaser's actual reliance on the fraudulent statement under § 18(a), as opposed to the constructive reliance, or fraud-on-the-market, theory available under § 10(b)") (citation omitted). "[C]onstructive reliance is not sufficient." *Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir. 1968) ("Reliance on the actual (filed) report is an essential prerequisite for a Section 18 action and constructive reliance is not sufficient."), *cert. denied*, 395 U.S. 903 (1969); *see In re Adelphia Communications Secs. and Derivative Litig.*, 542 F. Supp.2d 266, 268 (S.D.N.Y. 2008); *Ravenswood Inv. Co., L.P. v. Bishop Capital Corp.*, 374 F. Supp.2d1055, 1064 (D. Wyo. 2005); *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 56 (D. Mass. 1995). Thus, in asserting a § 18 claim, a plaintiff must specifically allege actually reading a copy of the document filed with the SEC and relying on misrepresentations contained in it when buying or selling a security. *See Ravenswood Inv. Co., L.P.*, 374 F. Supp.2d at 1064 ("Therefore, a plaintiff bringing suit under § 78r must affirmatively allege that he relied upon fraudulent information contained in a SEC filing when he bought or sold the security at issue."); *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F. Supp. 2d 559, 577 (E.D.N.Y.2002) ("To state a prima facie case pursuant to Section 18(a) of the Exchange Act, Plaintiffs must plead that they purchased or sold a security in actual reliance on a specifically identified

document filed with the SEC."); *In re Am. Cont'l Corp./Lincoln Sav. and Loan Sec. Litig.,* 794 F. Supp. 1424, 1438 (D. Ariz. 1992) ("eyeball reliance" cannot be demonstrated by the class, as the "weight of authority holds that plaintiffs must have actually read a copy of the misleading document to sustain a cause of action"); *see also In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig.,* 794 F. Supp. 1424, 1438 (D. Ariz.1992); *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F. Supp. 518, 525 (S.D.N.Y. 1977); *Lindner Dividend Fund, Inc.,* 880 F. Supp. at 56.

In addition, certain filings are exempted by SEC regulations from the provisions of § 18. *See, e.g.,* 17 C.F.R. § 240.13a-16(c) (exempting Form 6-K furnished in accord with Rule 13a-16); 17 C.F.R. § 240.15d-16(c) (exempting Form 6-K furnished in accord with Rule 15d-16); 17 C.F.R. §§ 240.14a-3(c)-(d), 240.14c-3(b) (exempting annual reports sent to shareholders unless report is integrated into proxy solicitation materials but subjecting the annual report to § 18 liability if it is prepared pursuant to Form 10-K and Form 10-KSB and submitted in satisfaction of the proxy solicitation rules); 17 C.F.R. §§ 240.13a-13(d), 240.15d-13(e) (exempting financial information on Form 10-Q and Form 10-QSB); 17 C.F.R. § 240.12g3-2(b)(4) (exempting certain information filed by foreign private issuers); 17 C.F.R. § 240.17h-2T(c)(5) (exempting certain information filed by brokers or dealers).

Moreover, under § 18, unlike § 10(b), a plaintiff bears no burden of proving that the defendant acted with scienter. *See In re Stone & Webster Sec. Litig.,* 414 F.3d at 193; *Howard,* 228 F.3d at 1063; *McGann v. Ernst & Young,* 102 F.3d 390, 396 (9th Cir. 1996), *cert. denied,* 117 S. Ct. 1460 (1997); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,* 540 F. Supp. 2d 800, 827 (S.D. Tex. 2007).

The Eighth Circuit Court of Appeals has yet to determine if the heightened pleading requirements of Rule 9(b) apply to § 18 claims.[18] It is unnecessary for the court to determine this issue here because plaintiffs' § 18 claims fail on the "actual reliance" prong. Plaintiffs identify misrepresentations in documents filed with the SEC under the 1934 Act. First Am. Compl. at ¶ 58. Plaintiffs also identify the misrepresentations and explain how they were misleading. First Am Compl. at ¶ 58. Plaintiffs, however, go on to make the conclusory allegation that "the plaintiffs relied on the misrepresentations contained [in APL's SEC filings]. First Am. Compl. at ¶ 278. Plaintiffs do not allege actual reliance on any specific misrepresentations themselves. The Third Circuit Court of Appeals affirmed the dismissal of similarly pled § 18 claims in *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d at 283, explaining:

> SSF Plaintiffs alleged cursorily that they "received, reviewed, actually read, and relied upon" various Form 10-Q filings and the 2000 and 2001 Form 10-K filings. For example, regarding the September 28, 2001, Form 10-K, they allege that they "obtained this document at or about the it [sic] was publicly filed with the SEC, and actually read and relied upon it in making their decisions to invest in Suprema common stock." App. at 367. SSF Plaintiffs failed, however, to plead facts probative of their actual reliance on any specific false statements contained in those filings. Given the lack of allegations to show the requisite causal nexus between their purchase of securities and specific statements contained in the SEC filings, we will affirm the District Court's dismissal of SSF Plaintiffs' Section 18 claims.

---

[18]Two Federal Circuit Courts of Appeals have found that the PSLRA does apply to § 18 claims. See *Deephaven Private Placement Trading Ltd.*, 454 F.3d at 1172; *In re Stone & Webster Sec. Litig.*, 414 F.3d at 194.

*Id.* Plaintiffs' § 18 claims are as insufficient as those dismissed in *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d at 283. The court concludes that plaintiffs' allegations fail to plead facts probative of actual reliance on specific false statements in APL's SEC filings. Plaintiffs have pled no facts probative of their actual reliance on specific false statements contained in those filings. Such cursory pleading is insufficient. Thus, plaintiffs' § 18 claims fail to state valid claims for relief. Accordingly, defendants' motions to dismiss are granted as to plaintiffs' § 18 claims.

### e.    *Section 20 claims*

Plaintiffs further have brought claims of controlling person liability under § 20 of the 1934 Act against various defendants, including Morrison, Gersten Savage, the Bumgarners and the Langley defendants. These defendants have moved to dismiss plaintiffs' § 20 claims on two grounds. First, they argue that plaintiffs have failed to establish an underlying prerequisite violation of the 1934 Act. Second, these defendants assert that, in the event the court finds plaintiffs have alleged 10(b) claims, the allegations regarding control are conclusory.

Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The Eighth Circuit Court of Appeals has instructed that:

> [A] control person relationship exists whenever (i) the alleged control person actually exercised control over the general operations of the primary violator and (ii) the alleged control

> person possessed-but did not necessarily exercise-the power to
> determine the specific acts or omissions upon which the
> underlying violation is predicated.

*Farley v. Henson,* 11 F.3d 827, 835 (8th Cir. 1993); *see also Metge v. Baehler,* 762 F.2d 621, 624 (8th Cir. 1985). The Eighth Circuit Court of Appeals has interpreted § 20 to reach persons who have only "some indirect means of discipline or influence" less than actual direction. *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir. 1967). Section 20 is "remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Farley,* 11 F.3d at 836. In accord with a liberal construction of the statute, the Eighth Circuit has held that in order to be secondarily liable under the statute, a controlling person need not actually participate in the alleged violation. *See Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir. 1985). Thus, within this circuit, a control-person relationship exists whenever

> (i) the alleged control person actually exercised control over
> the general operations of the primary violator and (ii) the
> alleged control person possessed-but did not necessarily
> exercise-the power to determine the specific acts or omissions
> upon which the underlying violation is predicated.

*Farley,* 11 F.3d at 835. Moreover, "a Section 20 claim is derivative and requires an underlying violation of the 1934 Act." *In re Hutchinson Tech. Inc. Secs. Litig., NECA-IBEW,* 536 F.3d 952, 961 (8th Cir. 2008); *DeVries v. Prudential-Bache Secs.*, 805 F.2d 326, 329 (8th Cir. 1986). Finally, § 20(a) claims are not subject to the heightened pleading standards of either the Reform Act or Rule 9(b). *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d. 281, 397 n.185 (S.D.N.Y. 2003).

The court finds that control of a primary violator has been pleaded as to Gersten Savage and the Bumgarners, but not as to either Morrison or the Langley defendants. As

discussed above, a § 20 claim is derivative of other claims under the 1934 Act, and without a separate underlying violation of the 1934 Act, a § 20 claim fails as a matter of law. *See In re Hutchinson Tech. Inc. Secs. Litig., NECA-IBEW*, 536 F.3d at 961; *DeVries*, 805 F.2d at 329. Here, plaintiffs have not properly alleged § 10(b) claims against Morrison or the Langley defendants. Accordingly, plaintiffs claims against Morrison and the Langley defendants fail to state a claim under § 20 and must be dismissed. Plaintiffs, however, have properly pled § 10(b) claims against Savage Gersten and the Bumgarners. The First Amended Complaint alleges that these defendants "controlled APL" and "induced the illegal, fraudulent and/or negligent conduct of various other defendants, individuals and/or employees. First Am. Comp. at ¶¶ 280-281. In light of the court's determination that the plaintiffs have sufficiently pled claims against these defendants for violations of § 10(b), and keeping in mind that § 20(a) claims are not subject to the heightened pleading requirements of either the PSLRA or Rule 9(b), the court will not dismiss the plaintiffs' claims against Gersten Savage or the Bumgarners based on liability under § 20(a). The court, therefore, will grant Morrison and the Langley defendants and deny Gersten Savage and the Bumgarners' motions to dismiss with respect to plaintiffs' § 20(a) claims.

### 5. State law claims

In addition to their federal law claims, plaintiffs have also brought state law claims for conversion, professional negligence, breach of fiduciary duty, negligent misrepresentations or nondisclosures, and fraudulent misrepresentations and omissions against various defendants, including Frost, the Nichols, the Langley defendants, Morrison, Gersten Savage and U.S. Bank. The court will take up each of plaintiffs' state law claims in turn, starting with their claims for conversion.

### a. Conversion claims

In Count 5 of the First Amended Complaint, plaintiffs have brought Iowa state common law claims for conversion against assorted defendants, including the Nichols.[19] The Nichols argue that the allegation that they received shares in APL for little or no consideration fails to state a claim for conversion. In response, plaintiffs argue that the First Amended Complaint alleges that the Nichols exercised dominion and control over shares in APL which were rightfully plaintiffs, thereby stating a proper claim for conversion.

Under Iowa law, conversion is "'the wrongful control or dominion over another's property contrary to that person's possessory right to the property. The wrongful control must amount to a serious interference with the other person's right to control the property.'" *Crawley v. Price,* 692 N.W.2d 44, 49 (Iowa Ct. App.2004) (quoting *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 594 (Iowa 1999)); *see Ezzone v.*

---

[19]The Nichols are the only defendants to challenge plaintiffs' conversion claims in their motions to dismiss. While defendant Frost has attacked the viability of plaintiffs' state law claims, he did so for the first time in his reply brief. The inclusion of a new argument in a reply brief is improper as a matter of motion practice in this court, *see* N.D. Ia. L.R. 7.1(g); *Lorenzen v. GKN Armstrong Wheels, Inc.,* 345 F. Supp. 2d 977, 992 n. 4 (N.D. Iowa 2004); *Baker v. John Morrell & Co.,* 263 F. Supp. 2d 1161, 1169 n. 1 (N.D. Iowa 2003), and, in this circuit. *See Republican Party of Minn. v. Kelly,* 247 F.3d 854, 881 (8th Cir. 2001) ("It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief," citing *United States v. Vincent,* 167 F.3d 428, 432 (8th Cir.), *cert. denied,* 528 U.S. 848 (1999); *South Dakota Mining Ass'n v. Lawrence County,* 155 F.3d 1005, 1011 (8th Cir. 1998); *United States v. Davis,* 52 F.3d 781, 783 (8th Cir. 1995); *French v. Beard,* 993 F.2d 160, 161 (8th Cir. 1993), *cert. denied,* 510 U.S. 1051 (1994)); *accord Barham v. Reliance Standard Life Ins. Co.,* 441 F.3d 581, 584 (8th Cir. 2006) ("As a general rule, we will not consider arguments raised for the first time in a reply brief."). Therefore, the court will not consider Frost's challenge to plaintiffs' state law claims against him here.

*Riccardi,* 525 N.W.2d 388, 396 (Iowa 1994); *Kendall/Hunt Publ'g Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988). In order to establish a claim of conversion, a plaintiff must establish a possessory interest in the property. *Kendall/Hunt Publ'g Co.,* 424 N.W.2d at 247. A person may commit conversion "by obtaining the chattel through fraud or by using a chattel, properly within one's control, in an unauthorized manner." *State v. Hollinrake,* 608 N.W.2d 806, 808 (Iowa App.2000) (citing *Restatement (Second) of Torts* §§ 221(b), 228 (1964)).

Here, plaintiffs' allegations against the Nichols' state a claim for conversion under Iowa law. Plaintiffs allege not only that the Nichols received their shares in APL for free, First Am. Compl. at ¶ 35-36, 137, but that plaintiffs had paid for the APL shares received by the Nichols. First Am. Compl. at 138. The Nichols are further alleged to have then sold the shares they received on the open markets. First Am. Compl. at ¶¶ 51 and 139. Therefore, this portion of the Nichols' motions to dismiss are denied.

### b.    *Breach of fiduciary duty claims*

Plaintiffs have also brought Iowa state common law claims for breach of fiduciary duty against a number of defendants, including U.S. Bank and the Langley defendants.[20] Both U.S. Bank and the Langley defendants challenge plaintiffs claim for breach of fiduciary duty on the ground that neither owed plaintiffs a fiduciary duty.

In order to prevail on a breach of fiduciary duty claim, the plaintiff must prove: "'(1) the existence of a fiduciary relationship; and (2) that the [actions taken by the fiduciary] were not beneficial to his or her interests.'" *Vos v. Farm Bureau Life Ins. Co.,* 667 N.W.2d 36, 52 (Iowa 2003) (quoting *Rothwell v. Chubb Life Ins. Co.,* 191 F.R.D. 25, 32 (D.N.H.1998)); *see Kurth v. Van Horn,* 380 N.W.2d 693 (Iowa 1986) (observing that

---

[20]The Langley defendants are not named in the text of Count IV, but that count does state "accountants" in its caption.

a breach of fiduciary duty claim requires proof of the existence of a fiduciary duty owed by the defendant to the plaintiffs, breach of that duty by the defendant, and damages to the plaintiffs proximately caused by the breach). The Iowa Supreme Court has defined a fiduciary duty as follows:

> "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). We have also noted,

> > a confidential relationship "exists when one person has gained the confidence of another and purports to act *1059 or advise with the other's interest in mind. . . . The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

> *Hoffman v. National Med. Enters., Inc.,* 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962)). . . .

> . . . . [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696.

*Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* 522 U.S. 810 (1997); *see Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 647-48 (Iowa 1995) (also recounting indicia of a fiduciary relationship); *Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct. App. 1992) ("'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of

another upon matters within the scope of the relationship,'" quoting *Kurth,* 380 N.W.2d at 695, in turn quoting Restatement (Second) of Torts § 874 cmt. a). "'Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another.'" *Anderson v. Brooke*, 491 N.W.2d 182, 188 (Iowa Ct. App. 1992) (quoting *Irons v. Community State Bank,* 461 N.W.2d 849, 852 (Iowa Ct. App. 1990)); *accord Zumaris,* 538 N.W.2d at 647-48 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other."). These standards are echoed in the Iowa Model Civil Jury Instructions, which direct that

> [A] fiduciary relationship is a relationship of trust and confidence on a subject between two persons. One of the persons is under a duty to act for or give advice to the other on that subject. Confidence is placed on one side, and domination and influence result on the other.
>
> Circumstances that may give rise to the existence of a fiduciary relationship include the acting of one person for another, the having and exercising of influence over one person by another, the placing of confidence by one person in another, the dominance of one person by another, the inequality of the parties, and the dependence of one person upon another. None of these circumstances is more important than another.

Iowa Model Civil Jury Instruction 3200.2 (2002).

### i.    *U.S. Bank*

U.S. Bank challenges plaintiffs breach of fiduciary claim against it, arguing that plaintiffs have failed to allege that they were in a fiduciary, confidential or other special

relationship with U.S. Bank relating to the transactions at issue in the First Amended Complaint. Plaintiffs respond that extraordinary circumstances warrant finding that U.S. Bank owed plaintiffs a duty.

The Iowa Supreme Court has held there is typically no fiduciary relationship between a bank and its customers. *Weltzin v. Cobank, ACB,* 633 N.W.2d 290, 294 (Iowa 2001) (citing Restatement (Second) of Torts § 874 cmt. a, at 300 (1979)); *Engstrand v. West Des Moines State Bank*, 516 N.W.2d 797, 799 (Iowa 1994). Rather, for a fiduciary relationship to exist there must be evidence of "domination and influence" and "a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other ." *Weltzin*, 633 N.W.2d at 294 (citations omitted). Plaintiffs concede that this is the general rule but argue for the court to recognize a duty of care based upon the monitoring and reporting requirements under the Bank Secrecy Act, 31 U.S.C. § 5318 (as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("Patriot Act"), Pub.L. 107-56, § 326).[21] Plaintiffs cite no decision by an Iowa court, or any other court, recognizing such a duty arising from that Act. Rather, courts have uniformly rejected such an argument. *Marlin v. Moody Nat'l Bank, N.A.*, No. 04-4443, 2006 WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006) (holding that under the Bank Secrecy Act "banks do not become guarantors of the integrity of the deals of their customers. It does not create a private right of action and, therefore, does not establish a standard of care"); *Aikens v. Interglobal Mergers and Acquisitions*, No. 05 Civ. 5503, 2006 WL 1878323, at *2 (S.D.N.Y. July 5, 2006) ("[N]either the Bank Secrecy Act nor the Patriot Act affords a private right of action. This Court may not announce a duty of care where the New York

---

[21]While plaintiffs' brief refers to a "Banking Regulations Act", no such act exists. The court assumes that plaintiffs meant to refer to the Bank Secrecy Act.

courts have declined to do so; nor may this Court impose a duty of care based upon a statute that does not permit a private right of action." (citing *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 318 (1995)); *cf. James v. Heritage Valley Fed. Credit Union,* 197 Fed. App'x 102, 106 (3d Cir. 2006) ( "[Plaintiff's] claim under the Bank Secrecy Act, 31 U.S.C. § 5318, does not authorize a private cause of action against a financial institution or its employees."), *cert. denied,* 127 S. Ct. 2253 (2007). Because the Bank Secrecy Act does not permit a private right of action, it follows that it cannot be construed as giving rise to a duty of care flowing to plaintiffs in this case. Accordingly, the court concludes that plaintiffs have not alleged a duty U.S. Bank owed to plaintiffs. Therefore, U.S. Bank's motion to dismiss plaintiffs' breach of fiduciary duty claim is granted.[22]

### ii.    *The Langley defendants*

The Langley defendants make a similar argument, asserting that plaintiffs, as mere stock purchasers, have failed to allege that they were in a fiduciary relationship with the Langley defendants giving rise to a duty. Plaintiffs respond that the lack of a traditional accountant-client relationship does not foreclose the possibility of a special relationship between the Langley defendants and plaintiffs.

Iowa courts have recognized that the requisite duty of care may be found where the defendant is in the profession of supplying information in an advisory nature in a nonadversarial manner, and the supplier of the information knows the recipient of the information intends to rely on the information. *See Ryan v. Kanne*, 170 N.W.2d 395, 402-403 (Iowa 1969) (holding that an accountant owed a duty of care not only to his own

---

[22]Because under Iowa law claims of negligent misrepresentation and fraudulent omission also require defendant to owe a duty to plaintiff, plaintiffs' claims against U.S. Bank for negligent misrepresentation and fraudulent omission fail and are also dismissed.

client, but to a limited and foreseeable class of third parties "for whose benefit and guidance the accountant knows the information is intended."); *see also Fry v. Mount*, 554 N.W.2d 263. 266 (Iowa 1996) (recognizing that the duty has been applied to accountants). In extending liability to professionals such as accountants, Iowa has adopted a middle ground standard between unlimited foreseeability and privity, which is derived from *Restatement (Second) of Torts, § 552 (1977). See Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 124-25 (Iowa 2001). Under this standard, an accountant who supplies information can be liable for negligence only to a known person, or limited class of persons, where the accountant was also manifestly aware of the use to which the information was to be put and intended that it be so used. The duty of accountants to third parties is a relative standard of care which "may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect." Restatement (Second) of Torts, § 552 cmt. a.

Here, accepting all allegations in plaintiffs' First Amended Complaint as true and drawing all reasonable inferences in the light most favorable to plaintiffs, the court concludes that plaintiffs have alleged sufficient facts to support the existence of a fiduciary duty on the part of the Langley defendants. They allege that they relied on the integrity of accounting statements included in SEC filings the Langley defendants prepared. The Langley defendants, in providing their opinion certified statements, publicly held themselves out as an independent professional source of assurance that their financial presentations were accurate and reliable, thereby giving rise to a duty to plaintiffs. Thus, plaintiffs have met their burden of alleging the existence of a fiduciary duty. Accordingly, the Langley defendants' motion to dismiss Count 4 is denied.

> **c.    *Fraudulent misrepresentation and omission claims***

Plaintiffs have also alleged state common law claims for fraudulent misrepresentation and omission against several defendants, including U.S. Bank, the Langley defendants, Morrison, and the Nichols.

In order to establish a claim of fraudulent misrepresentation, plaintiffs must prove:

> (1) [the defendant] made a representation to [the plaintiff]; (2) the representation was false; (3) the representation was material; (4) [the defendant] knew the representation was false; (5) [the defendant] intended to deceive [the plaintiff]; (6) [the plaintiff] acted in reliance on the truth of the representation and was justified in relying on the representation; (7) the representation was the proximate cause of [the plaintiff's] damages; and (8) the amount of damage.

*Midwest Home Distributor, Inc. v. Domco Indus., Ltd.,* 585 N.W.2d 735, 737 (Iowa 1998)(citing *Magnusson Agency v. Public Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 27-28 (Iowa 1997)); *accord Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004); *Gibson v. ITT Hartford Ins Co.*, 621 N.W.2d 388, 400 (Iowa 2001). A fraudulent representation need not be an affirmative statement. Fraud may also arise from a failure to disclose material facts. *Sinnard v. Roach,* 414 N.W.2d 100, 105 (Iowa 1987)(citing *Cornell v. Wunschel,* 408 N.W.2d 369, 374 (Iowa 1987)). The elements of a fraudulent omission are the same as for fraudulent misrepresentation, requiring plaintiffs to establish:

> (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage.

*Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct. App.1992)(citing *Robinson v. Perpetual Servs. Corp.,* 412 N.W.2d 562, 565 (Iowa 1987); *Cornell,* 408 N.W.2d at 374; *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981)). Moreover, the omission must "relate to a material matter known to the party . . . which it is his legal duty to communicate to

the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." *Wilden Clinic Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975); *accord Anderson*, 491 N.W.2d at 188 ("'The misrepresentation or failure to disclose material facts must relate to a material matter which is known by the party. The party must have a legal duty to communicate the information to the other party. Such a duty can arise from a relation of trust, a relation of confidence, inequality of condition and knowledge, or other circumstances as shown by a particular fact situation.'") (quoting *Irons,* 461 N.W.2d at 854).

### i.    *U.S. Bank*

U.S. Bank contends that plaintiffs' fraudulent misrepresentation claim fails because plaintiffs have failed to allege that U.S. Bank made any materially false representations to plaintiffs relating to the transactions at issue in this case. Plaintiffs respond that U.S. Bank provided advice to plaintiffs regarding APL and direct the court's attention to paragraph 135 of the First Amended Complaint. In that paragraph plaintiffs allege:

> The arrangement the Bumgarners had with US bank allowed Timothy Bumgarner and APL to perpetrate the fraud alleged in the Complaint upon the Plaintiffs, some of whom were also customers of US Bank and US Bancorp Investment Services, Inc. and some of the Plaintiff customers relied upon advice from US Bank employees in regard to APL transactions.

First Am. Comp. at ¶ 135. These allegations fail to identify any representation made by U.S. Bank, how that representation was false, who made the representation and to whom it was made, or when. Accordingly, court concludes that plaintiffs have failed to sufficiently plead a claim of fraudulent misrepresentation against U.S. Bank, let alone with with the particularity required by Rule 9(b). Therefore, this portion of U.S. Bank's motion to dismiss is also granted.

### ii.    *The Langley defendants*

On this claim, the Langley defendants argument is that plaintiffs have not alleged with requisite specificity that their representations were false or made with an intent to deceive plaintiffs.  Plaintiffs contend that they have properly pled both of these requirements.  For the reasons stated above in plaintiffs' § 10(b) claim against the Langley defendants, the court concludes plaintiffs have failed to adequately plead the Langley defendants intended to deceive plaintiffs.  Therefore, the court grants this portion of the Langley defendants' motion to dismiss.

### iii.    *Morrison*

Morrison similarly contends that plaintiffs' fraudulent misrepresentation claim against him fails because they have failed to allege that he made a representation to any plaintiff.  Plaintiffs respond that Morrison is alleged to have made a representation in his written opinion regarding the reverse merger in which he opined that all the requirements and SEC regulations had been complied with and that good and valuable consideration had been paid by all the alleged purchasers of the Literary Playpen, Inc. stock.  The court concludes that the alleged misrepresentations in Morrison's opinion letter are sufficient for the purposes of a motion to dismiss.  Such allegations are sufficient since under Iowa law fraudulent misrepresentation claims may be based on statements made to third parties.  *See Clark v. McDaniel*, 546 N.W.2d 590, 593 (Iowa 1996) (holding that no direct contractual relationship is required between the alleged tortfeasor and the person who justifiably relies to his or her detriment on the alleged tortfeasor's representations, because "[u]nder Restatement (Second) of Torts section 533 (1977) [hereinafter Restatement], persons who fraudulently misrepresent the truth can be held liable to third parties if they have a 'reason

to expect' their misrepresentation will be communicated to third parties.").[23]  Therefore, this portion of Morrison's motion to dismiss is denied.

### iv.    The Nichols

The Nichols also attack on plaintiffs' fraudulent misrepresentation/omission claims against them, contending that plaintiffs have failed to allege with any specificity any materially false representations made by them to plaintiffs.[24]  Plaintiffs contend that they have sufficiency alleged misrepresentations made by the Nichols, pointing out that the Nichols signed subscription agreements stating that they were paying cash for APL stock when they had not done so.  These allegations are sufficient because, as discussed above, Iowa recognizes fraudulent misrepresentation claims based on statements made to third parties.  *See Clark*, 546 N.W.2d at 593.  Therefore, this portion of the Nichols' motions to dismiss are denied.

---

[23]Restatement (Second) of Torts § 533 provides as follows:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

Restatement (Second) of Torts § 533 (1977).

[24]The Nichols also argue that to the extent plaintiffs are alleging a fraudulent omission claim against them, plaintiffs have failed to allege a duty owed by them to plaintiffs.  Plaintiffs do not contend that they have brought a fraudulent omission claim against the Nichols.  Therefore, the court need not address this issue at this juncture.

### d.   *Negligent misrepresentation/nondisclosure claims*

In Count 6 of the First Amended Complaint, plaintiffs bring claims of negligent misrepresentation/nondisclosure against a raft of defendants, including Morrison, the Langley defendants, and the Nichols.    This court has explained the genesis and requirements of a claim of negligent misrepresentation under Iowa law as follows:

> The Iowa Supreme Court "first recognized the tort of negligently giving misinformation" in *Ryan v. Kanne,* 170 N.W.2d 395 (Iowa 1969), and since that time, has continued to find the "genesis" of the tort in Restatement (Second) of Torts § 552. *See Sain v. Cedar Rapids Comm. Sch. Dist.,* 626 N.W.2d 115, 123 (Iowa 2001).    Section 552 of the Restatement provides as follows:
>
> > One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> RESTATEMENT (SECOND) OF TORTS § 552(1).    From this "genesis," the Iowa Supreme Court has recognized that, "[a]s with all negligence actions, an essential element of negligent misrepresentation is that the defendant must owe a duty of care to the plaintiff." *Sain,* 626 N.W.2d at 124; *accord Jensen v. Sattler,* 696 N.W.2d 582, 588 (Iowa 2005) ("Absent a special relationship giving rise to a duty of care, a plaintiff cannot establish negligent misrepresentation."). Although the Iowa Supreme Court has recognized that "the Restatement supports a broader view," that court has determined that, under Iowa law, "this duty arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.*

Thus, the elements of the claim are the following: (1) the defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff. *See id.* at 127 ("[L]iability for negligent misrepresentation is limited to harm suffered by a person for whose benefit and guidance the counselor intended to supply the information or knew the recipient intended to supply it and to loss suffered through reliance upon the information in a transaction the counselor intended the information to influence. Additionally, we observe that the tort applies only to false information and does not apply to personal opinions or statements of future intent. Finally, the standard imposed is only one of reasonableness, and the elements of proximate cause and damage must also be shown.") (citations and footnote omitted).

*The Conveyor Co. v. Sunsource Tech. Servs., Inc.*, 398 F. Supp. 2d 992, 1013 (N.D. Iowa 2005). Keeping these requirements in mind, the court turns to the parties' specific arguments regarding plaintiffs' negligent misrepresentation/nondisclosure claims.

### i.    *The Langley defendants*

The Langley defendants' argument on this issue is identical to the one they raised above concerning plaintiffs' breach of fiduciary duty claim, namely that plaintiffs have failed to allege that they owed a duty to plaintiffs. For the reasons discussed above, the court has rejected that assertion. Therefore, this portion of the Langley defendants' motion to dismiss is denied.

### ii.  *Morrison*

Morrison contends that plaintiffs have failed to plead that he is in the business or profession of supplying information to others and therefore have failed to adequately plead a negligent misrepresentation claim against him. Plaintiffs contend that they have adequately plead this element. The First Amended Complaint alleges that Morrison is an attorney and escrow agent who in those capacities "gave a written opinion saying that all the legal requirements and regulations of the SEC and State securities regulations had been met and that good and valuable consideration had been paid by all of the alleged purchasers of the Literary Playpen, Inc. stock." First Am. Compl. at ¶ 29.

In *Sain,* the Iowa Supreme Court explained that, because the necessary duty only arises under Iowa law "when the information is provided by persons in the business or profession of supplying information to others[,] when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, [the court must] distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Sain,* 626 N.W.2d at 124 (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 227 (Iowa 1998); *Fry v. Mount,* 554 N.W.2d 263, 265-66 (Iowa 1996); *Freeman v. Ernst & Young,* 516 N.W.2d 835, 838 (Iowa 1994); *Haupt v. Miller,* 514 N.W.2d 905, 910 (Iowa 1994); *Meier v. Alfa-Laval, Inc.,* 454 N.W.2d 576, 581-82 (Iowa 1990)). More specifically,

> We recognize th[at] [transactions where a defendant is in the business or profession of supplying information to others] justify the imposition of a duty of care because a transaction between a person in the business or profession of supplying information and a person seeking information is compatible to a special relationship. *See Meier,* 454 N.W.2d at 581; *see also* 2 Fowler V. Harper et al., *The Law of Torts* § 7.6, at 412-13

(2d ed.1986) [hereinafter Harper] ("remedy for negligent misrepresentation [is] principally against those who advise in an essentially nonadversarial capacity"). A special relationship, of course, is an important factor to support the imposition of a duty of care under a claim for negligence. *See J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.,* 589 N.W.2d 256, 259 (Iowa 1999). Moreover, a person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to supply it for that purpose. *See Restatement (Second) of Torts* § 552 cmt. a; *see also* Dobbs § 472, at 1350-51; 2 Harper § 7.6, at 405-06. Such a person is also in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect. *Restatement (Second) of Torts* § 552 cmt. a. Under these circumstances, the foreseeability of harm helps support the imposition of a duty of care. *See J.A.H. ex rel. R.M.H.,* 589 N.W.2d at 258 (reasonable foreseeability of harm to person who is injured is a factor in deciding whether a legal duty exists). Additionally, the pecuniary interest which a person has in a business, profession, or employment which supplies information serves as an additional basis for imposing a duty of care. *See Restatement (Second) of Torts* § 552 cmts. c, d. On the other hand, information given gratuitously or incidental to a different service imposes no such duty. *See id.; see also Meier,* 454 N.W.2d at 581-82 (defendant in business of selling and servicing merchandise, not supplying information).

*Sain,* 626 N.W.2d at 124-25 (footnote omitted).

The Iowa Supreme Court has recognized attorneys may fall within the class of profession subject to liability under the § 552 cause of action for negligent misrepresentation. *See Ryan,* 170 N.W.2d at 402-403 (recognizing that § 552 liability "may be applicable in other recognized professions, such as abstracters and attorneys."). Other court have explicitly so held. *See First Nat'l Bank of Durant v. Trans Terra Corp.*

*Int'l*, 142 F.3d 802, 808-809 (5th Cir. 1998) (applying Texas law); *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 915-16 (6th Cir. 1991) (applying Michigan law); *see also F.E. Appling Interests v. McCamish, Martin, Brown & Loefler*, 953 S.W2d 405, 408 (Tex. App. 1997). Here, accepting all allegations in plaintiffs' First Amended Complaint as true and drawing all reasonable inferences in the light most favorable to plaintiffs, the court concludes that plaintiffs have alleged sufficient facts that Morrison is in a profession of supplying information to others. Therefore, this portion of Morrison's motion to dismiss is denied.

### iii.      *The Nichols*

In this portion of their motions to dismiss, the Nichols contend that plaintiffs have failed to plead that either of them owed a legal duty to plaintiffs. The Nichols also assert that plaintiffs have failed to adequately plead that plaintiffs reasonably relied upon information received from the Nichols in making their investment in APL stock. Plaintiffs resist this portion of the Nichols' motion, arguing that they have sufficiently alleged all elements of a claim of negligent misrepresentation against the Nichols. Plaintiffs, however, have not directed the court's attention to any case holding that the mere signing of a stock subscription agreement gives rise to a legal duty to other possible purchasers of stock. The court's own efforts have failed to locate such authority. Absent some additional facts establishing some relationship between the Nichols and plaintiffs, the court declines to find that plaintiffs have adequately pleaded that the Nichols owed a duty to them. Therefore, this portion of the Nichols' motions to dismiss are granted.

### e.      *Professional Negligence*

Plaintiffs also have brought claims under the theory of professional negligence against several defendants including Morrison, the Langley defendants, and Gersten Savage. Each of these defendants seeks dismissal of the professional negligence claim

against them. Both Morrison and Gersten Savage assert that plaintiffs have not pled facts which establish that plaintiffs were a direct and intended beneficiary of their services. The Langley defendants, on the other hand, contend that plaintiffs have not pled that they had a duty to plaintiffs, that they breached that duty and that they were the proximate cause of plaintiffs' damages. In responding to these defendants' arguments, plaintiffs assert that because they have alleged fraud allegations against these defendants they may be held liable despite the lack of privity.

### i.   *Morrison and Gersten Savage*

Because Morrison and Gersten Savage raise identical arguments, the court addresses them together. It is well-established that an attorney-client relationship may give rise to a duty, the breach of which may be legal malpractice. *See Ruden v. Jenk*, 543 N.W.2d 605, 610 (Iowa 1996). In a legal malpractice case, the plaintiff generally must demonstrate:

> (1) the existence of an attorney-client relationship giving rise to
> a duty, (2) the attorney, either by an act or failure to act,
> violated or breached that duty, (3) the attorney's breach of duty
> proximately caused injury to the client, and (4) the client
> sustained actual injury, loss, or damage.

*Trobaugh v. Sondag*, 668 N.W.2d 577, 581 n.1 (Iowa 2003); *see also Ruden,* 543 N.W.2d at 610 (Iowa 1996)*; Vande Kop v. McGill,* 528 N.W.2d 609, 613 (Iowa 1995); *Schmitz v. Crotty,* 528 N.W.2d 112, 115 (Iowa 1995); *Dessel v. Dessel,* 431 N.W.2d 359, 361 (Iowa 1988); *Burke v. Roberson,* 417 N.W.2d 209, 211 (Iowa 1987); *see also Kubik v. Burk,* 540 N.W.2d 60, 63 (Iowa Ct. App. 1995); *Benton v. Nelsen,* 502 N.W.2d 288, 291 (Iowa Ct. App. 1993). However, the Iowa Supreme Court has recognized third-party legal malpractice claims "under severely limited circumstances." *Estate of Leonard v. Swift*, 656 N.W.2d 132, 145 (Iowa 2003) (quoting *Brody v. Ruby,* 267 N.W.2d 902, 906 (Iowa 1978)). Such circumstances exist where the third party is "'a direct and intended

beneficiary of the lawyer's services.'" *Estate of Leonard*, 656 N.W.2d at 145 (quoting *Brody,* 267 N.W.2d at 906). Following this rule, Iowa courts have recognized third-party claims by intended beneficiaries of a testamentary instrument. *Schreiner v. Scoville*, 410 N.W.2d 679, 682 (Iowa 1987) ("[A] lawyer owes a duty of care to the direct, intended, and specifically identifiable beneficiaries of the testator as expressed in the testator's testamentary instruments."). In *Estate of Leonard*, the Iowa Supreme Court further recognized that:

> the attorney for a conservator owes a duty to the ward *upon proof of and to the extent* (1) the conservator intends as a primary objective of the lawyer's services that those particular services benefit the ward, i.e., the ward is the direct and intended beneficiary of the lawyer's services; (2) recognition of a duty would not significantly impair the lawyer's performance of his obligations to the conservator; and (3) recognition of such a duty is necessary to ensure enforcement of the attorney's obligations to the conservator.

*Estate of Leonard*, 656 N.W.2d at 146.

Here, plaintiffs have not alleged facts that they were "'a direct and intended beneficiary'" of either Morrison or Gersten Savage's services. See *Estate of Leonard*, 656 N.W.2d at 145; *Brody,* 267 N.W.2d at 906. At most, plaintiffs have alleged that they were secondary beneficiaries of their services. Moreover, no Iowa court has recognized a legal malpractice claim on facts such as are presented in this case. Accordingly, the court concludes that plaintiffs have failed to plead a claim of legal malpractice against either Morrison or Gersten Savage. Therefore, Morrison and Gersten Savage's motions to dismiss are granted as to plaintiffs' claims of professional negligence.

### ii.    *The Langley defendants*

"In a professional negligence action, the plaintiff must prove a duty of care is owed to him or her, breach of that duty, and that the breach caused the plaintiff's damages."

*Rowedder v. Helkenn*, No. 08-0117, 2009 WL 1492558, at *4 (Iowa Ct. App. 2009). For the reasons discussed above, the court has concluded that plaintiffs have alleged that the Langley defendants owed a duty to plaintiffs and that they breached that duty. Plaintiffs have further alleged that the Langley's breach has caused plaintiffs' damages. Accordingly, this portion of the Langley defendants' motion to dismiss is denied.

### f.    *Punitive damages*

Plaintiffs seek punitive damages against all defendants. The Langley defendants, Morrison, Gersten Savage, The Nichols, and the Bumgarners all request dismissal of plaintiffs' claim for punitive damages. Under Iowa law, punitive damages are available to "'punish the party against whom they are awarded and to deter others from similar wrongdoing.'" *Steckelberg v. Randolph*, 448 N.W.2d 458, 462 (Iowa 1989) (quoting *Grefe v. Ross,* 231 N.W.2d 863, 868 (Iowa 1975)). Punitive damages may be awarded for fraud. *See Steckelberg*, 448 N.W.2d at 462*; C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy, Inc.,* 412 N.W.2d 593, 599 (Iowa 1987). To support an award of punitive damages, a tort must be committed with either actual or legal malice. *Parks v. City of Marshalltown,* 440 N.W.2d 377, 379 (Iowa 1989). Actual malice may be shown by such things as personal spite, hatred, or ill-will. *Id.* Legal malice may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another. *Id.* Plaintiffs' claims for punitive damages are clearly contingent on plaintiffs' success on their underlying claims against these defendants. Because the court has not dismissed all of the underlying claims against any of these defendants, the court denies this portion of their respective motions to dismiss.

### D.  Leave To Amend

Plaintiffs ask for leave to amend their First Amended Complaint in the event that the court concludes that their allegations are inadequate. Plaintiffs' briefs, however, do not indicate what, if any, amendments they could make that would cure deficiencies in the First Amended Complaint. Moreover, because plaintiffs have already had one opportunity to amend their pleadings, the court finds that another effort to replead would be futile. Plaintiffs' request for leave to amend the First Amended Complaint is denied.

## III. CONCLUSION

For the reasons addressed above, the court grants U.S. Bank's motion to dismiss and grants in part and denies in part the Langley defendants, Morrison, Gersten Savage, The Nichols, Frost, and the Bumgarners' respective motions to dismiss. Specifically, U.S. Bank's Motion to Dismiss (docket no. 420) is granted as to Counts 4, 6, 7 and 14. The Langley defendants' Motion to Dismiss (docket no. 433) is granted in part and denied in part. It is granted as to Counts 1, 2, 3, 7, 8, 9, 11, and 12 but denied as to Counts 4, 6, 10, 13, and 14. Defendant Morrison's Motion To Dismiss (docket no. 435) is also granted in part and denied in part. It is granted as to Counts 1, 2, 3, 8, 9, 11, 12, and 13, but denied as to Counts 6, 7, 10, and 14. Defendant Gersten Savage's Motion to Dismiss (docket no. 390) is likewise granted in part and denied in part. It is granted as to Counts 1, 2, 3, and 13 but denied as to Counts 8, 9, 12, and 14. The Bumgarners' Motion to Dismiss (docket no. 474) is also granted in part and denied in part. It is granted as to Counts 1, 2, 3, 9, and 11, but denied as to Counts 8, 10, 12, and 14. Defendant Frost's Motion to Dismiss (docket no. 399) is granted in part and denied in part. It is granted as to Counts 1, 2, 3, 9 and 11 but denied as to Counts 8, 10, and 14. The Nichols' motions to dismiss (docket nos. 476 and 478) are also granted in part and denied in part. The

Nichols' motions are each granted as to Counts 1, 2, 3, 6, 9, and 11, but denied as to Counts 7, 8, 10, and 14.

**IT IS SO ORDERED.**

**DATED** this 26th day of August, 2009.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA